UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 19 2015

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 19 2015

CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| AT&T INC., | ) | |
| | ) | |
| *Petitioner*, | ) | **15-1038** |
| | ) | |
| v. | ) | No. 15-_____ |
| | ) | |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondents*. | ) | |

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Rule 15(a) of the Federal Rules of Appellate Procedure, AT&T Inc., on behalf of its price cap carrier affiliates (collectively, "AT&T"), hereby petitions this Court for review of an order of the Federal Communications Commission ("Commission"). *See* Report and Order, *Connect America Fund*, 29 FCC Rcd 15644 (2014) ("*Order*"). The *Order*, a copy of which is attached as Exhibit A to this petition, was released on December 18, 2014, and published in the Federal Register on January 27, 2015 (80 Fed. Reg. 4445). Venue is proper in this Court pursuant to 28 U.S.C. § 2343.

In the *Order*, the Commission, among other things, adopted a new rule (47 C.F.R. § 54.201(d)(3)) that maintains the eligible telecommunications carrier ("ETC") and Lifeline obligations of price-cap carriers, such as AT&T, in high-cost areas in which the price cap carriers receive no support from the Universal Service Fund ("USF"), as well as the Lifeline obligations of those carriers in low-cost areas where the carriers also receive no USF support.

AT&T, which participated in the proceedings below, must comply with 47 C.F.R. § 54.201(d)(3). AT&T is thus aggrieved by the *Order* and has standing to challenge it.

AT&T seeks review on the grounds that this portion of the *Order* is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. AT&T requests that this Court hold unlawful that portion of the *Order*.

Respectfully submitted,

CATHY CARPINO
GARY L. PHILLIPS
LORI A. FINK
AT&T SERVICES, INC.
1120 20th Street, N.W.
Washington, D.C. 20036
(202) 457-3046

SCOTT H. ANGSTREICH
BENJAMIN S. SOFTNESS
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@khhte.com

*Counsel for Petitioner AT&T Inc.*

February 17, 2015

2

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AT&T Inc., ) | |
| ) | |
| ) | |
| *Petitioner*, ) | |
| ) | |
| v. ) | No. 15-_____ |
| ) | |
| FEDERAL COMMUNICATIONS COMMISSION ) | |
| and UNITED STATES OF AMERICA, ) | |
| ) | |
| *Respondents*. ) | |
| ) | |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, petitioner AT&T Inc. ("AT&T") submits the following corporate disclosure statement:

AT&T is a publicly traded corporation that, through its wholly-owned affiliates, is principally engaged in the business of providing communications services and products to the general public. AT&T has no parent company, and no publicly held company owns 10 percent or more of its stock.

Respectfully submitted,

CATHY CARPINO
GARY L. PHILLIPS
LORI A. FINK
AT&T SERVICES, INC.
1120 20th Street, N.W.
Washington, D.C. 20036
(202) 457-3046

SCOTT H. ANGSTREICH
BENJAMIN S. SOFTNESS
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@khhte.com

*Counsel for Petitioner AT&T Inc.*

February 17, 2015

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of February 2015, I served the

foregoing Petition for Review and Corporate Disclosure Statement upon the parties

listed below by first-class mail, postage prepaid, and by electronic mail (as

indicated by asterisk):

SCOTT H. ANGSTREICH

**FEDERAL COMMUNICATIONS
COMMISSION**
Jonathan Sallet*
General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554
Jonathan.Sallet@fcc.gov

**UNITED STATES OF AMERICA**
Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

# Exhibit A

Federal Communications Commission    FCC 14-190

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Connect America Fund | **)** | WC Docket No. 10-90 |
| | **)** | |
| ETC Annual Reports and Certifications | **)** | WC Docket No. 14-58 |
| | **)** | |
| Petition of USTelecom for Forbearance Pursuant to | **)** | WC Docket No. 14-192 |
| 47 U.S.C. § 160(c) from Obsolete ILEC | **)** | |
| Regulatory Obligations that Inhibit Deployment of | **)** | |
| Next-Generation Networks | **)** | |

**REPORT AND ORDER**

**Adopted: December 11, 2014**                    **Released: December 18, 2014**

By the Commission: Chairman Wheeler and Commissioner Rosenworcel issuing separate statements; Commissioners Clyburn and Pai approving in part, dissenting in part and issuing separate statements; Commissioner O'Rielly concurring and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I. INTRODUCTION ................................................................................................................ 1
II. BACKGROUND ................................................................................................................. 9
III. PUBLIC INTEREST OBLIGATIONS ............................................................................. 13
    A. Evolving Speed Obligations ......................................................................................... 13
    B. Term of Support for Price Cap Carriers Accepting Phase II Model-Based Support ...... 30
    C. Flexibility in Meeting Deployment Obligations ........................................................... 33
        1. Interim Deployment Obligations ............................................................................ 36
        2. Number of Locations ............................................................................................. 38
    D. Obligations of Carriers Serving Non-Contiguous Areas that Elect Phase II Frozen
       Support ........................................................................................................................ 45
    E. ETC Obligations as Funding Transitions to New Mechanisms ..................................... 50
IV. ELIGIBILITY OF AREAS FOR PHASE II SUPPORT .................................................... 71
    A. Areas Served By Competitors ...................................................................................... 71
    B. Rural Broadband Experiments ..................................................................................... 82
V. PHASE II TRANSITIONS ................................................................................................. 90
    A. Aligning Connect America Phase II Funding and Calendar Years ................................ 91
    B. Transition Where Model-Based Support is Greater than Connect America Phase I
       Support ........................................................................................................................ 95
    C. Base Support Amount for Transition to Connect America Phase II ............................... 97
VI. REFORMS IN RATE-OF-RETURN STUDY AREAS ...................................................... 99
    A. HCLS Reimbursement Rates under the Cap ................................................................ 101
    B. 100 Percent Overlap Rule .......................................................................................... 115
VII. ACCOUNTABILITY AND OVERSIGHT ...................................................................... 118
    A. Reasonably Comparable Rates Certification for Broadband ....................................... 119

    B.   Monitoring Progress in Meeting Deployment Obligations ...........................................................124
    C.   Reduction in Support for Late Filing ........................................................................................129
    D.   Measures To Address Non-Compliance ....................................................................................139
        1.   Non-Compliance with Deployment Obligations .................................................................142
        2.   Non-Compliance with Reasonably Comparable Pricing Obligations ..................................155
VIII.   PROCEDURAL MATTERS ...............................................................................................................158
    A.   Paperwork Reduction Act Analysis ..........................................................................................158
    B.   Congressional Review Act.........................................................................................................159
    C.   Final Regulatory Flexibility Analysis .......................................................................................160
    D.   Additional Information ..............................................................................................................161
IX. ORDERING CLAUSES...........................................................................................................................163
APPENDIX A—Final Rules
APPENDIX B—Final Regulatory Flexibility Analysis

# I.    INTRODUCTION

1.    With this Report and Order (Order), the Commission takes another momentous stride towards fully implementing a modernized universal service regime capable of meeting consumer demands for 21st century networks.[1]  We finalize the decisions necessary to proceed with the offer of support to price cap carriers in early 2015, thereby paving the way for the deployment of new broadband infrastructure to millions of unserved Americans.  In the coming months, we will turn our attention to finalizing the rules for the Phase II competitive bidding process that will occur in those states where the price cap carrier declines the offer of model-based support.

2.    Throughout the universal service reform process, we have sought to ensure that all consumers "have access to . . . advanced telecommunications and information services"[2] and benefit from the historic technology transitions that are transforming our nation's communications services.  This Report and Order continues down that path.  We adopt several revisions to Connect America Phase II to account for changes in the marketplace since the *USF/ICC Transformation Order* was adopted.  In particular, we revise the minimum speed requirement that recipients of high-cost universal service must offer.  We find that it is in the public interest to require recipients of high-cost support subject to broadband performance obligations to serve fixed locations to provide at least a minimum broadband speed of 10 Mbps downstream.

3.    We adopt targeted changes to the framework established for the offer of model-based support to price cap carriers.  Specifically, we make an adjustment to the term of support, adopt more evenly spaced interim deployment milestones, and conclude that adjustments of up to five percent in the number of locations that must be served with corresponding support reductions are appropriate to ensure that deployment obligations recognize conditions in the real world.  We also forbear from the federal high-cost universal service obligation of price cap carriers to offer voice service in low-cost areas where they do not receive high-cost support, in areas served by an unsubsidized competitor, and in areas where the price cap carrier is replaced by another eligible telecommunications carrier (ETC).

4.    In addition, we address where Phase II support will be available, both for the offer of model-based support to price cap carriers and the subsequent Phase II competitive bidding process.  First,

---

[1] *See Connect America Fund et al.;* WC Docket Nos. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663 (2011) (*USF/ICC Transformation Order and/or FNPRM*) *aff'd sub nom., In re: FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).  Earlier this year, we adopted rules that built on the framework established by the Commission in the *USF/ICC Transformation Order*, and proposed targeted adjustments necessary to ensure that the Commission best utilizing the funds that consumers and businesses pay into the universal service system.  *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order et al., 29 FCC Rcd 7051 (2014) (*April 2014 Connect America Order and/or FNPRM*).

[2] 47 U.S.C. § 254(b)(3).

we will exclude from the offer of Phase II model-based support any census block served by a subsidized facilities-based terrestrial competitor that offers fixed residential voice and broadband services meeting or exceeding 4 Mbps downstream and 1 Mbps upstream (4/1 Mbps), using 3 Mbps downstream/768 kbps upstream (3 Mbps/768 kbps) as a proxy for this standard, as determined by the Wireline Competition Bureau (Bureau) upon completion of the Phase II challenge process.[3]  We also reaffirm the Commission's decision to exclude from the offer of model-based support any census block served by an unsubsidized competitor that meets or exceeds the 3 Mbps/768 kbps performance metrics.[4]  Second, we conclude that those high-cost blocks served by a subsidized carrier that are excluded from the offer of model-based support—including blocks with service meeting or exceeding the new 10 Mbps downstream/1 Mbps upstream (10/1 Mbps) speed requirement—will be eligible for support in the Phase II competitive bidding process.  Third, we conclude that any area served by an unsubsidized facilities-based terrestrial competitor that offers 10/1 Mbps will be ineligible for support in the Phase II competitive bidding process.

5.        In the *Connect America Fund FNPRM*, we sought comment on a number of near-term and longer-term reforms for rate-of-return carriers, including developing and implementing a "Connect America Fund" for rate-of-return carriers.[5]  Although a number of parties have submitted proposals that may have promise, we find that further analysis and development of these proposals is necessary.  We will continue to explore the possibility of a voluntary path to model-based support for those rate-of-return carriers that choose to pursue it.  We also expect to continue to develop the record and act in the coming year on alternatives for those who do not elect to receive model-based support.

6.        In this Order, we focus on near-term reforms for rate-of-return carriers.  Specifically, we adopt a revised methodology for applying the cap on high-cost loop support to distribute that support on a more equitable basis.  We also address the proposals from the *April 2014 Connect America FNPRM* regarding the 100 percent overlap rule.

7.        In the *USF/ICC Transformation Order*, the Commission established a "uniform national framework for accountability" that replaced the various data and certification filing deadlines that carriers previously were required to meet.[6]  In this Order, we take several steps to strengthen that framework, including codifying the reasonable comparability pricing requirement for broadband services, adjusting the reductions in support for late-filed annual ETC reports and certifications, and providing greater specificity regarding how we will address non-compliance with the Commission's service obligations for voice and broadband.

8.        The actions we take today, combined with the implementation of the rural broadband experiments and the reforms we implemented earlier in the year, will allow us to continue to advance further down the path outlined in the *USF/ICC Transformation Order*.  We expect the Bureau to complete the Connect America Phase II challenge process and then make a final determination as to which census

---

[3] *See Wireline Competition Bureau Commences Connect America Phase II Challenge Process*, WC Docket Nos. 10-90 and 14-93, Public Notice, 29 FCC Rcd 7986 (Wireline Comp. Bur. 2014) (*Challenge Process Public Notice*); *Replies Sought in Connect America Phase II Challenge Process*, WC Docket Nos. 10-90 and 14-93, Public Notice, 29 FCC Rcd 11497 (Wireline Comp. Bur. 2014) (*Challenge Process Reply Public Notice*).  Challenges were due in mid-August, with more than 140 parties challenging the designation of nearly 180,000 census blocks.  The Bureau concluded that 24,225 challenges made a valid prima facie case that a census block should be treated as served, while 70,868 challenges made a valid prima facie case that a census block should be treated as unserved.  Responses to the prima facie challenges were due November 10.

[4] *USF/ICC Transformation Order*, 26 FCC Rcd at 17729, para. 170.

[5] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7134-47, paras. 258-308.

[6] *USF/ICC Transformation Order*, 26 FCC Rcd at 17850, para. 573.

blocks will be eligible for the offer of model-based Phase II support by early 2015.[7]  That final determination will allow us to extend the offers of Phase II model-based support to price cap carriers to fund the deployment of voice and broadband-capable infrastructure in their territories.[8]  The carriers will then have 120 days to consider the offer, and in those states where the price cap carrier declines the offer of support, we will move forward with the Phase II competitive bidding process to determine support recipients.

## II.    BACKGROUND

9.      In the *USF/ICC Transformation Order*, the Commission comprehensively reformed and modernized the high-cost program within the universal service fund and the intercarrier compensation system to focus support on networks capable of providing voice and broadband services.[9]  The Commission created the Connect America Fund and for the first time established an overall budget for the high-cost program.[10]  The Commission concluded that support in price cap areas would be provided through a combination of "a new forward-looking model of the cost of constructing modern multi-purpose networks" and a competitive bidding process.[11]  The Commission provided for up to $1.8 billion of the Connect America budget to be spent annually to make broadband-capable infrastructure available to as many unserved locations as possible within these areas served by price cap carriers, while sustaining voice and broadband-capable infrastructure in high-cost areas that would not be served absent support.[12]  In the *USF/ICC Transformation FNPRM*, the Commission sought comment on proposed general auction rules governing the competitive bidding process itself, including options regarding basic auction design, the application process, and information and competition, and proposed to delegate to the Wireline Competition Bureau and the Wireless Telecommunications Bureau authority to establish detailed auction procedures and to take all other actions necessary to implement a competitive bidding process.[13]

10.     For rate-of-return carriers, the Commission largely maintained the existing legacy universal support mechanisms and required that they provide broadband meeting the Commission's public service obligations upon reasonable request.[14]  Noting that rate-of-return carriers serve fewer than five percent of the access lines in the country, but operate in many of the country's most difficult-to-serve areas, the Commission set an annual budget of up to $2 billion in Connect America support for rate-of-return carriers.[15]

11.     Over the past two and one-half years, significant progress has been made in implementing the reforms established in the *USF/ICC Transformation Order*.  Pursuant to its delegated authority, the Bureau adopted a forward-looking Connect America Cost Model (CAM) that will be used to determine the offer of model-based support to price cap carriers, as well as several other decisions related to Phase II.[16]  In April 2014, the Commission adopted several rules necessary for the Commission

---

[7] *Connect America Fund*, WC Docket No. 10-90, Report and Order, 28 FCC Rcd 7211, 7220, para. 21 (Wireline Comp. Bur. 2013) (*Phase II Challenge Process Order*).

[8] *Challenge Process Reply Public Notice*, 29 FCC 11497.

[9] *USF/ICC Transformation Order and FNPRM*, 26 FCC Rcd 17663.

[10] *Id.* at 17710, para. 123.

[11] *Id.* at 17725, para. 156.

[12] *See id.* at 17725, para. 158.

[13] *Id.* at 18089-91, paras. 1208-19.

[14] *Id.* at 17740, para. 206.

[15] *Id.* at 17674, para. 26, 17711, para. 126.

[16] *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order, 28 FCC Rcd 5301 (Wireline Comp. Bur. 2013) (*CAM Platform Order*); *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order, 29 FCC Rcd 3964 (Wireline Comp. Bur. 2014) (*CAM Inputs Order*).  *See also Phase II Challenge Process Order*

(continued….)

**Federal Communications Commission**    **FCC 14-190**

to transition carriers from Phase I support to Phase II model-based support, and sought comment on a number of proposals that we adopt today.[17]

12.    In July 2014, the Commission adopted a $100 million budget for rural broadband experiments and established an objective methodology for selecting projects among formal applications from those carriers that would deploy new, robust broadband to consumers in price cap areas.[18]  The Commission received 181 applications from entities seeking nearly $885 million over a ten-year term for projects in all 50 states and one territory.[19]  On December 5, 2014, the Commission announced the provisionally selected bidders who now are required to submit information demonstrating their financial and technical qualifications.[20]  The rural broadband experiments have informed us about competitive interest to build networks to rural communities that will deliver services that far exceed the Commission's current performance standards, while helping us explore the mechanics of conducting this type of competitive bidding process.  This initiative also will help inform the Commission's decisions in 2015 regarding the design of the Phase II auction that will occur in 2016.

## III.    PUBLIC INTEREST OBLIGATIONS

### A.    Evolving Speed Obligations

13.    *Background*.  In the *USF/ICC Transformation Order*, the Commission adopted public interest obligations for recipients of high-cost universal service support, including the obligation to offer broadband service at an initial minimum speed of at least 4/1 Mbps.[21]  In particular, price cap carriers accepting a state-level commitment would be required to offer at least 4/1 Mbps broadband service to at least 85 percent of their high-cost locations by the end of the third year of a five-year term.[22]  By the end of the fifth year, these price cap carriers would be required to offer at least 4/1 Mbps broadband service to all supported locations, and at least 6 Mbps downstream/1.5 Mbps upstream (6/1.5 Mbps) to a subset of those locations to be specified at a later date.[23]  Rate-of-return carriers, as a condition of receiving support, are required to offer broadband service at speeds of at least 4/1 Mbps, upon reasonable request.[24]

(Continued from previous page) ─────────────

*Connect America Fund*, 28 FCC Rcd at 7221-22, paras. 23-29 (adopting procedures for price cap carriers to accept Phase II support via the state-level commitment); *Connect America Fund*, WC Docket No. 10-90, Report and Order, 28 FCC Rcd 15060 (2013) (*Phase II Service Obligations Order*) (adopting specific latency, usage allowance, and pricing requirements for deployments by price cap carriers that accept Connect America Phase II model-based support).

[17] *April 2014 Connect America Order and FNPRM*, 29 FCC Rcd 7051.

[18] *See Connect America Fund; ETC Annual Reports and Certification*, WC Docket Nos. 10-90, 14-58, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8769 (2014) (*Rural Broadband Experiments Order*).

[19] Press Release, FCC, Rural Broadband Experiments Draw Interest from Almost 200 Applicants (Nov. 12, 2014), http://www.fcc.gov/document/rural-broadband-experiments-draw-interest-nearly-200-applicants.

[20] *Wireline Competition Bureau Announces Entities Provisionally Selected Bidders for Rural Broadband Experiments; Sets Deadlines for Submission of Additional Information*, WC Docket No. 10-90, Public Notice, DA 14-1772 (Wireline Comp. Bur. rel. Dec. 5, 2014) (*Provisionally Selected Bidders for Rural Broadband Experiments Public Notice*) (identifying provisionally selected bidders that must complete certain steps in order to be authorized to receive support).

[21] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17697, para. 94, 17721, para. 147, 17726, para. 17740, para. 206.  This initial minimum speed benchmark did not apply to Phase I of the Mobility Fund.

[22] *See id*. 17726, para. 160.

[23] *See id*. at 17726, paras. 160-62.

[24] *See id*. at 17740, para. 206; *see also April 2014 Connect America Order*, 29 FCC Rcd at 7070-75, paras. 59-72 (discussing declaratory ruling regarding which requests should be deemed unreasonable).

Federal Communications Commission                                    FCC 14-190

14.      Because the Commission expected that technical capabilities and user needs would continue to evolve, the Commission also committed to monitor trends in both urban and rural broadband offerings, and to initiate a proceeding no later than the end of 2014 to review its broadband service performance requirements to ensure that funding continues to support broadband service that is reasonably comparable to service in urban areas, consistent with the statute.[25]  In the *April 2014 Connect America FNPRM*, the Commission initiated that proceeding.[26]  Specifically, the Commission proposed to increase the minimum broadband speed to 10 Mbps downstream, and sought comment on whether to increase the upstream requirement to something higher than 1 Mbps.[27]

15.      *Discussion*.  In this section, we adopt a new minimum speed standard of 10 Mbps downstream and 1 Mbps upstream (10/1 Mbps) to further the statutory goal in section 254 of ensuring that consumers in rural and high-cost areas of the country have access to advanced telecommunications and information services that are reasonably comparable to those services in urban areas, at reasonably comparable rates.[28]  The marketplace for broadband has continued to evolve since the Commission established its initial minimum speed benchmark of 4/1 Mbps in 2011, and will continue to do so, given consumer demand for an ever growing range of services and applications.  Our task is to implement policies with our available funds that will extend broadband to high-cost and rural areas where the marketplace alone does not currently provide a minimum level of broadband connectivity.[29]

16.      The most recent State Broadband Initiative (SBI) data for December 2013 show that 99 percent of Americans living in urban areas have access to fixed broadband with speeds of at least 10 Mbps downstream/768 kbps upstream (10 Mbps/768 kbps), and a majority of Americans have already chosen to adopt such service.[30]  Moreover, fixed broadband services with even higher speeds, such as 25 Mbps downstream /3 Mbps upstream (25/3 Mbps) or higher, are available to the vast majority of urban households.[31]  In contrast, the SBI data indicate that 31 percent of the population residing in rural census blocks lack access to fixed broadband providing at least 10 Mbps/768 kbps speeds.

17.      Our objective with high-cost support is to extend broadband-capable infrastructure to as many high-cost locations as efficiently as possible, and at the same time ensure that we are best utilizing

---

[25] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17703, para. 106; 47 U.S.C. § 254(b)(3).

[26] *See April 2014 Connect America FNPRM*, 29 FCC Rcd at 7100, para. 138.  On August 1, 2014, the Commission adopted the *Tenth Broadband Progress Notice of Inquiry*, which sought comment on whether to modify the 4/1 Mbps speed benchmark the Commission had relied on since 2010.  *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act*, GN Docket No. 14-126, Tenth Broadband Progress Notice of Inquiry, 29 FCC Rcd 9747, 9755, para. 14 (2014).

[27] *See April 2014 Connect America FNPRM*, 29 FCC Rcd at 7100, para. 138.

[28] This obligation does not apply to recipients of Connect America Phase I incremental support.  We will address in a future order the minimum broadband performance obligations for recipients of support awarded through the Phase II competitive bidding process.

[29] In the *USF/ICC Transformation Order*, the Commission established a defined budget for the high-cost component of the universal service fund and made available no more than $1.8 billion annually for price cap territories and up to $2 billion annually for rate-of-return territories.  *See USF/ICC Transformation Order*, 26 FCC Rcd at 17710, para. 123, 17711, para. 126.

[30] The adoption rate for at least 10 Mbps/768 kbps is 52%.  SBI Data and Form 477 Data, as of December 31, 2013.  *See* National Broadband Map, http://www.broadbandmap.gov/ (last visited Dec. 11, 2014); Federal Communications Commission, FCC Form 477 Data, http://www.fcc.gov/encyclopedia/form-477-resources-filers.

[31] Current deployment data indicate that 92% of Americans in urban areas, and 47% in rural areas, have access to fixed broadband with speeds of at least 25/3 Mbps.  SBI Data, as of December 31, 2013.

Federal Communications Commission                                                      FCC 14-190

the funds that consumers and businesses pay into the universal service system.[32]  We find that raising the minimum downstream speed requirement to 10 Mbps is an appropriate way at the present time to implement the statutory language in section 254 regarding reasonable comparability.[33]  As noted above, where available, a majority of households adopt fixed broadband with speeds of at least 10 Mbps/768 kbps.  This is not surprising, as fixed broadband with speeds of at least 10 Mbps downstream offers more functionality to consumers than 4 Mbps downstream, particularly when multiple users are relying upon the broadband connection.  For users browsing the Web, the total time needed to load a page decreases with higher speeds up to about 10 Mbps.[34]  High definition video requires 5 Mbps downstream.[35]  Although VoIP services are adequately supported by lower speeds, VoIP quality may suffer when household bandwidth is shared by other services.[36]  When rural households have access to speeds of 10 Mbps or more, they are just as likely to adopt a 10 Mbps service as households in urban areas.[37]

18.     We are setting a standard that is achievable in the near term with support from the Connect America Fund, while mindful of the need to balance the interests of both recipients and contributors to the Fund.  We encourage recipients of funding to deploy to the extent possible future proof infrastructure that will be capable of meeting evolving broadband performance obligations over the longer term.  That will ensure that our policies will continue to support an evolving level of universal service in the future.

19.     Based on the record before us, we find ample basis for revising the current broadband performance obligations to require minimum speeds of 10 Mbps downstream.[38]  In contrast, while a few

---

[32] In the *USF/ICC Transformation Order*, the Commission adopted specific performance goals for the high-cost component of the universal service fund, including the goal to "minimize the universal service contribution burden on consumers and business."  *USF/ICC Transformation Order*, 16 FCC Rcd at 17672, para. 17.  *See also High-Cost Universal Service Support, Federal-State Joint Board on Universal Service, Joint Petition of the Wyoming Public Service Commission and the Wyoming Office of Consumer Advocate for Supplemental Federal Universal Service Funds for Customers of Wyoming's Non-Rural Incumbent Local Exchange Carrier,* WC Docket No. 05-337, CC Docket No. 96-45, Order On Remand and Memorandum Opinion and Order, 25 FCC Rcd 4072, 4087, para. 28 (2010), *aff'd sub nom, Vermont Pub. Svc. Bd. v. FCC*, 661 F.3d 54 (D.C. Cir. 2011) (*Qwest II Remand Order*) (footnotes omitted) ("Moreover, whether the Commission has satisfied the goal of "sufficiency," as required by section 254(e), must be evaluated in the larger context of section 254. The various objectives of section 254 impose practical limits on the fund as a whole.  If the universal service fund grows too large, it will jeopardize other statutory mandates, such as ensuring affordable rates in all parts of the country, and ensuring that contributions from carriers are fair and equitable.  This issue is not theoretical. . . . [T]he Commission has to balance the principles of section 254(b) to ensure that support is sufficient but does not impose an excessive burden on all ratepayers. . . . [T]he Commission must balance the statutory principles of reasonable comparability and affordability, taking into account both affordability of rates in high-cost areas served by . . . carriers and affordability of rates in other areas where customers are net contributors to universal service funding.").

[33] *See* 47 U.S.C. § 254(b)(3).

[34] *See* Federal Communications Commission, Office of Engineering and Technology and Consumer and Governmental Affairs Bureau, 2014 Measuring Broadband America Fixed Broadband Report:  A Report on Consumer Fixed Broadband Performance in the U.S. at 17 (2014), http://data.fcc.gov/download/measuring-broadband-america/2014/2014-Fixed-Measuring-Broadband-America-Report.pdf.

[35] *See id.*

[36] *See id.*

[37] The adoption rate for at least 10 Mbps/768 kbps is 56% in urban areas and 47% in rural areas, with an overall adoption rate of 52%.  SBI Data and Form 477 Data, as of December 31, 2013.  The adoption rate for at least 25/3 Mbps is 30% in urban areas, 28% in rural areas, with an overall adoption rate of 29%.  *Id.*  These data suggest that adoption rates among rural consumers are similar to urban consumers, where service is available.

[38] *See, e.g.*, Comments of ADTRAN, Inc., WC Docket No. 10-90 et al., at 4-6 (Aug. 8, 2014) (ADTRAN Comments); Comments of the American Farm Bureau Federation, WC Docket No. 10-90 et al. (filed Aug. 8, 2014); Comments of AT&T, WC Docket No. 10-90 et al., at 43-44 (filed Aug. 8, 2014) (AT&T Comments); Comments of

(continued….)

commenters supported raising the upstream speed,[39] there is little analysis in this docket regarding the potential advantages and disadvantages associated with raising the minimum upstream speed above 1 Mbps for purposes of high-cost funding.[40]  We therefore do not adjust the minimum upstream speed required for high-cost support recipients at this time, but expect to consider the matter again when we revisit our broadband performance obligations for recipients of high-cost support in the future.  Accordingly, pursuant to section 254, we adopt a minimum speed standard of 10/1 Mbps to ensure that Connect America funding is used efficiently, to deploy broadband-capable networks to meet ever evolving consumer demand.

20.    As the Commission explained in the *April 2014 Connect America FNPRM*, by increasing the current broadband downstream speed benchmark, we are primarily focusing on the minimum standard for *new* deployments of broadband-capable infrastructure.[41]  Consistent with the approach the Commission adopted for the previous speed benchmark, high-cost support recipients will be expected to achieve the new standard over a period of years, as they utilize that support to extend and upgrade networks in high-cost areas that are otherwise uneconomic to serve.  Price cap carriers accepting a state-level commitment will be required to offer at least 10/1 Mbps broadband service to the requisite number of high-cost locations in a given state by the end of the support term.[42]  Rate-of-return carriers will be required to offer at least 10/1 Mbps broadband service upon reasonable request, consistent with past guidance regarding our expectations regarding the reasonable request standard.[43]  If a request for 10/1 Mbps is not reasonable in a given circumstance, but offering 4/1 Mbps is reasonable, we would expect a rate-of-return carrier to offer 4/1 Mbps.

21.    We are not persuaded by arguments that increasing the downstream speed benchmark to 10 Mbps requires fundamental changes in the terms of the offer to price cap carriers that accept a state-

(Continued from previous page) ——————————————————

CenturyLink, WC Docket No. 10-90 et al., at 2, 11 (filed Aug. 8, 2014) (CenturyLink Comments); Comments of Deere & Company, WC Docket No. 10-90 et al., at 5 (filed Aug. 8, 2014); Comments of Frontier Communications Corp., WC Docket No. 10-90, et al, at 2-4 (filed Aug. 8, 2014) (Frontier Comments); Reply Comments of Pennsylvania Public Utility Commission, WC Docket No. 10-90 et al., at 11 -13 (filed Sept. 8, 2014) (Pennsylvania PUC Reply); Comments of United States Telecom Association, WC Docket No. 10-90 et al., at 2-4 (filed Aug. 8, 2014) (USTelecom Comments); Reply Comments of USTelecom, WC Docket No. 10-90 et al., at 2-3 (filed Sept. 8, 2014); Letter from Arizona Corporation Commission to Tom Wheeler, Chairman, FCC, WC Docket 10-90 (filed Oct. 28, 2014); Letter from Larry Cohen, President, Communications Workers of America, to Tom Wheeler, Chairman, FCC, WC Docket No. 10-90 (filed Oct. 31, 2014); Letter from Joseph Gaskins, President & CEO, United Spinal Assoc., to Tom Wheeler, Chairman, FCC, WC Docket No. 10-90 (filed Sept. 2, 2014).  *But see* Comments of the Wireless Internet Service Providers Association, WC Docket No. 10-90 et al., at 1-2, 4-6 (filed Aug. 8, 2014); Reply Comments of the Wireless Internet Service Providers Association, WC Docket No. 10-90 et al., at 6-9 (filed Sept. 8, 2014) (WISPA Reply) (urging Commission not to increase the minimum speed).

[39] *See, e.g.*, Comments of BARC Electric Cooperative, WC Docket No. 10-90, et al., at (5-6) (filed Aug. 8, 2014) (BARC Comments) (arguing that speeds should be increased to at least 10/2 Mbps and that Skype recommends at least 1.5 Mbps upstream to perform a high-definition Skype video call).

[40] *See, e.g.*, BARC Comments at 5-6 (urging Commission to consider minimum speeds much greater than 10/1 Mbps); Comments of the Fiber to the Home Council America, WC Docket No. 10-90, at 3-5 (arguing that Commission should move away from focus on speeds and focus on deploying fiber).

[41] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7101, para. 142.

[42] *See infra* Section III.C.

[43] *See April 2014 Connect America Order*, 29 FCC Rcd at 7070, para. 59 (explaining that the Commission adopted differing approaches for the areas of the country served by rate-of-return carriers in the *USF/ICC Transformation Order* than it did for price cap carriers, expressly declined to establish a mandatory requirement to deploy broadband-capable facilities to all locations within the service territory of a rate-of-return carrier, and instead required rate-of-return carriers receiving support to provide broadband meeting the specified performance requirements upon "reasonable request").

Federal Communications Commission    FCC 14-190

level commitment. Although price cap carriers generally support a 10 Mbps speed benchmark, they contend concurrent changes should be made to other terms of the state-level offer.[44] We do not agree that by increasing the required broadband speed we are upending the "delicate balance" adopted by the Commission in the *USF/ICC Transformation Order*.[45] The Commission made clear in 2011 that it expected broadband performance obligations to evolve, committed to initiating a proceeding in three years to re-examine the standard, and noted that carriers were expected to build "robust, scalable networks."[46] Moreover, at that time, the Commission delegated authority to the Bureau to require price cap carriers accepting model-based support to deploy service delivering at least 6/1.5 Mbps to a number of supported locations.[47] Thus, the framework adopted by the Commission in 2011 expressly anticipated that a higher minimum speed standard would be necessary in the future to provide an evolving level of universal service.

22.    Although we recognize that carriers upgrading their networks may incur additional capital investment costs to offer 10/1 Mbps as opposed to 4/1 Mbps,[47] how much more costly this is in the real world depends on circumstances that vary by carrier, such as the location of existing facilities and distances to unserved locations.[48] The fact that achieving this revised standard may require additional network investment than would be the case if the speed standard remained 4/1 Mbps is not a justification, however, for not adjusting the standard at all.[49] Rather as discussed more fully below, we make other modest adjustments to the Phase II framework to ensure that the support provided is sufficient to meet the obligations that are accepted through the state-level commitment. To the extent a carrier believes the

---

[44] *See, e.g.*, Letter from Jonathan Banks, Senior Vice President, USTelecom, to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90 (filed Nov. 13, 2014) (USTelecom Nov. 13, 2014 *Ex Parte* Letter); AT&T Comments at 43-48; CenturyLink Comments at 14-22; Comments of ITTA—The Voice of Mid-Size Communications Companies, WC Docket No. 10-90 et al., at 8-10 (filed Aug. 8, 2014) (ITTA Comments); Comments of Windstream Communications Inc., WC Docket No. 10-90 et al., at 3-4 (filed Aug. 8, 2014) (Windstream Comments).

[45] *See* ITTA Comments at 9; Windstream Comments at 3.

[46] *USF/ICC Transformation Order*, 26 FCC Rcd at 17703, para. 107.

[47] *See, e.g.*, ITTA Comments at 9; Windstream Comments at 2; USTelecom Nov. 13, 2014 *Ex Parte* Letter at 4-9; Letter from Jeffrey Laning, Vice President, CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90 et al. (filed Nov. 19, 2014) (Century Link Nov. 19, 2014 *Ex Parte* Letter).

[48] *See CAM Platform Order*, 28 FCC Rcd at 5311 ("[W]hether an individual price cap carrier would actually spend more or less than the model-determined support over the course of the five-year term will depend on where the individual price cap carriers that make a state-level commitment are in their respective investment cycles. Carriers have made and must continue to make investments that last substantially longer than the five years, incurring costs that do not, year-by-year, match their revenues (even for the case of commercially-viable investments). Those carriers that must undertake a relatively high level of asset replacement may therefore face higher costs than the modeled costs. Others will face lower costs.").

[49] We note that the forward-looking costs estimated by the model remain the same, whether the speed benchmark is 4 Mbps or 10 Mbps, because the model calculates costs for a fiber to the premises network with sufficient capacity at the time of peak usage to provide the higher speed. *See CAM Inputs Order*, 29 FCC Rcd at 4008, para. 97. We therefore find no reason why the input values used in the model to determine network costs should be changed.

Nor are we persuaded by ACA's arguments that the input value for the average revenue per user (ARPU) should be changed in light of this modification of the minimum required speed, which would in turn increase the funding benchmark. ACA claims that carriers will receive more revenue for higher speed broadband services. *See* Comments of the American Cable Association, WC Docket No. 10-90, at 7-8 (filed Aug. 8, 2014) (ACA Comments). In adopting an ARPU of $75, however, the Bureau did not assume that revenues were based only 4/1 Mbps broadband service; rather, the Bureau assumed there would be some mix of voice-only, broadband-only, and voice-and-broadband subscribers, and that providers would offer lower and higher speeds. We expect that some consumers will be willing to pay more for higher speeds, but others will not and instead will subscribe to lower cost, lower speed services.

support offered is insufficient to meet the obligations, it may turn down the offer of Phase II model-based support.

23.     We expect carriers planning upgrades to their networks today would take into account near term and future consumer demand.  As noted above, current data show that a majority of broadband subscribers today purchase at least 10/1 Mbps.[50]  A comparison of adoption rates from 2011 to 2013 show a steady increase in adoption for this level of service.  We therefore find that it is reasonable to assume that many carriers upgrading their networks with Phase II support would aim to provide the capability to provide at least 10/1 Mbps, with higher speeds available to a subset of locations.

24.     Rate-of-return carriers are expected to take into account the revised 10/1 Mbps speed standard when considering whether and where to upgrade existing plant in the ordinary course of business and will be required to report on progress toward this goal in annual updates to their five-year service quality plans.  As we emphasized in proposing the revised speed standard, however, a rate-of-return carrier will only be required to meet the higher speed standard if the request for service is reasonable.[51]  Rate-of-return carriers will be able to comply with the revised speed standard because we already have adopted a more flexible approach to determining compliance with our broadband performance obligations for this segment of the industry.[52]  We previously have stated that a "reasonable request is one where the carrier could cost-effectively extend a voice and broadband-capable network to that location.  In determining whether a particular upgrade is cost effective, the carrier should not consider only its anticipated end-user revenues, for the services to be offered over that network, both voice and broadband internet access, but also other sources of support, such as federal and, where available, state universal service funding."[53]  Among other things, the Commission has explained that a request would not be reasonable if the incremental cost of undertaking the necessary upgrades to a particular location exceed the revenues that could be expected from that upgraded line.[54]  The Commission has determined that carriers may take into account backhaul costs or other unique circumstance that make it cost-prohibitive to extend service to particular customers.[55]  Moreover, rate-of-return carriers have no obligation to extend broadband-capable infrastructure in any census block that is served by a competitor that meets the Commission's revised performance standards.[56]

25.     Nor are we persuaded that increasing the broadband speed requirement requires enlarging the budget for rate-of-return carriers.[57]  As discussed above, carriers evaluating whether or not a request for service is reasonable may consider the cost of upgrading the network and the support available.  If, for instance, the cost of extending fiber sufficiently close to a requesting customer to be able to offer 10/1 Mbps service is more than a rate-of-return carrier could cover with existing universal service support and anticipated end-user revenues, but it would be able to cover the cost of extending fiber to provide 4/1 Mbps service, then we would expect the carrier to extend 4/1 Mbps service.

---

[50] *See supra* para. 16 and note 30.

[51] *See April 2014 Connect America Order and FNPRM*, 29 FCC Rcd at 7102, para. 144.

[52] *See id.* at 7070-75, paras. 59-72 (issuing a declaratory ruling regarding which requests should be deemed unreasonable); *supra* note 43.

[53] *April 2014 Connect America Order and FNPRM*, 29 FCC Rcd at 7102, para. 144.  The Commission emphasized that it had made no decisions regarding how the Remote Areas Fund might be implemented in those areas of the country where the incumbent provider is a rate-of-return carrier.  *See id*. at 7072, para. 71.

[54] *See id*. at 7072, para. 65.

[55] *See id*. at 7072, para. 66 (citing *Third Order on Reconsideration*).

[56] *See id*. at 7073, para. 69.

[57] *See, e.g.*, Comments of the Rural Associations, WC Docket No. 10-90, et al., at 30 (filed Aug. 8, 2014) (Rural Association Comments); Comments of Washington Independent Telecommunications Association et al, WC Docket No. 10-90, et al., at 5 (filed Aug. 8, 2014) (Western Associations Comments).

**Federal Communications Commission**                                    **FCC 14-190**

26.     We are confident that these carriers will deploy broadband-capable infrastructure meeting these new requirements to the extent economically feasible in their communities and will continue to work on creative ways to partner with each other and other entities to provide service meeting these requirements.  We note that rate-of-return carriers have continued to deploy broadband-capable infrastructure since the Commission adopted the landmark reforms in the *USF/ICC Transformation Order*,[58] and we expect they will continue to do so in the future.  As discussed below, we adopt modifications to the current high-cost loop support mechanism to provide a more equitable method of distributing funding among carriers serving high-cost areas, ensuring that some carriers serving high-cost areas do not precipitously lose support.[59]  In the *April 2014 Connect America FNPRM*, we proposed longer-term reforms for rate-of-return carriers, including a voluntary path to model-based support.  We remain interested in finding a way to distribute support on an equitable basis that will provide support for investment in infrastructure capable of delivering 10/1 Mbps where reasonable in areas served by rate-of-return carriers.

27.     We also reject arguments that we should increase the high-cost universal service budget, as a means of advancing broadband deployment in rural areas to an even greater degree than we already do in this Order.[60]  "[T]he Commission has to balance the principles of section 254(b) to ensure that support is sufficient but does not impose an excessive burden on all ratepayers."[61]  The Commission previously conducted just such a balancing in adopting the budget at issue here, and we are not persuaded to depart from it at this time.[62]  In particular, "any determination about whether the Commission has adequately implemented section 254 must look at the cumulative effect of the four support programs, acting together."[63]  The Commission has been undertaking comprehensive reforms of its universal service programs to facilitate broadband deployment,[64] and we continue to advance that objective through the reforms adopted in this Order.  Although we recognize that there are possible broadband goals that we could advance even more broadly here, the ratepayer impact that already will occur as a result of our universal service programs collectively, coupled with the particular circumstances here, persuade us to proceed cautiously when weighing any benefits from increased support against the burden on ratepayers.

28.     In that regard, the record here does not persuade us that an increased high-cost budget is warranted.  When comprehensively reforming the high-cost support mechanism to better advance broadband deployment, the Commission began implementing certain reforms immediately, while setting

---

[58] *See, e.g., April 2014 Connect America Order*, 29 FCC Rcd at 7094, para. 124, 7098, para. 134.  SBI data indicate that the number of census blocks served by rate-of-return carriers where at least 3 Mbps/768 kbps fixed broadband is available has increased since the *USF/ICC Transformation Order*.  *See* 2014 Universal Service Monitoring Report Appendix at Figure 13 (rate of return carriers reporting 796,335 census blocks with at least 3 Mbps/768 kbps fixed connection as of December 2013, compared to 664,467 census blocks with such availability as of December 2011), available at http://transition.fcc.gov/Daily_Releases/Daily_Business/2014/db1204/DOC-330829A1.pdf); Wireline Competition Bureau, Universal Service Implementation Progress Report, WC Docket No. 10-90, at Figure 14 (Wireline Comp. Bur. 2014), available at http://www.fcc.gov/document/universal-service-implementation-progress-report (the number of census blocks with fixed connections offering at least 3 Mbps/768 kbps increased 10% between 2012 and 2013, based on State Broadband Initiative data for all rate-of-return carriers).

[59] *See infra* Section VI.A.

[60] *See, e.g.,* Comments of GVNW Consulting, Inc., WC Docket No. 10-90 et al., at 13-14 (filed Aug. 8, 2014) (GVNW Consulting Comments); Western Associations Comments at 5.

[61] *Qwest II Remand Order*, 25 FCC Rcd at 4087, para. 28.

[62] *See supra* notes 29, 32.

[63] *Qwest II Remand Order*, 25 FCC Rcd at 4086, para. 26.

[64] *See, e.g., Technology Transitions et al.*, GN Docket Nos. 13-5 *et al.*, Order, Report and Order and Further Notice of Proposed Rulemaking, Report and Order, Order and Further Notice of Proposed Rulemaking, Proposal for Ongoing Data Initiative, 29 FCC Rcd 1433, 1463, para. 86 (2014).

Federal Communications Commission                                    FCC 14-190

out a plan to advance broadband even more widely over time through additional initiatives. For example, noting that some areas may be too costly to serve with traditional wireline or terrestrial wireless broadband technologies, the Commission established the Remote Areas Fund to provide support for such "extremely high-cost" areas and set a budget of "at least" $100 million.[65] In April 2014, the Commission concluded that extremely high-cost areas would be eligible for the Phase II competitive bidding process.[66] In the coming year, we expect to develop the rules for the Phase II auction and how to address the areas that remain unserved after that competitive bidding process. The Commission also is considering, among other things, long term high-cost universal service reforms for rate-of-return study areas.[67] Against the backdrop of these and other existing and planned efforts, some commenters nonetheless advocate making increased high-cost support available here,[68] but fail to meaningfully quantify or demonstrate—even in an aggregate way—the incremental cost (and associated burden on ratepayers) required to achieve an incremental advancement of broadband deployment beyond what we already are achieving through the reforms adopted here and through our universal service programs more broadly.[69] We thus are not persuaded to increase high-cost universal service support further. Instead, we advance our broadband universal service goals through the high-cost fund to the extent we are able within the existing budget. We also note that the states have an important role to play in advancing universal service goals.[70] We welcome and encourage states to supplement our federal funding, whether through state universal service funds or other mechanisms.

29.     Finally, we conclude that recipients of support through the Phase II competitive bidding process will be required to meet an evolving broadband speed standard over the ten-year term. Given the historical and anticipated trajectory of broadband speeds, we anticipate that consumers will increasingly demand greater upstream speeds as well as downstream speeds. We would expect to initiate a proceeding to review the performance standards for the Connect America Fund no later than 2018. While we will establish the specific performance obligations and auction design in an upcoming order regarding the Phase II competitive bidding process, we decide now that 10/1 Mbps should not be our end goal for recipients of support over a ten-year term.[71] We recognize that competitive bidding is likely to be more efficient if potential bidders can predict what their performance obligations will be for the length of the term. We therefore now adopt a methodology for determining the minimum speeds that will be required by the end of the ten-year term for entities receiving support through the Phase II competitive bidding process. We conclude that the minimum speed shall be based on the highest speed adopted by a majority

---

[65] *USF/ICC Transformation Order*, 26 FCC Rcd at 17837-39, paras. 533-38.

[66] *See, April 2014 Connect America Order and FNPRM*, 29 FCC Rcd at 7060, para. 30.

[67] *See, e.g., id.* at 7134-47, paras. 258-308.

[68] *See supra* note 60.

[69] Although the budget adopted in the *USF/ICC Transformation Order* did not include a precise evaluation of cost for each provider, it reflected the Commission's reasonable predictive judgment based on a consideration of multiple factors, including existing support levels, the net effects of eliminating or reducing waste or inefficiencies, and the availability of waivers as a safety valve. *See In re FCC 11-161*, 753 F.3d 1015, 1060 (10th Cir. 2014). Here, by contrast, we do not find a sufficient basis in the record to make a predictive judgment that the benefits from any particular increased budget for rural consumers would outweigh the burdens on ratepayers.

[70] *See, e.g.*, 47 U.S.C. §254(b)(5) ("There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service); 47 U.S.C. §254(f) (expressly permitting states to take action to preserve and advance universal service and to require contributions to support universal service in the state); *Qwest Corp. v. FCC*, 258 F.3d 1191, 1203 (10th Cir. 2001) (stating that the Act "plainly contemplates a partnership between the federal and state governments to support universal service and that "it is appropriate—even necessary— for the FCC to rely on state action."); *Qwest Communications Int'l Inc. v. FCC*, 398 F.3d 1222, 1232 (10th Cir. 2005).

[71] *See, e.g.*, Comments of the National Rural Electric Cooperative Association, WC Docket No. 10-90, et al. at 5-9 (filed Aug. 8, 2014) (NRECA Comments).

of households, as reported in the most recent Form 477 data available at the time we next revisit the specific performance obligations for the Connect America Fund.  We encourage parties receiving ten years of support through the Phase II competitive bidding process to deploy future-proof networks that are capable of meeting future demand.

### B.    Term of Support for Price Cap Carriers Accepting Phase II Model-Based Support

30.      In the *USF/ICC Transformation Order*, the Commission adopted a five-year term of support for price cap carriers accepting a state-level commitment.[72]  In the *April 2014 Connect America FNPRM*, the Commission sought comment on whether we should provide a longer term of support, and asked whether price cap carriers accepting a state-level commitment should have the ability to extend the five-year term for an additional two years.[73]

31.      We make a modest adjustment to the framework the Commission adopted in 2011 for the Connect America Fund and adopt a six-year term of support, which will begin in 2015 and extend through 2020, with an option for a seventh year in certain circumstances.  We recognize that upgrading existing networks to provide 10/1 Mbps requires deploying fiber further into the distribution network.  We are not persuaded, however, that the ten-year term advocated by some is warranted.[74]  When the Commission adopted the five-year term it emphasized "the limited scope and duration of the state-level commitment procedure" and expected that "support after such five-year period will be awarded through a competitive bidding process in which all eligible providers will be given an equal opportunity to compete."[75]  We continue to believe that we should move to competitive bidding processes in a timely manner in those areas where support initially is awarded through the acceptance of state-level commitments.[76]  In particular, we expect to conduct a competitive bidding process no later than the end of 2019 to ensure there is continuity and a transition path to Connect America Phase III.

32.      To the extent a price cap carrier that accepts the offer of Phase II model-based support in a particular state is a winning bidder in the Phase III auction, it will commence receiving that support in 2021.  In the event that carrier either does not win in the Phase III auction, or chooses not to bid on such support, its term of Phase II support will be completed at the end of 2020.  We will provide such carriers the option to elect one additional year of support, however, with Phase II support continuing in calendar year 2021 as a gradual transition to the elimination of support.  This is consistent with the principle established in the *USF/ICC Transformation Order* of "no flash cuts," while also recognizing that additional funding may be appropriate in particular circumstances in those states where six years of support is insufficient to cover the capital investment necessary to meet the revised 10 Mbps downstream standard.  We also note that even if a new entrant is authorized to begin receiving Phase III support in 2020, there will be a certain amount of time before that new provider will be able to deploy its network

---

[72] *USF/ICC Transformation Order*, 26 FCC Rcd at 17732, para. 178.

[73] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7103, para. 148.

[74] *See, e.g.*, USTelecom Nov. 13, 2014 *Ex Parte* Letter at 3, 6-9; CenturyLink Nov. 19, 2014 *Ex Parte Letter*; Letter from Jonathan Banks, Senior Vice President, USTelecom, to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90, at 2 (filed Dec. 4, 2014) (USTelecom Dec. 4, 2014 *Ex Parte* Letter).  Although there might be different ways to resolve individual issues, the overall approach for Connect America Phase II taken in this Order seeks to advance voice service and broadband network deployment in the areas where support is needed by balancing alternative approaches that would rely on greater or lesser degrees either on the incumbent or on competitive processes and that would focus on comparatively higher- or lower-bandwidth requirements for the voice and broadband-capable networks, all balanced against the potential effect on ratepayers.

[75] *USF/ICC Transformation Order*, 26 FCC Rcd at 17732, para. 178.

[76] *See April 2014 Connect America Order*, 29 FCC Rcd at 7062, para. 36 ("One reason why the Commission established a five-year term for the areas subject to model-based support was to move to competitive bidding processes in a timely manner in those areas where support initially would be awarded through the acceptance of state-level commitments.").

and begin offering service. Providing another year of Phase II support to the incumbent provider through the end of 2021 will ensure that there is an appropriate transition from the incumbent to new ETCs.

### C.    Flexibility in Meeting Deployment Obligations

33.    In the *USF/ICC Transformation Order*, the Commission provided that price cap carriers accepting a state-level commitment would be required to offer service meeting the broadband public interest obligations to 85 percent of all supported locations by the end of the third year and to all supported locations by the end of the five-year term.[77] The Commission provided price cap carriers with a certain amount of flexibility in meeting these deployment obligations. Specifically, in meeting its obligation to serve a particular number of locations in a state, the price cap carrier could choose to substitute some extremely high-cost locations in adjacent census blocks for locations in eligible census blocks, provided that the total number of locations served is equal to or greater than the number of supported locations in the eligible census blocks.[78]

34.    In the *April 2014 Connect America FNPRM*, the Commission sought comment on a number of measures that would provide recipients of Phase II support greater flexibility in meeting their deployment obligations.[79] In response, price cap carriers argue that if we require 10 Mbps, we should increase the build-out period of the state-level commitment to eight or ten years.[80] They claim that building networks capable of providing 10/1 Mbps will take more time and more funding than networks meeting the current 4/1 Mbps speed requirement, because it will require extending fiber further into the network and deploying additional remote terminals.[81] In addition to taking more time for planning network upgrades and obtaining necessary permits, they also argue that the broadband construction industry as a whole may not be capable of meeting the demand in a shorter timeframe.

35.    Here, we address flexibility for price cap carriers accepting Phase II model-based support. We expect to provide similar flexibility to recipients of support awarded through the Phase II competitive bidding process, which will be addressed in a future order adopting the rules for the competitive bidding process.

#### 1.    Interim Deployment Obligations

36.    We modify the build-out requirements established for price cap carriers accepting model-based support to create straight line interim milestones over the revised six-year term, rather than front-loading the deployment obligations in the first three years of the term. When the Commission adopted the interim deployment milestone of deploying to 85 percent of locations by the end of the third year, it noted that "there were few concrete suggestions in the record on what those interim milestones should

---

[77] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17726, para. 160.

[78] *See id*. at 17729, para. 171 n.279. The Commission subsequently gave recipients of support in the competitive bidding process the same flexibility to substitute locations in adjacent extremely high-cost census blocks to enable them to build integrated networks as appropriate. *See April 2014 Connect America Order*, 29 FCC Rcd at 7061, para. 32.

[79] *See April 2014 Connect America FNPRM*, 29 FCC Rcd at 7107-10, paras. 162-72. Specifically, we sought comment on permitting Phase II recipients to specify that they are willing to deploy to less than 100% of locations in their funded areas, with support reductions to the extent they elect to deploy to less than 100% of funded locations. We asked whether 95% of funded locations would be an appropriate minimum. *See id*. at 7108, para. 165. In addition, we sought comment on allowing Phase II recipients to substitute some number of unserved locations within partially served census blocks for locations within funded census blocks. *See id*. at 7108-09, para. 167.

[80] *See, e.g.*, AT&T Comments at 44; CenturyLink Comments at 20-22; Windstream Comments at 3-4.

[81] *See, e.g.*, ITTA Comments at 9; Windstream Comments at 3-4; AT&T Comments at 44 (claiming that "the technologies and network design needed to deliver 10/1 Mbps are substantially different"); USTelecom Nov. 13, 2014 *Ex Parte* Letter at 3, 6-9.

**Federal Communications Commission**                          **FCC 14-190**

be."[82]  We recognize that the first task for any major network upgrade is to complete an overall plan and then undertake detailed engineering analyses in the field to plan the construction of particular routes.[83] Recipients of support—whether price cap carriers or bidders in a competitive auction—will likely then proceed incrementally, route by route, working to complete construction evenly over the course of the term required for deployment.  For that reason, rather than requiring price cap carriers accepting a state-level commitment to offer broadband service meeting the minimum requirements to at least 85 percent of their high-cost locations by the end of the third year, we instead adopt evenly spaced annual interim milestones for price cap carriers to offer at least 10/1 Mbps to an additional 20 percent of the requisite number of high-cost locations each year, as shown in Table 1 below.[84]  Completing construction to 40 percent of the requisite number of locations in a state by the end of calendar year 2017, instead of 85 percent by mid-2018 year, is a more realistic expectation, given that carriers will not accept the offer of support until mid-year in 2015 and once authorized to receive support, will then be developing detailed network construction plans.[85]

**Table 1: Deployment Milestones for Price Cap Carriers Accepting Phase II Model-Based Support**

|        | Current requirement | Revised interim milestones |
|--------|---------------------|----------------------------|
| Year 1 |                     | **%                        |
| Year 2 |                     | **%[86]                    |
| Year 3 | 85% of locations    | 40% End of 2017            |
| Year 4 |                     | 60% End of 2018            |
| Year 5 | 100% of locations   | 80% End of 2019            |
| Year 6 |                     | 100% End of 2020           |

37.     We recognize that price cap carriers may choose to prioritize construction in certain states in any given year and therefore do not expect them to be deploying new facilities in every state in

---

[82] *USF/ICC Transformation Order*, 26 FCC Rcd at 17726, para. 161.

[83] We also recognize that such planning cannot commence in many instances until the price cap carrier in question knows the outcome of the Phase II challenge process, which will determine which census blocks are on the final list of eligible census blocks.

[84] Accordingly, price cap carriers accepting a state-level commitment will no longer be required to offer at least 6/1.5 Mbps to a specified number of supported locations.  *See id.* at 17726, para. 162.

[85] We agree with USTelecom that a straight line approach to these milestones more accurately reflects the real world challenges of deploying new voice and broadband-capable infrastructure.  *See* Letter from Jonathan Banks, Senior Vice President, USTelecom, to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90 (filed Oct. 30, 2014) (USTelecom Oct. 30, 2014 *Ex Parte* Letter).

[86] As discussed more in the Accountability section below, we are not creating an enforceable milestone for the first or second year of the Phase II term, but rather merely are requiring the price cap carriers to report to us their status each year.  *See infra* Section VII.B.

every year of the Phase II term. However, we do require that carriers annually deploy new infrastructure to some locations that previously lacked 4/1 Mbps in the earlier years of the Phase II term so that consumers benefit from the availability of new broadband services as early as possible. By the end of calendar year 2017, we require that, at the holding company level, at least five percent of the nationwide total of funded locations that have been reported as newly served in the annual reports must be locations that previously lacked 4/1 Mbps.

### 2.    Number of Locations

38.    In addition, we recognize that the "facts on the ground" when price cap carriers are deploying facilities may necessitate some additional flexibility regarding the scope of the deployment obligations. At the outset, we note that there may be some variance between the number of funded locations as specified by the forward-looking cost model adopted by the Bureau and the actual number of locations in a given area.[87] For instance, the price cap carrier model utilizes GeoResults study area boundaries, which in some instances may be inaccurate, which in turn may result in the inaccurate assignment of certain locations to a particular price cap territory.[88] The model also utilizes GeoResults business location data, which in some instances may be inaccurate in terms of either business counts or actual physical locations; this in turn may result in too many or too few locations in a given census block. While these minor inaccuracies should cancel one another out in most instances across multiple census blocks, we recognize that in particular areas that may not be the case, and the total number of locations assigned to a particular price cap carrier in a given state according to the model simply does not necessarily reflect the actual number of locations. We also recognize that there may be a variety of unforeseen factors, after the initial planning stage, that can cause significant changes as a network is actually being deployed in the field, and a variety of factors that can affect the time needed to deploy a planned route.[89] Finally, we note that the customer location data utilized in the model reflect location data at a particular point in time. The precise number of locations in some funded census blocks is likely to change over time for a variety of reasons, which may impact the orderly progress of the planned construction cycle.

39.    Given all of these factors, rather than requiring deployment to 100 percent of funded locations as identified by the model in a given state, we will permit a modest adjustment to the number of model-determined funded locations in a given state with a corresponding reduction in support in certain instances. Price cap carriers taking advantage of this flexibility will be required to refund support based on the number of required locations without access to broadband.[90] We balance this flexibility with our goal of advancing the availability of broadband to these high-cost locations. Therefore, we will require deployment to at least 95 percent of the funded locations, but in order for a price cap carrier to take advantage of this flexibility, we require them to identify by December 31, 2015, any specific census blocks where they do not intend to meet their deployment commitments, with those blocks covering at

---

[87] See, e.g., CenturyLink Comments, Attach. 1, at 5-6.

[88] We note that price cap carriers are not required, and indeed are prohibited, from using funding to deploy infrastructure in areas where there is an incumbent rate-of-return carrier. We encourage price cap carriers accepting model-based support to promptly bring any situations involving a known disparity between the number of model-determined locations and the actual number of locations in a state to the Commission's attention while developing their network plans in that first year. We delegate authority to the Bureau to address these types of situations by adjusting the number of funded locations in the relevant state and the associated funding levels on a pro rata basis.

[89] See, e.g., CenturyLink Comments, Attach. 1, at 5-6. As discussed above, to the extent necessary, the deployment timetable for price cap carriers accepting a state-level commitment may be extended beyond 2020 as appropriate to take into account those unforeseen factors' outside a carrier's control.

[90] We sought comment on whether to require a Phase II recipient to specify the number of locations it intends to deploy at the time funding is authorized, or after a certain period of time. Based on our review of the record, we are persuaded that unforeseen circumstances may occur throughout the term. See April 2014 Connect America FNPRM, 29 FCC Rcd at 7108 para. 165.

Federal Communications Commission    FCC 14-190

least two percent of their total eligible locations in a state. We recognize there may be discrete census blocks identified during the early planning stages that will be challenging to serve. By requiring the price cap carriers to identify up front those particular census blocks that they know they will not deploy to during Phase II, the Commission can make those census blocks eligible for support in the Phase II competitive bidding process. For those carriers that elect to take advantage of this flexibility, we then allow them to identify an additional number of the eligible locations left unserved at of the end of the term, up to three percent.[91]

40.     We find that requiring deployment to at least 95 percent of the number of funded locations will provide some flexibility to price cap carriers in meeting their deployment obligations. We are not persuaded by commenters who argue that we should provide much more flexibility. For example, price cap carriers argue that those accepting a state-level commitment should be permitted to deploy to as few as 90 percent of their funded locations.[92] Although they propose to forego funding on a pro rata basis for the remaining locations, we are concerned that providing that degree of flexibility across the board is inconsistent with the Commission's rationale for providing these carriers the offer of model-based support in the first instance: to ensure ubiquitous coverage. Rather, we may address unique situations through the waiver process where specific circumstances justify additional flexibility.[93]

41.     Nor are we persuaded by commenters who argue that requiring anything less than 100 percent would allow recipients to "cherry pick" and opt out of serving the highest-cost locations.[94] As discussed above, there are a number of legitimate reasons why it may not be possible for a provider— whether a price cap carrier or a competitive provider awarded support in a competitive bidding process— to deploy to 100 percent of the funded locations in Phase II areas by the end of the deployment term.[95] We conclude that the benefits of providing some flexibility to a price cap carrier to address any variance between the cost model and real world circumstances outweigh the theoretical risk that the carrier could systematically identify and exclude the five percent of locations that are highest-cost and are likely sprinkled throughout its funded territory.

42.     We will require price cap Phase II recipients that have deployed to at least 95 percent, but less than 100 percent, of the number of funded locations to refund support based on the number of funded locations left unserved in the state at the end of their support term. We recognize that many factors determine a carrier's deployment decisions, and affect costs even after those decisions are made, so we doubt that a carrier would or could systematically exclude the highest cost locations. At the same time, it is reasonable to assume that many of the locations left unserved would have higher than the average costs calculated by the model. A higher amount per location than the average therefore is appropriate. Moreover, we want to provide more incentive to carriers to build out to 100 percent of the required number of locations. On a nationwide basis, the average support for the top five percent of the highest-cost funded locations is 3.77 times the average support for all funded locations. We recognize that costs will vary by state and carrier, but find that the administrative simplicity of using one-half of the nationwide aggregate factor outweighs the benefits of false precision. Accordingly, we will require a

---

[91] If a carrier does not elect the flexibility option by December 31, 2015, its baseline deployment obligation will be 100% of its funded locations in the state.

[92] *See, e.g.*, AT&T Comments at 43-48; CenturyLink Comments at 14-18; Windstream Comments at 5-6.

[93] While inclement weather or significant delays in obtaining the required permits may justify limited waiver of the milestones in certain cases, we do not expect to routinely grant waiver requests. In particular, failure to plan for some contingencies will counsel against a finding that there is good cause to grant a waiver request.

[94] *See, e.g.*, ACA Comments at 10; Comments of the Rural Independent Competitive Alliance, WC Docket No. 10-90 et al., at 3 (filed Aug. 8, 2014) (RICA Comments); Letter from Thomas Cohen, Counsel to ACA, to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90, at 4-5 & nn.10-11 (filed Nov. 10, 2014) (ACA Nov. 10, 2014 *Ex Parte* Letter).

[95] *See supra* para. 38.

price cap carrier at the end of its support term to refund an amount based on the number of locations left unserved and the average Phase II support the carrier receives in a state multiplied by 1.89.[96]

43.    We conclude that the administrative simplicity of this method outweighs the potential benefit of reducing support based on a more complicated determination based on the relative costs of particular locations as determined by the forward-looking cost model.[97]  As discussed below, we will require price cap carriers to include in the final annual progress report that they submit with their section 54.313 reports the total number and geocodes of all funded locations to which they have deployed facilities capable of delivering broadband meeting the requisite requirements, which will provide an objective, easily verifiable basis for USAC to determine the amount of support to recover in the event there is less than 100 percent compliance with the deployment obligation.

44.    Finally, for those carriers accepting Phase II model-based support, we decline to adopt the proposal to substitute unserved locations within partially served census blocks for locations within funded census blocks.  While we will continue to explore this issue, questions remain in the record how best to determine whether or not a particular location in a partially served block is served or unserved without placing significant burdens on interested parties and Bureau staff.[98]  We note that all parties potentially interested in Connect America support—both incumbents and new entrants alike—have an interest in building economically efficient networks, and those networks do not neatly align with census boundaries.  Therefore, we encourage all stakeholders interested in the Phase II competitive bidding process to work together to propose for future Commission consideration an administratively feasible method for ensuring that unserved consumers in partially served census blocks are not left behind.

D.    **Obligations of Carriers Serving Non-Contiguous Areas that Elect Phase II Frozen Support**

45.    *Background*.  In the *April 2014 Connect America FNPRM*, the Commission proposed that non-contiguous carriers electing to continue to receive frozen support amounts in lieu of the offer of model-based support be subject to the same service obligations as carriers receiving model-based support, including the new broadband speed requirement of 10/1 Mbps.[99]  The Commission sought comment on the best approach to monitoring and enforcing compliance with these service obligations, as well as the specific build-out obligations for non-contiguous carriers receiving frozen support.[100]  The Commission

---

[96] For instance, if there were 100 unserved locations and the average support per line in the state was $100, the carrier would be required to refund $113,400 ($100 x 100 locations x 6 years x 1.89) in support.  ACA proposes that if the Commission permits price cap carriers to build out to only 95% of its required locations, that the carriers be required to return two times the average amount of support per location in the state.  *See* Letter from Thomas Cohen, Counsel to ACA, to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90 at 5-6 (filed Nov. 26, 2014).  Bureau staff could not verify ACA's estimates of the differences between the support for the 5% most expensive locations and the overall model-based support for a state.

[97] Developing a methodology to reduce support based on relative costs of individual census blocks would require pinpointing unserved locations to particular census blocks, and as noted above, the actual number of locations in particular census blocks may vary from what is in the model.  *See supra* para. 38.  ACA mistakenly assumes there are only 75,000 census blocks eligible for the offer of Phase II model-based support.  *See* ACA Nov. 10, 2014 *Ex Parte* Letter at 4-5, n.10.  In fact, there are currently more than 865,000 census blocks presumptively eligible for the offer of Phase II model-based support.  It would be enormously burdensome to USAC if it were required to audit compliance at the census block level, which would be necessary in order to implement such an approach.

[98] *See, e.g.*, ACA Comments at 13-14; Comments of the Utilities Telecom Council, WC Docket No. 10-90 et al., at 20 (filed Aug. 8, 2014) (UTC Comments).

[99] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7118-21, paras. 202-07.  The Bureau previously permitted non-contiguous carriers to elect to continue to receive frozen support or to opt to receive model-based support.  *See CAM Inputs Order*, 29 FCC Rcd at 4028-29, paras. 150-54.

[100] *April 2014 Connect America Fund FNPRM*, 29 FCC Rcd at 7120-21, paras. 208-09.

also sought comment on whether any specific extenuating circumstances in non-contiguous areas required extending the term of frozen support for longer than five years.[101]  Finally, the Commission solicited comment whether, in the alternative, it should adopt tailored service obligations for each non-contiguous carrier that elects to continue receiving frozen support.[102]

46.     *Discussion*.  Based on the record before us, we conclude that the best approach is to adopt tailored service obligations for each of the non-contiguous carriers that elect to continue to receive frozen support amounts for Phase II in lieu of the offer of model-based support.[103]  We recognize that non-contiguous carriers face unique circumstances in the areas they serve and experience different challenges in deploying broadband service in those areas.  Consequently, a "one-size-fits-all" approach would leave some of these carriers potentially unable to fulfill their service obligations.  We believe that tailoring specific service obligations to the individual circumstances of each non-contiguous carrier that elects to continue receiving frozen support for Phase II will best ensure that Connect America funding is put to the best possible use.[104]

47.     Because the amount of frozen support may in some cases be greater than the amount of model-based support, we must reserve sufficient funds for frozen support before generally making the offer of support to price cap carriers in order to ensure that we do not exceed the overall budget for the offer of model-based support.  We require each non-contiguous carrier to notify the Bureau no later than 15 days after the release of this Order whether it is interested in Phase II frozen support in lieu of model-based support.[105]  The Bureau then will be able to determine the appropriate maximum amount of money that should be reserved out of the $1.8 billion budget for those carriers.[106]  We conclude that waiting to extend the offer of model-based support until we adopt tailored service obligations for each non-contiguous carrier would unnecessarily delay the offer of model-based support to all other price cap carriers.

48.     As we stated in the *April 2014 Connect America FNPRM*, we expect that any tailored service obligations would be consistent with the Commission's goal of ensuring universal availability of modern networks capable of providing voice and broadband service to homes, businesses, and community anchor institutions.[107]  We anticipate being able to adopt these tailored service obligations no later than the time we adopt the rules for the Phase II competitive bidding process.  The non-contiguous carriers then will have 60 days to determine whether to accept or decline the Phase II frozen support.  If any non-contiguous carrier declines Phase II frozen support with tailored service obligations, those areas may be eligible in the Phase II competitive bidding process.

49.     Though we do not determine at this time specific service obligations for non-contiguous carriers receiving Phase II frozen support, we conclude that carriers serving non-contiguous areas will not be permitted to use Phase II frozen support in any areas where there is a terrestrial provider of fixed residential voice and broadband service that meets Phase II requirements, as modified in this Order.

---

[101] *Id.* at 7121, para. 210.

[102] *Id.* at 7121, para. 211.

[103] Commenters generally support this approach.  Comments of Alaska Communications Systems, WC Docket No. 10-90 et al., at 5, 30-32 (filed Aug. 8, 2014); Comments of Puerto Rico Telephone Company, Inc., WC Docket No. 10-90 et al., at 8 (filed Aug. 8, 2014); USTelecom Comments at 27-28.

[104] USTelecom Comments at 28.

[105] We believe that making this requirement effective upon release of this Order will ensure that the offer of model-based support we intend to make in early 2015 is not delayed any further.

[106] This timeline supersedes that previously contemplated, under which each non-contiguous carrier would notify the Bureau within 15 days of resolution of the associated service obligations whether it will choose to elect to continue to receive frozen support for the term of Phase II.  *See CAM Inputs Order* at para. 153.

[107] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7121, para. 211.

Therefore, we prohibit non-contiguous carriers receiving frozen support from using that support in any census block where there is a competitor providing service of 10/1 Mbps or greater. If a carrier is unable to meet this requirement in certain areas, we require it to relinquish the relevant Phase II frozen support for those areas.

### E.    ETC Obligations as Funding Transitions to New Mechanisms

50.    *Background.* In the *USF/ICC Transformation FNPRM*, the Commission noted that ETC service obligations and funding should be "appropriately matched, while avoiding consumer disruption in access to communications services."[108] It sought comment on how existing voice telephony service obligations for ETCs would change as funding shifts to new, more targeted mechanisms, including potentially via forbearance from the relevant requirements of section 214(e)(1).[109] In the *April 2014 Connect America FNPRM*, the Commission sought to develop the record further on how relieving incumbent local exchange carriers (LECs) of their ETC obligations would comport with section 214 of the Communications Act and what specific obligations incumbent LECs would be relieved of in areas where they do not receive high-cost support.[110] In August of 2014, USTelecom submitted a petition seeking, among other things, forbearance from the enforcement of section 214(e)(1)(A) where a price cap carrier receives no high-cost support.[111]

51.    *Discussion.* Based on our consideration of the relevant statutory framework and the record before us, we now conclude that it is in the public interest to forbear, pursuant to section 10 of the Communications Act of 1934, as amended (the Act) from enforcing a federal high-cost requirement that price cap carriers offer voice telephony service throughout their service areas pursuant to section 214(e)(1)(A) in three types of geographic areas: (1) census blocks that are determined to be low-cost,[112] (2) all census blocks served by an unsubsidized competitor, as defined in our rules, offering voice and broadband at speeds of 10/1 Mbps to all eligible locations,[113] and (3) census blocks where a subsidized competitor – i.e., another ETC – is receiving federal high-cost support to deploy modern networks capable of providing voice and broadband to fixed locations.[114] They will remain obligated, however, to

---

[108] *USF/ICC Transformation FNPRM*, 26 FCC Rcd at 18062, para. 1089.

[109] *See id.* at 18062-66, paras. 1089-1102.

[110] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7117, paras. 195-98.

[111] Petition for Forbearance of the United States Telecom Association, WC Docket No. 14-192, at 60-73 (filed Oct. 6, 2014) (USTelecom Oct. 6, 2014 Forbearance Petition); *Pleading Cycle Established for Comments on United States Telecom Association Petition for Forbearance from Certain Incumbent LEC Regulatory Obligations*, WC Docket No. 14-192, Public Notice, DA 14-1585 (Wireline Comp. Bur. rel. Nov. 5, 2014).

[112] The Bureau has tentatively set the funding benchmark at $52.50 per location, so that census blocks where the average cost is less than $52.50 per location would be deemed low-cost areas. *CAM Inputs Order*, 29 FCC Rcd at 3964, 4033, 4040, paras. 164, 180. The Bureau will finalize the determination of which areas are low-cost after the conclusion of the Phase II challenge process. According to SBI Data and Form 477 data (as December 31, 2013), in price cap census blocks that are determined to be low-cost, over 90% of locations are served by a cable provider offering voice and broadband speeds of at least 10/1 Mbps. Below we describe the safeguards that will ensure that consumers living in low-cost locations that are not served by a cable provider will continue to have access to voice service.

[113] 47 C.F.R. § 54.5. This would include both high-cost census blocks and extremely high-cost census blocks (i.e., those census blocks where the average cost per location exceeds the extremely high-cost threshold to be determined by the Bureau after the conclusion of the Phase II challenge process) where the unsubsidized competitor is providing service.

[114] Under Phase II, price cap carriers will be offered model-based Phase II support only in certain census blocks. If they accept such support, they will be obligated to comply with the Phase II service obligations only in such census blocks. They will not receive model-based support to serve low-cost census blocks, nor will they receive support to serve census blocks that are served by competitors offering service that provides at least 3 Mbps/768 kbps or where another ETC is receiving federal high-cost support to deploy modern networks capable of providing voice and

(continued….)

maintain existing voice service unless and until they receive authority under section 214(a) to discontinue that service.[115]  They also will remain subject to the obligation to offer Lifeline service to qualifying low-income households throughout their service territory.

52.    Effectively, as a result of this limited forbearance, price cap carriers that accept the state-level commitment for Phase II support will continue to have a federal high-cost universal service obligation to offer voice telephony services in those census blocks that are deemed to be extremely high-cost, unless and until they are replaced by another ETC in those areas.  We do not address at this time and in particular do not forbear from enforcing the section 214(e) obligation of a price cap carrier to offer voice telephony services in extremely high-cost areas where it is not receiving support, except for the two circumstances expressly described herein:  those extremely high-cost census blocks served by an unsubsidized competitor or where the price cap carrier is replaced by another ETC selected through a competitive bidding process that is required to offer voice and broadband services to fixed locations that meet the Commission's public service obligations.[116]  Price cap carriers that decline the state-level commitment will have the federal high-cost universal service obligation to offer voice telephony services in those census blocks that are determined to be high-cost or extremely high-cost, and unserved by an unsubsidized competitor, until they are replaced by another ETC that is required to offer voice and broadband service to fixed locations that meet the Commission's public service obligations.[117]

53.    As the Commission explained in the *USF/ICC Transformation FNPRM*,[118] states have primary authority for designating ETCs and defining their service areas except in cases where they lack jurisdiction over the entity seeking designation.[119]  In such situations, the Act gives the Commission responsibility for designating the entity as an ETC.[120]  Once an entity is designated as an ETC it must "throughout the service area for which the designation is received . . . offer the services that are supported by Federal universal service support mechanisms under section 254(c)."[121]  The Commission defined the service supported by universal service support mechanisms under section 254(c)(1) to be "voice telephony" in the *USF/ICC Transformation Order*.[122]  An ETC's "service area" is defined to be the

(Continued from previous page)
broadband to fixed locations.  *See USF/ICC Transformation Order*, 26 FCC Rcd at 17728-29, paras. 167-170.  Price cap carriers serving non-contiguous areas that elect to continue to receive Phase II frozen support in lieu of model-based support will be subject to specific service obligations that will be determined at a future date.  *See supra* Section III.D.  Until we make the determination of those specific service obligations, this forbearance does not apply to those price cap carriers.

[115] The Commission recently initiated a rulemaking proceeding to update its rules to define what would constitute an adequate substitute for retail services that a carrier seeks to discontinue, reduce, or impair in connection with a technology transition (e.g., TDM to IP, wireline to wireless).  *See Ensuring Customer Premises Equipment Backup Power for Continuity of Communications et al.*, PS Docket No. 14-174, Notice of Proposed Rulemaking and Declaratory Ruling, FCC 14-185 (rel. Nov. 25, 2014) (*Section 214 NPRM*).

[116] *See* USTelecom Oct. 6, 2014 Forbearance Petition at 60-73.

[117] We do not forbear in those census blocks where the only ETC is a competitive ETC receiving frozen support to offer voice service, nor do we forbear in those census blocks served by an ETC receiving Mobility Fund support.

[118] *USF/ICC Transformation FNPRM*, 26 FCC Rcd at 18062, para. 1090.

[119] 47 U.S.C. § 214(e)(2).

[120] 47 U.S.C. § 214(e)(6).

[121] 47 U.S.C. § 214(e)(1).  *See also* 47 C.F.R. § 54.201(d)(1).

[122] *USF/ICC Transformation Order*, 26 FCC Rcd at 17692, para. 77; 47 C.F.R. § 54.101.  We note that nothing in section 254(c)(1) or elsewhere precludes the Commission from establishing different supported services for different elements of the federal universal service fund.  *See Modernizing the E-rate Program for Schools and Libraries*, WC Docket No. 13-184, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870, 8897, para. 72 (2014).

geographic area as established by the relevant state commission within which an ETC has universal service obligations and may receive universal service support.[123]

54.    The Commission previously interpreted section 214(e) of the Act to require that an ETC offer voice telephony service throughout its designated service area.[124]  But with the Bureau's adoption of the CAM, the Commission is now able to determine on a more granular level which areas are low-cost and therefore do not need a subsidy because price cap carriers can recoup their costs through reasonable end-user rates.[125]  We note that these low-cost census blocks already have voice telephony service with rates well below the reasonable comparability benchmark for voice service.[126]  And in the other census blocks where we now grant limited forbearance, an unsubsidized competitor exists that is offering voice telephony service at reasonably comparable rates, or there is another ETC with an obligation to offer reasonably comparable voice telephony service.  Thus, we no longer find that it is necessary as a matter of federal universal service policy to require price cap carriers to offer voice telephony service in these areas to achieve the section 254(b)(3) principle of ensuring that "[c]onsumers in all regions of the Nation . . . should have access to telecommunications . . . services, . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas."[127]

55.    Accordingly, as discussed below, we conclude that forbearance from the federal high-cost requirement that price cap carriers offer voice telephony services throughout their service area is warranted in these limited circumstances.[128]  The Act requires the Commission to forbear from applying any requirement of the Act or our regulations to a telecommunications carrier if the Commission determines that: (1) enforcement of the requirement is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory; (2) enforcement of that requirement is not necessary for the protection of consumers; and (3) forbearance from applying that requirement is consistent with the public interest.[129]  We conclude each of these statutory criteria is met for the specific types of areas described above.

---

[123] 47 U.S.C. § 214(e)(5); 47 C.F.R. § 54.207(a).

[124] *See, e.g., Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 20 FCC Rcd 6371, 6380, para. 21 (2005).

[125] *CAM Inputs Order*, 29 FCC Rcd at 4033-41, paras. 164-82.  Our section 10(a) analysis identifies a number of other protections beyond section 214(e)(1)(A) and other considerations that all collectively persuade us that forbearance is justified.

[126] We note that the highest residential local voice rate reported by any price cap carrier anywhere in the country on the 2014 FCC Form 481 was $31.39, well under the $46.96 reasonable comparability benchmark for voice telephony in 2014.  Wireline Competition Bureau Staff Analysis, Form 481 Data filed in WC Docket No. 10-90 (July 1, 2014).  *See also Wireline Competition Bureau Announces Results of Urban Rate Survey for Voices Services; Seeks Comment on Petition for Extension of Time to Comply with New Rate Floor*, WC Docket No. 10-90, Public Notice, 29 FCC Rcd 2967 (Wireline Comp. Bur. 2014).

[127] 47 U.S.C. § 254(b)(3).

[128] *Cf.* AT&T Comments at 24; Letter from Jonathan Banks, Senior Vice President Law & Policy, USTelecom to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90 et al., Attach. at 15-17 (filed Mar. 14, 2014)(attaching paper titled "Modernizing the Eligible Telecommunications Carrier Designation") (USTelecom Mar. 14, 2014 *Ex Parte* Letter); Comments of Frontier Communications, WC Docket No. 10-90 et al., at 9 (filed Jan. 18, 2012); Reply Comments of Alaska Communications Systems Group, Inc., WC Docket No. 10-90 et al., at 8 (filed Feb. 17, 2012) (ACS Feb. 17, 2012 Reply); Comments of Verizon, WC Docket No. 10-90 et al., at 7-8 (filed Jan. 18, 2012)(Verizon Jan. 18, 2012 Comments); USTelecom Oct. 6, 2014 Forbearance Petition at 60-73 (supporting forbearance from enforcing section 214(e)(1)(A) where price cap carriers do not receive support).

[129] 47 U.S.C. § 160(a).  In making a public interest determination, section 10(b) requires the Commission to consider whether forbearance will promote competitive market conditions.  47 U.S.C. § 160(b).

56.    *Just and Reasonable.*  We conclude that enforcement of the section 214(e)(1)(A) federal requirement that price cap carriers offer voice telephony throughout their service areas is not necessary to ensure that the charges, practices, or classifications of price cap carriers are just and reasonable and not unjustly or unreasonably discriminatory in specific geographic areas.[130]  The areas where we forbear from enforcing the federal requirement that price cap carriers offer voice telephony services are census blocks (1) that have been deemed low-cost, (2) where there is an unsubsidized competitor meeting the Commission's standards, or (3) where there is another ETC required to offer voice and broadband services to fixed locations that meet the Commission's public service obligations.

57.    ETCs receiving Connect America support will be required to offer reasonably comparable voice and broadband services in their funded high-cost census blocks at rates that are reasonably comparable to urban areas.  Therefore, there is no need to require a price cap carrier that declines the offer of model-based support to offer voice telephony in those census blocks where another ETC is subject to that reasonable comparability requirement.

58.    Moreover, in all the census blocks where we grant forbearance, the price cap carrier will remain subject to other Title II requirements that ensure that voice telephony rates remain just and reasonable and not unjustly or unreasonably discriminatory.  Price cap carriers will continue to be subject to sections 201 and 202 of the Act, which place nondiscrimination obligations on common carriers.[131]  Additionally, we defer to the states' judgment in assuring that the local rates that price cap carriers offer in the areas from which we forbear remain just and reasonable.  It also is reasonable to expect that the rates that price cap carriers charge in these areas for voice telephony will constrain the rates of other providers.  And finally, in the event that the price cap carrier seeks to cease offering voice telephony in these areas, it will be subject to the section 214(a) discontinuance process that we address more fully below, during which any concerns that may be raised by the price cap carrier's decision to cease offering voice service can be addressed if necessary.[132]  We conclude that these circumstances ensure just, reasonable, and nondiscriminatory offerings in the areas where we grant forbearance.  For these reasons, we find that the first prong of section 10(a) is met.

59.    *Protection of Consumers.*  We find that, in the three types of census blocks subject to this forbearance determination, other mechanisms will be sufficient to protect consumers, and therefore it is unnecessary to enforce the obligation of price cap carriers to offer voice telephony services to ensure that consumers are protected.

60.    First, there are several safeguards that will prevent the consumers living in these areas from losing access to voice telephony services.  Not enforcing the high-cost ETC obligation of price cap carriers to offer voice telephony services in these areas does not mean that price cap carriers can immediately cease providing voice telephony service.[133]  Pursuant to section 214(a) of the Act and section 63.71 of the Commission's rules, all carriers must provide notice to their customers and the relevant states in writing that they plan to discontinue service and then file an application with the Commission before discontinuing voice telephony service in an area.[134]  Outside parties have the opportunity to provide

---

[130] 47 U.S.C. § 160(a)(1).

[131] 47 U.S.C. §§ 201, 202.

[132] 47 U.S.C. § 214(a)

[133] *See* Letter from Mary L Henze, Assistant Vice President, Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 10-90, 11-42, at 2 (filed Nov. 7, 2014).

[134] 47 U.S.C. § 214(a), 47 C.F.R. § 63.71.  The Commission has recently sought comment on improving and modernizing its rules regarding section 214 discontinuances.  *See Section 214 NPRM* at paras. 92-113.  To be clear, the fact that a carrier is statutorily obligated to seek discontinuance approval does not mean the carrier will be prevented from discontinuing the service.  Rather, it means that the request must go through a public review process to ensure that the public interest—encompassing consumer protection, competition, public safety, and other statutory responsibilities—is protected.

comment on the application, and the Commission may then decide that the application should not be automatically granted.[135]  The discontinuance rules are designed to ensure that customers are fully informed of any proposed change that will reduce or end service, ensure appropriate oversight by the Commission of such changes, and provide an orderly transition of service, as appropriate.[136]  This process allows the Commission to minimize harm to customers and to satisfy its obligation under the Act to protect the public interest.[137]

61.    The Commission has discretion to grant a discontinuance request in whole or in part, and may attach conditions as necessary to protect consumers and the public interest.[138]  Given the fact-intensive nature of this inquiry for each affected market, we are not persuaded by suggestions in the record that we should grant blanket discontinuance to price cap carriers in the areas where we grant forbearance.[139]  Where there is a question as to appropriate alternatives available to consumers or whether the present or future public convenience and necessity will be adversely affected, the Commission will scrutinize the discontinuance application, consistent with its statutory obligations.[140]  In evaluating a section 214 discontinuance application, the Commission generally considers a number of factors, including the existence, availability, and adequacy of alternatives.[141]  Through consideration of these factors, the Commission ensures that the removal of a choice from the marketplace occurs in a manner that respects consumer expectations and needs.  The Commission will not authorize a proposed discontinuance of service if customers or other end users would be unable to receive service or a reasonable alternative, or the public convenience and necessity would be otherwise adversely affected.  In such circumstances, the Commission will require price cap carriers to continue offering voice telephony services in those areas in those instances where there is no reasonable alternative.  Moreover, if an area is

---

[135] *See, e.g., Comments invited on Application of Verizon New England Inc.; Verizon New Jersey Inc.; Verizon New York Inc.; Verizon Pennsylvania LLC and Verizon Virginia LLC to Discontinue Domestic Telecommunications Services*, WC Docket No. 14-136, Public Notice, 29 FCC Rcd 10446 (Wireline Comp. Bur. 2014).

[136] *See Petition of USTelecom for Forbearance Under 47 U.S.C. § 160(c) from Enforcement of Certain Legacy Telecommunications Regulations*, WC Docket No. 12-61, et al., Memorandum Opinion and Order and Report and Order and Further Notice of Proposed Rulemaking and Second Further Notice of Proposed Rulemaking*, 28 FCC Rcd 7627, 7685, para. 131 (2013).

[137] *See* 47 U.S.C. § 201.

[138] 47 U.S.C. § 214(c) (stating that the Commission may grant or deny a section 214 discontinuance application in whole or in part, and may attach "such terms and conditions as in its judgment the public convenience and necessity may require"); *see also Verizon Tel. Cos., Section 63.71 Application to Discontinue Expanded Interconnection Service Through Physical Collocation*, WC Docket No. 02-237, Order, 18 FCC Rcd 22737, 22742, para. 8 (2003) (*Verizon Expanded Interconnection Discontinuance Order*); *Federal Communications Commission v. RCA Commc'ns, Inc.*, 346 U.S. 86, 90-91 (1953) (*FCC v. RCA*) (ruling that the Commission has considerable discretion in deciding how to make its section 214 public interest finding).

[139] USTelecom Comments at 22; Reply Comments of Alaska Communications Systems, WC Docket No. 10-90 et al., at 21 (filed Sept. 8, 2014).

[140] *See* 47 U.S.C. § 214(a); 47 C.F.R. § 63.71; *see also Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, CC Docket No. 79-252, First Report and Order, 85 FCC 2d 1, 49 (1980) ("[W]e have retained the right to delay grant of a discontinuance authorization if we believe an unreasonable degree of customer hardship would result."); *FCC v. RCA*, 346 U.S. at 90; *AT&T Application to Discontinue Interstate Sent-Paid Coin Service Not Automatically Granted*, NSD File No. W-P-D-497, Public Notice, 16 FCC Rcd 14935 (Common Carrier Bur. Aug. 3, 2001).

[141] *Southwestern Bell Tel. Co., US West Commc'ns, Bell Atlantic Tel. Cos., Bellsouth Tel. Cos. Applications for Authority Pursuant to Section 214 of the Communications Act of 1934 to Cease Providing Dark Fiber Service*, File Nos. W–P–C–6670, W–P–D–364, Memorandum Opinion and Order, 8 FCC Rcd 2589, 2600, para. 54 (1993); *see also Verizon Expanded Interconnection Discontinuance Order*, 18 FCC Rcd at 22742, para. 8.

unserved and no common carrier will serve that area, the relevant state commission (or the Commission if applicable) is directed by the Act to designate an ETC to serve the area with voice telephony service.[142]

62.    Second, it is reasonable to expect that price cap carriers will continue to offer voice service in these areas even after they have been relieved of the federal ETC requirement to do so.[143] They already have existing networks and customers in these areas. They have an economic incentive to continue to serve these customers and to offer them innovative new services.

63.    Third, even if price cap carriers were to exit these areas, in areas where there is an unsubsidized competitor or another ETC receiving federal high-cost support to deploy modern networks capable of providing voice and broadband to fixed locations, there will be at least one provider in that area offering a voice telephony service that is reasonably comparable to service available in urban areas.[144]  Because consumers in these areas will have at least one other option for fixed voice telephony service at reasonable rates, there is no need to require price cap carriers to continue to offer such services as a federal ETC obligation. And as explained above, whether appropriate substitutes exist in all of the geographic areas in which we grant limited forbearance will be addressed through the section 214(a) discontinuance process; thus, we are comfortable that there is no need to continue to apply ETC obligations in these areas.

64.    We disagree with the claim that the Commission should not forbear from section 214(e) because we should ensure that there is at least one carrier that has a federal obligation to provide voice telephony service to all consumers in a particular area.[145]  As explained above, there are existing regulatory protections that provide reasonable assurance that consumers in the areas where we forbear from the federal high-cost ETC obligation to provide voice telephony service will continue to have access to voice telephony service. And as we explain below, our decision to grant forbearance in these limited circumstances does not disturb existing state carrier of last resort obligations and does not preclude states that do not have carrier of last resort obligations from imposing such obligations. In sum, we find that consumers will be protected, and the second prong of section 10(a) is satisfied.

65.    *Public Interest.*  We conclude that it is in the public interest to forbear from the federal high-cost obligation to offer voice service throughout the service territory because enforcement of that obligation is unnecessary to preserve voice service. As noted above, the section 214 discontinuance process will ensure that consumers will continue to have access to voice service. Price cap carriers that are granted the ability to discontinue their voice telephony service as a matter of federal law because there are alternatives available will no longer be required to spend their resources on maintaining existing voice telephony services or deploying new infrastructure to offer voice telephony service in newly constructed homes where there are already reasonable substitutes. Instead, price cap carriers can reallocate their

---

[142] 47 U.S.C. § 214(e)(3).

[143] In this regard, we note the section 214 requirement that an ETC offer the supported services through "its own facilities or a combination of its own facilities and resale of another carrier's service" would be satisfied when service is provided by any affiliate within the holding company structure.  47 U.S.C. § 214(e)(1)(A).  *See also, e.g.*, *Applications of GCI Communication Corp. et al.*, WT Docket Nos. 12-187, 09-197, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10477-78, para. 119 (2013) (finding it appropriate to "construe the statutory requirement of 'own facilities' under section 214(e) in a flexible way to meet the goals of universal service" and of promoting broadband more specifically).

[144] *See In re: FCC 11-161*, 753 F.3d at 1076 (agreeing with the Commission that its predictive judgment that an unsubsidized competitor "would have an incentive to recover its investment by continuing to serve every possible customer" was "entirely reasonable").

[145] Comments of the National Association of State Utility Consumer Advocates, WC Docket No. 14-192, at 9-16 (filed Dec. 5, 2014) (NASUCA Dec. 5, 2014 Comments).

resources towards making upgrades to their networks to meet the broadband needs of their existing or new customers.[146]

66.    We also find that limited forbearance from section 214(e)(1)(A) will promote competitive market conditions by giving price cap carriers the flexibility to compete on a more equal regulatory footing in the voice telephony market with competitors that already have the opportunity to make business decisions about how best to offer voice telephony service.[147]  Accordingly, our decision is consistent with the principle that universal service policies be equitable and nondiscriminatory and the principle of competitive neutrality.[148]

67.    We do not take the further steps suggested by some commenters of reinterpreting section 214(e)(1) to sunset all existing ETC designations and require states to re-designate ETCs so that their service areas include only high-cost funded areas,[149] imposing rules on state ETC designations,[150]

---

[146] NASUCA does not provide support for its claim that a price cap carrier would need to reallocate *all* of the money it spends on maintaining voice service to broadband deployment before our decision to grant limited forbearance would advance broadband deployment goals.  NASUCA Dec. 5, 2014 Comments at 14.  If a price cap carrier that is relieved of a federal ETC obligation to offer voice service in some areas spends even a portion of the funds that it otherwise would have used to provide voice in those areas to upgrade its broadband networks or deploy broadband to new customers, that would help advance our goal of ensuring that all Americans have access to advanced networks.  We are also not persuaded by the Consumer Advocates' argument that we should not relieve price cap carriers of the obligation to provide voice telephony service in these areas because price cap carriers have not provided adequate evidence to quantify the costs of maintaining voice service in these areas and fail to account for the benefits they accrued as a result of the legacy advantages of being an incumbent LEC.  *See* Reply Comments of the National Association of State Utility Consumer Advocates, Maine Office of the Public Advocate, and the New Jersey Division of Rate Counsel, WC Docket No. 10-90 et al., at 2-4 (filed Feb. 15, 2012).  As we discuss above, we do not grant forbearance in these areas due to the costs imposed on price cap carriers from those obligations, but rather because it is no longer necessary to maintain a federal high-cost voice telephony service obligation in these areas to ensure the protection of consumers and just and reasonable offerings.

[147] We also are not persuaded by NASUCA's claim that a price cap carrier would not be required compete with a provider that receives Connect America support to serve the same high-cost census block, except as a carrier of last resort.  NASUCA December 5, 2014 Comments at 15.  In the census blocks where another ETC replaces the price cap carrier (e.g., through the Phase II competitive process), that ETC will be required to offer both voice and broadband services to *all* eligible locations in that census block.  Thus, if the price cap carrier were to continue to have a high-cost obligation to offer voice service to all locations in that census block, it would be required to compete with the subsidized provider that is already required to offer voice service to all eligible locations.  While some price cap carriers might receive high-cost support other than model-based support, the record does not reveal that this support necessarily would be used in the areas subject to forbearance, and even if that were to occur, price cap carriers—like any other recipient of high-cost support—would, independent of section 214(e)(1)(A), be subject to the requirement to "use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended."  47 U.S.C. § 254(e).

[148] *See* 47 U.S.C. § 254(b)(4) ("All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service."); *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776, 8801, para. 47 (1997) ("Universal service support mechanisms and rules should be competitively neutral . . . [meaning] that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another . . . .").  *See also* Verizon Jan. 18, 2012 Comments at 5; Comments of Windstream, WC Docket No. 10-90 et al., at 34 (filed Jan. 18, 2012) (Windstream Jan. 18, 2012 Comments); USTelecom Mar. 14, 2014 *Ex Parte* Letter Attach. at 15.  While price cap carriers may continue to receive some level of implicit subsidies through intercarrier compensation, all LECs—including those competing with price cap carriers—have the opportunity to collect intercarrier compensation regardless of whether or not they are ETCs, and thus without respect to whether they have service obligations under section 214(e)(1)(A).

[149] *See, e.g.*, AT&T Comments at 18-21; USTelecom Comments at 22; USTelecom Mar. 14, 2014 *Ex Parte* Letter Attach. at 12-13, 17-18.  *See also* WISPA Reply at 14 (urging the Commission to "limit ETC obligations to the funded areas"); Reply Comments of Verizon, WC Docket No. 10-90 et al., at 1-5 (filed Sept. 8, 2014).

[150] *See, e.g.*, AT&T Comments at 22; USTelecom Mar. 14, 2014 *Ex Parte* Letter Attach. at 13-15.

adopting a federal process to redefine service areas,[151] or preempting states.[152]  State commenters argue that these approaches would give insufficient consideration to the important role that Congress has given the states in defining service areas and designating ETCs.[153]  Our decision to grant limited forbearance does not redefine price cap carriers' service areas or revoke price cap carriers' ETC designations in these areas, and we emphasize that it does not preempt price cap carriers' obligation to continue to comply with any state requirements, including carrier of last resort obligations to the extent applicable.[154]  We also note that we do not relieve ETCs of their other "incumbent-specific obligations" like interconnection and negotiating unbundled network elements pursuant to sections 251 and 252 of the Act.  The continued existence of these obligations supports our finding that the forbearance we do grant today is consistent with the public interest.

      68.    Our public-interest finding is also supported by the fact that any incumbent price cap carrier must still comply with the requirements of section 214(e)(4) of the Act regarding relinquishment of ETC designation.[155]  We are not persuaded that our decision to not preempt state obligations constitutes a taking.[156]  We note that no party has articulated which specific state obligations constitute a taking, submitted specific evidence to show how those state obligations are burdensome, or provided detailed analysis as to how the preemption standard has been met for these obligations.

      69.    *Timing.*  Because many ETCs will no longer receive support for discrete census blocks upon full implementation of Phase II in price cap territories, we believe that it is appropriate to clarify our expectations regarding the specific timing of this forbearance.  We find that in the first month that support is disbursed to another ETC that is required to serve particular census blocks with voice and broadband service to fixed locations, incumbent price cap carriers not receiving such support will be immediately relieved of their federal high-cost ETC obligation to offer voice telephony in those specific census blocks.  Also, incumbent price cap carrier ETCs will be relieved of the federal high-cost ETC obligation to offer voice telephony service in the low-cost census blocks where Phase II support is not available and also in census blocks where the average cost is above the funding benchmark where an unsubsidized provider is already providing service.  Incumbent price cap carriers shall be relieved of their existing federal high-cost universal service obligations to offer voice telephony service in low-cost census blocks beginning on the date on which they accept or decline to make a state-level commitment.  Incumbent price cap carriers shall be relieved of their existing federal high-cost universal service obligations to offer voice telephony service in census blocks served by unsubsidized competitors on the date that there is a determination that there is an unsubsidized competitor offering 10/1 Mbps in those census blocks.[157]

---

[151] *See, e.g.*, Comments of United States Cellular Corporation, WC Docket No. 10-90 et al., at 48-49 (filed Jan. 18, 2012).

[152] *See, e.g.*, AT&T Comments at 22; USTelecom Mar. 14, 2014 *Ex Parte* Letter Attach. at 13-15.

[153] *See, e.g.*, Reply Comments of the Massachusetts Department of Telecommunications and Cable, WC Docket No. 10-90 et al., at 2-4 (filed Sept. 8, 2014) (MDTC Reply); Pennsylvania PUC Reply at 9-10.

[154] *See, e.g.*, Comments of the California Public Utilities Commission and the People of the State of California, WC Docket No. 10-90, et al., at 9-10 (filed Aug. 8, 2014) ("All of the incumbent LECs operating in California are Carriers of Last Resort (COLR), a designation that is not dependent upon receipt of federal USF support, either low-income or high-cost.  COLR responsibilities would not end as the result of the expiration of USF funding.").

[155] 47 U.S.C. § 214(e)(4).  We are not persuaded by the argument that state relinquishment proceedings can be burdensome.  *See* Verizon Jan. 18, 2012 Comments at 12-14.  We are not aware of any incumbent provider seeking to relinquish its ETC designation to date, and as such, these arguments are merely speculative.

[156] *See, e.g.*, ITTA Comments at 20; Windstream Jan. 18, 2012 Comments at 34-35; Verizon Jan. 18, 2012 Comments at 5.

[157] We expect that the Wireline Competition Bureau will publish a list of the census blocks that have been determined to be low-cost or served by an unsubsidized competitor offering broadband service at speeds of 10/1 Mbps, and thus are subject to this limited forbearance.

70.    Price cap carriers subject to this limited forbearance in these three specific types of census blocks must continue to satisfy all Lifeline ETC obligations.[158]  Therefore, they will effectively become Lifeline-only ETCs in the specific census blocks that are the subject of this forbearance.  As such, they must continue to offer voice telephony service to qualifying low-income households in those areas unless or until they relinquish their ETC designations in those areas pursuant to section 214(e)(4), and, in any event, must continue to offer voice more generally until they receive discontinuance authority under section 214.[159]

## IV.    ELIGIBILITY OF AREAS FOR PHASE II SUPPORT

### A.    Areas Served By Competitors

71.    *Background*.  In the 2011 *USF/ICC Transformation Order*, the Commission concluded that Connect America support would not be available in those areas that are served by an unsubsidized competitor, which it defined as "a facilities-based provider of residential fixed voice and broadband service that does not receive high-cost support."[160]  It directed the Bureau to exclude such areas from the offer of model-based support to price cap carriers.[161]

72.    In the *April 2014 Connect America FNPRM,* the Commission proposed to exclude from the offer of model-based support any census block that is served by a facilities-based terrestrial competitor offering fixed residential voice and broadband services that meet the Commission's service requirements, whether or not that provider is subsidized.[162]  The Commission also proposed to exclude census blocks where there is a facilities-based terrestrial competitor offering 10 Mbps downstream fixed broadband from eligibility for Connect America Phase II.[163]

73.    *Discussion.*  Upon consideration of the record, we now adopt these proposals with certain modifications.  First, to ensure support is targeted to areas lacking 4/1 Mbps, we will exclude from the offer of Phase II model-based support to price cap carriers any census block served by a subsidized facilities-based terrestrial competitor that offers fixed residential voice and broadband services meeting or exceeding 3 Mbps/768 kbps speed requirement,[164] as determined by the Bureau.  Second, we conclude that any such high-cost blocks served by a subsidized carrier that are excluded from the offer of model-based support—including blocks with service meeting or exceeding the new 10/1 Mbps speed requirement—will instead be eligible for support in the Phase II competitive bidding process.[165]  Third, we conclude that any area served by an unsubsidized facilities-based terrestrial competitor that offers 10/1 Mbps will be ineligible for support in the Phase II competitive bidding process.

---

[158] *Cf.* AT&T Comments at 30-33; CenturyLink Comments at 22-23; USTelecom Comments at 24; WISPA Reply at 14 (seeking that their high-cost ETC designation be de-linked from their Lifeline ETC designation).

[159] 47 U.S.C. § 214(e)(4).  Section 214(e)(4) of the Act provides that a state commission or the Commission "shall permit" an ETC to relinquish its designation "in any area served by more than one [ETC]" so long as "the remaining [ETCs] ensure that all customers served by the relinquishing carrier will continue to be served."  *See* MDTC Reply at 9 (existing relinquishment procedures "ensure[s] consistency for carriers and continuity of service for the especially vulnerable, low-income consumers").

[160] *USF/ICC Transformation Order*, 26 FCC Rcd at 17701, para. 103; 47 C.F.R. § 54.5 (defining unsubsidized competitor).

[161] *USF/ICC Transformation Order*, 26 FCC Rcd at 17729, para. 170.

[162] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7110, para. 174.

[163] *Id.*

[164] The Commission has consistently used 3 Mbps/768 kbps as a proxy for 4/1 Mbps broadband service.  *See, e.g.*, *USF/ICC Transformation Order*, 26 FCC Rcd at 17701, para. 103 n.168.

[165] Partially served census blocks are treated as fully served for purposes of excluding blocks from model-based support.  *See Phase II Challenge Process Order*, 28 FCC Rcd at 7220, para. 22.

74.     We exclude areas served by subsidized competitors providing 3 Mbps/768 kbps or greater service from the offer of model-based support because we are persuaded that whether another provider receives high-cost universal service support should not be the determining factor in excluding a high-cost census block from the offer of model-based support.[166]  In the *USF/ICC Transformation Order*, the Commission eliminated the identical support rule and established Phase II of the Mobility Fund as the mechanism to provide ongoing support for mobile services.[167]  Competitive ETCs offering broadband services that meet the performance standards, however, only have the opportunity to compete for ongoing support if price cap companies decline the state-level commitment.[168]  Upon further consideration, we now conclude that areas served by a subsidized facilities-based terrestrial competitor offering fixed residential voice and broadband services meeting or exceeding 3 Mbps/768 kbps should not be part of the price cap carrier state-level commitment.[169]

75.     By excluding these areas from the offer of Phase II model-based support and instead including them in the Phase II competitive bidding process, we give competitive ETCs serving these areas the opportunity to compete for ongoing support in their high-cost areas, regardless of whether a price cap incumbent accepts or declines the state-level commitment.  This modification recognizes that these areas are high-cost and, absent such ongoing support, it may not be economically feasible for providers in these areas to continue providing service.[170]  Removing these census blocks from the offer of model-based support and instead immediately opening these areas to competitive bidding allows competition to drive support to efficient levels, to be awarded to the provider that will most effectively use funds.[171]

76.     Changing the minimum speed threshold for network deployment to 10/1 Mbps does not mean, however, that we should use the 10/1 Mbps coverage map in determining what areas are served by either unsubsidized or subsidized competitors for purposes of the offer of Phase II model-based support.[172]  The version of the CAM adopted by the Bureau for purposes of identifying the initial list of eligible census blocks provides support for census blocks with an average cost per location per month of between $52.50 and $207.81 and that are unserved by an unsubsidized competitor offering 3 Mbps/768 kbps broadband service.[173]  While adjusting the CAM to provide support for census blocks not served

---

[166] Commenters generally supported the exclusion of areas served by both unsubsidized and subsidized competitors from the offer of model-based support.  ADTRAN Comments at 48-49; Comments of General Communication, Inc., WC Docket No. 10-90 et al., at 11-13 (Aug. 8, 2014); Comments of the Idaho Public Utilities Commission, WC Docket No. 10-90 et al., at 3 (Aug. 7, 2014); Comments of the National Cable and Telecommunications Association, WC Docket No. 10-90 et al., at 9-11 (Aug. 8, 2014) (NCTA Comments); RICA Comments at 3-4.

[167] *USF/ICC Transformation Order*, 26 FCC Rcd at 17830, para. 513.

[168] *Id.* at 17831, para. 514.

[169] We direct the Bureau to exclude any block shown in the adopted version of the model as having 3 Mbps/768 kbps from a competitive terrestrial provider of fixed voice and broadband from the offer of model-based support; the Bureau is not required to complete individual adjudications regarding the eligibility of such blocks in the Phase II challenge process.

[170] ADTRAN Comments at 15; USTelecom Comments at 12; Windstream Comments at 9 (all noting that subsidized competitors may not be able to continue providing service in some areas absent support).

[171] *USF/ICC Transformation Order*, 26 FCC Rcd at 17732, para. 179.  *See also* NCTA Comments at 6-7.

[172] Frontier Comments at 4-6; ITTA Comments at 15-16; USTelecom Comments at 10-11; CenturyLink Comments at 12 (all supporting using 10/1 as the standard for determining the presence of an unsubsidized competitor).

[173] *See CAM Inputs Order*, 29 FCC Rcd at 4040-41, paras. 180-82.  As noted above, the extremely high-cost threshold that determines which blocks are part of the offer of model-based support will be adjusted after conclusion of the pending Phase II challenge process.  *See Wireline Competition Bureau Commences Connect America Phase II Challenge Process*, WC Docket Nos. 10-90 and 14-93, Public Notice, 29 FCC Rcd 7986 (Wireline Comp. Bur. 2014) (*Challenge Process PN*); *Replies Sought in Connect America Phase II Challenge Process*, WC Docket Nos. 10-90 and 14-93, Public Notice, DA 14-1397 (Wireline Comp. Bur. rel. Sept. 26, 2014) (*Challenge Process Reply PN*).  Challenges were due in mid-August, with more than 140 parties challenging the designation of nearly 180,000

(continued….)

with 10/1 Mbps service would increase the number of locations eligible for the offer of model-based support, this increase would be predominately the result of the extremely high-cost threshold shifting downwards.[174]  The end result would be that locations in those blocks that are more expensive to serve, relatively speaking, that currently do not receive even 3 Mbps/768 kbps service would no longer be eligible for the offer of model-based support.  In contrast, using the same 3 Mbps/768 kbps coverage map to target the offer of Phase II model-based support to locations in these higher cost census blocks will result in Connect America model-based funding being targeted to the very same areas that the Commission intended to be subject to the offer of model-based support when it adopted the *USF/ICC Transformation Order* in 2011—those lacking the most basic Internet access.[175]

77.    We are not persuaded by the suggestion that it would be more efficient to use the 10/1 Mbps coverage map because that will result in more locations being served.[176]  The fact that areas that currently have 3 Mbps/768 kbps service but not 10/1 Mbps are excluded from the offer of model-based support does not mean there is no mechanism to ensure that consumers in those areas have access to service meeting the newly established standard.  Instead, we conclude that any area lacking service from a facilities-based terrestrial competitor that meets our new 10/1 Mbps standard and existing latency/usage/pricing requirements will be eligible for support in the Phase II competitive bidding process.[177]  We conclude it is preferable to address these areas in the competitive bidding process, as competitive forces will drive support to efficient levels in those geographic areas that now lack broadband by virtue of our adjustment of the minimum speed threshold.

78.    We also are not persuaded by arguments that using the 10/1 Mbps coverage map to determine eligibility for the offer of model-based support is necessary to enable price cap carriers to build more efficient networks.[178]  We note that price cap carriers—like all other providers—will be able to bid on these census blocks in the Phase II competitive bidding process, providing them with an opportunity to gain additional territory for network efficiency.

79.    Utilizing the 3 Mbps/768 kbps coverage map to exclude areas eligible for model-based support also is administratively efficient.  Excluding areas served by qualifying competitors providing at least 10/1 Mbps service would require the Bureau to conduct a new challenge process to determine which

---

(Continued from previous page) ————————————

census blocks.  The Bureau concluded that 24,225 challenges made a valid prima facie case that a census block should be treated as served, while 70,868 challenges made a valid prima facie case that a census block should be treated as unserved.  Responses to the prima facie challenges were due November 10, 2014.

[174] The Bureau previously released illustrative results showing the number of locations that would be eligible for the offer of model-based Connect America Phase II support if the proposed speed benchmark of 10/1 Mbps was used to determine the presence of an unsubsidized competitor.  *See Wireline Competition Bureau Releases Connect America Cost Model Illustrative Results Using Higher Speed Benchmark*, WC Docket No. 10-90, Public Notice, 29 FCC Rcd 7338 (Wireline Comp. Bur. 2014).

[175] *USF/ICC Transformation Order*, 26 FCC Rcd at 17702, para. 105.

[176] USTelecom Comments at 10-11.

[177] We have already determined that participants in the Phase II competitive bidding process should be permitted to bid on any area where the estimated cost is at or above the Connect America Phase II funding benchmark.  *See April 2014 Connect America FNPRM*, 29 FCC Rcd at 7060, para. 30.  We conclude that our action today to further expand the number of census blocks eligible for the competitive bidding process warrants allocating additional funding to the Phase II competitive bidding process, which we intend to do when we establish the rules for that competitive bidding process.  Such funding will be drawn from unallocated funds in the Connect America reserve account.

[178] *USF/ICC Transformation Order*, 26 FCC Rcd at 17702, para. 105.

[178] USTelecom Comments at 13.

areas that have 3 Mbps/768 kbps lack 10/1 Mbps service.[179]  The Phase II challenge process has been underway since June 2014, and with the record now closed, the Bureau is poised to complete these adjudications.  We believe that undertaking such an effort to conduct a supplemental challenge process would unnecessarily delay the offer of model-based support that otherwise would occur in early 2015.  We therefore direct the Bureau to complete the challenge process for the offer of model-based support and to remove from eligibility any blocks it determines are served by a qualifying competitor providing service of at least 3 Mbps/768 kbps.

80.      Finally, we conclude that any area served by an unsubsidized facilities-based terrestrial competitor that offers 10/1 Mbps will be ineligible for support in the Phase II competitive bidding process.  Because these areas already have service that meets or exceeds the new speed requirement without receiving high-cost funding, we do not have the same concern as we do for areas served by subsidized competitors—that it may not be economically feasible for providers in these areas to continue providing service absent support.  We believe that it would be an inefficient use of Connect America support to provide funding in these areas.  We expect to update the list of census blocks that will be excluded from eligibility from the Phase II competitive bidding process based on the most current data available at the time shortly before that auction to take into account any new deployment that is completed in the coming year.

81.      We also note that any areas left unserved after the Phase II competitive bidding process will be addressed through the Remote Areas Fund.  We do not establish a separate Remote Areas Fund at this time, as we have concluded that parties should be free in the Phase II competitive bidding process to submit bids to bring service to the highest cost, most remote areas of the nation.[180]  Once that Phase II competitive bidding process occurs, and we have determined which winning bidders are authorized to receive support, we will be in a much better position to determine what areas, if any, remain unserved and can be addressed through a separate Remote Areas Fund.

B.      **Rural Broadband Experiments**

82.      *Background.*  In July 2014, the Commission adopted a $100 million budget for rural broadband experiments in eligible areas served by price cap carriers.[181]  At that time, the Commission decided to exclude from the offer of model-based support those areas that are the subject of winning bids in the experiments.[182]  In the *April 2014 Connect America FNPRM*, the Commission sought comment on whether it should also remove any geographic area that is the subject of bidding in the rural broadband experiments from a price cap carrier's state-level commitment, specifically, areas subject to bids not funded by the rural broadband experiments.[183]  On December 5, 2014, the Commission announced the provisionally selected low bidders who are required to submit information demonstrating their financial and technical qualifications by December 19, 2014.[184]

83.      *Discussion.*  We now establish a process to enable the selection of next-in-line bidders for rural broadband experiments support, in the event any of the provisionally selected bidders defaults by failing to meet our technical and financial requirements before the time the Bureau finalizes the list of census blocks that will be offered to the price cap carriers.  All bidders in the rural broadband experiments that wish to remain in consideration for rural broadband experiment support must file their financial and technical information no later than **7 p.m. EST on Tuesday, January 6, 2015, in WC Docket No. 14-**

---

[179] *See infra* Appendix A (defining "qualifying competitor").

[180] *April 2014 Connect America FNPRM,* 29 FCC Rcd at 7060, para. 30.

[181] *See Rural Broadband Experiments Order*, 29 FCC Rcd at 8773-74, para. 9.

[182] *Id.* at 8777, para. 18.

[183] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7123-24, paras. 220-23.

[184] *Provisionally Selected Bidders for Rural Broadband Experiments Support Public Notice*, DA 14-1772.

**259**.[185]  In particular, they must file the most recent three consecutive years of audited financial statements, including balance sheets, net income, and cash flow, in order to enable a thorough financial review.[186]  They also must submit a description of the technology and system design that would be used to deliver voice and broadband service meeting the requisite speeds to all locations in the funded census blocks, including a network diagram, which must be certified by a professional engineer.[187]  This will enable Bureau staff quickly to identify additional provisionally selected bidders in the event that any of the initially selected bidders default before the Bureau finalizes the list of eligible census blocks for the offer of model-based support, which we expect may occur in early 2015.  All bidders that wish to remain under consideration must seek confidential treatment of their filing in order to protect the integrity of the competitive bidding process.[188]

84.    We conclude that excluding from the offer of model-based support any census block included in a non-winning rural broadband experiment application submitted in funding category one will ensure the more efficient use of Connect America support.[189]  We will only exclude those census blocks where a losing bidder has indicated that it wishes to remain in consideration for rural broadband experiment support as described above.  We will not exclude from the offer of model-based support any area where the rural broadband experiment applicant is seeking a waiver of one or more requirements established for rural broadband experiments, including the submission of the requisite financial and technical information.  We conclude that the time necessary to resolve such waiver requests to determine which blocks to remove from the offer of model-based support would unnecessarily delay the implementation of Phase II.  We emphasize that we have no intention of delaying the offer of model-based support to the price cap carriers, and expect to proceed with that offer in early 2015.[190]

85.    We determine that rural broadband experiment proposals submitted in funding category one that facially meet the requirements for submission of financial and technical information could help us achieve our universal service goals in a cost-effective manner.  Though all rural broadband experiment proposals seek an amount of support at or below model-calculated levels, proposals in funding category one are required to commit to constructing networks that are capable of providing 100/25 Mbps.[191]  We are not convinced that providing model-based support to a price cap carrier in an area where another

---

[185] All serious bidders should have been prepared to submit their financial and technical information within ten days of the release of the Public Notice announcing the winning bidders, so this imposes no additional burden on them. Further, we believe it is necessary for bidders to submit these materials by this date in order to ensure that the offer of model-based support we intend to make in early 2015 is not delayed any further.  Bidders wishing to remain under consideration should consult the *Provisionally Selected Bidders for Rural Broadband Experiments Public Notice* for additional information.  *See id.*

[186] *See Rural Broadband Experiments Order*, 29 FCC Rcd at 8787-88, para. 54.

[187] *Id.*  In this regard, we note that for a category one bid, a network plan certified by a professional engineer independent of the applicant that the proposed network design will consistently deliver 25/5 Mbps service to all locations within the project area during peak hours and is capable of consistently delivering 100/25 Mbps service to all locations would likely be more persuasive evidence of technical qualifications than a network plan prepared by an employee of the applicant that does not on its face demonstrate that all locations would receive such service.  An applicant that relies on technology that requires line of sight should be prepared to explain how all locations in the project would be served.

[188] *See* 47 C.F.R. § 0.459.

[189] ACA Comments at 17-18; BARC Comments at 2; Comments of the Fiber to the Home Council Americas, WC Docket No. 10-90, at 9 (filed Aug. 8, 2014); Comments of Midwest Energy Cooperative, WC Docket No. 10-90, at 12-13 (filed Aug. 8, 2014); NRECA Comments at 13-15; UTC Comments at 6.

[190] For this reason, we conclude that this requirement must be effective upon publication of this Order in the Federal Register.  *See* 5 U.S.C. 553(d)(3); 47 C.F.R. § 1.427(b).

[191] *Rural Broadband Experiments Order*, 29 FCC Rcd at 8779-80, para. 26.

entity has demonstrated an interest to provide service that so significantly exceeds the Commission's new speed requirements, for an amount at or below the model-determined support, would be an efficient use of funding.[192]  Further, because the proposals we received in funding category one requested support below the level of support that the model would otherwise provide,[193] excluding these areas from the offer of model-based support and instead making them available in the Phase II competitive bidding process should enable us to stretch our finite Connect America budget even further.[194]

86.     We are not persuaded by concerns that this approach could result in an opportunity for gaming by allowing a party to submit a rural broadband experiments application that the party never intended to honor simply to reserve its opportunity to participate in the Phase II competitive bidding process.[195]  We believe that the parameters we establish above – that only rural broadband experiment proposals in category one for which the applicant submits the required technical and financial information will be excluded from the offer of model-based support – alleviate any concerns that our decision would enable applicants to game the system.  The submission of a network engineering diagram certified by a professional engineer and audited financial statements as described above provides some assurance that these are serious bidders prepared to participate in the Phase II competitive bidding process.  Through such action, these parties will demonstrate a baseline understanding of Commission regulations and procedures.  Moreover, entities with three years of audited financial statements by definition are ongoing businesses.

87.     This decision also reflects our balancing of section 254(b) principles under the circumstances here.  In the *USF/ICC Transformation Order*, the Commission concluded — and we now reaffirm — that the CAF "should ultimately rely on market-based mechanisms, such as competitive bidding, to ensure the most efficient and effective use of public resources."[196]  The Commission adopted a mechanism to offer incumbent price cap carriers a right of first refusal to provide service in exchange for model-based support due to its recognition that the continued existence of legacy obligations could complicate the transition to competitive bidding and might cause consumer disruption.[197]  The Commission also reasoned that the offer would generally include only areas where the incumbent price cap carrier would likely have the only wireline facilities, and that other bidders may have the ability to deliver scalable broadband meeting the Commission's requirements over time.[198]  It was also "our predictive judgment that the incumbent LEC is likely to have at most the same, and sometimes lower, costs compared to a new entrant in many of these areas."[199]  Under the analysis in the *USF/ICC Transformation Order,* these considerations weighed against strict application of the competitive neutrality principle and other factors that might, on their own, otherwise have led us to move more quickly to competitive bidding.[200]

---

[192] ACA Comments at 17-18.

[193] Bidders collectively requested $69 million in annual support for category one for census blocks that collectively would receive $149 million annually in model-based support.

[194] The fact that bidders proposed to serve an area for an amount lower than model-based support in no way calls into question the accuracy of the forward-looking cost model.  There are many reasons why a bidder may be willing to serve an area for less than model-based support, such as access to other sources of funding, a different cost structure, and access to other assets that can be leveraged to provide broadband service.  We note that many of the bidders in category one proposed to use wireless technology.

[195] USTelecom Comments at 29; AT&T Comments at 50-51.

[196] *USF/ICC Transformation Order*, 26 FCC Rcd at 17727-28, para. 165.

[197] *Id*.

[198] *Id. at* 17730-31, para. 175.

[199] *Id*.

[200] *Id*. at 17731-32, paras. 176-78.

88.    We are persuaded to revisit that balancing in certain targeted ways here.  Today, the rural broadband experiments give us more of an ability to identify areas that are likely to be candidates to transition more quickly to competitive bidding, and it is our predictive judgment that those areas will be better served, and the Connect America budget better used, by excluding those areas from price cap carrier's right of first refusal, enabling both incumbents and competitors to seek support through a competitive process.  In light of these new circumstances, and against the backdrop of other changes adopted in this Order, we find that moving more quickly to competitive bidding in certain respects as a result of the changes adopted here is warranted under our reevaluation of the balancing of the competitive neutrality principle against other universal service goals.

89.    We do recognize the possibility that if we remove these areas from the offer of model-based support, both the price cap carrier and the rural broadband experiment applicant ultimately may opt not to bid on such areas in the Phase II competitive bidding process.[201]  That risk exists as well for areas where the price cap carrier declines the offer of model-based support.  On balance, however, we conclude that this risk is outweighed by the public policy benefits potentially, and we believe likely, to be gained of having consumers in these areas receive higher-quality service from a competitor at or below the amount of model-based support and being able to ensure that additional consumers are served with that unused funding.  We also note that any areas left unserved after the Phase II competitive bidding process will be addressed through the Remote Areas Fund.

## V.    PHASE II TRANSITIONS

90.    In this section, we address several issues relating to the implementation of Phase II in areas currently served by price cap carriers.  First, we adopt our proposal to align the funding years for price cap carriers accepting model-based Phase II support with the calendar year, but clarify that the deployment obligation will commence on the date of public notice of authorization for Phase II funding.  Second, we eliminate the transition year formerly adopted by the Commission in the *USF/ICC Transformation Order*.  Third, we clarify that Phase I incremental support should not be included in the calculations of transitional support for those price cap carriers that choose to accept model-based support that is less than frozen support in a given state.

### A.    Aligning Connect America Phase II Funding and Calendar Years

91.    *Background.*  In the *April 2014 Connect America FNPRM*,[202] we sought comment on aligning the funding years of Connect America Phase II with the calendar years used for reporting and recordkeeping established in sections 54.313 and 54.314 of the Commission's rules.[203]

92.    *Discussion.*  We adopt our proposal to align the funding years for the offer of model-based support with the calendar year.  Thus, we adopt our proposal to disburse a lump sum amount to those carriers for whom model-based support in a given state will be greater than Connect America Phase I support.[204]  This lump sum will represent the additional amount of model-based support (above the frozen support that price cap carriers already receive) that would accrue for the beginning months of the year while price cap carriers are considering the offer of model-based support.[205]  Thus, as discussed above, carriers accepting model-based support will receive such support in calendar years 2015 through 2020.

---

[201] USTelecom Comments at 29.

[202] *Id.* at 7122, para. 213-14.

[203] 47 C.F.R. §§ 54.313, 54.314.

[204] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7122, para. 213-14.  No parties submitted comments on this issue.

[205] Price cap carriers will have 120 days to consider the offer of model-based support.  *Phase II Challenge Process Order*, 28 FCC Rcd at 7221, para. 24.

93.    We anticipate extending the offer of model-based support in early 2015, with carriers responding 120 days later.  Then, the Bureau will issue a Public Notice authorizing USAC to disburse the new funding amounts for those providers electing model-based support.  We direct USAC to disburse the lump sum payment in the month after the issuance of this Public Notice, drawing the funds from the broadband reserve account.  We will, however, provide an option for a carrier to elect to defer this lump sum payment until calendar year 2016, in recognition that may be the first year in which significant capital investments are made to meet the deployment obligations established for Phase II.

94.    We clarify that while carriers will receive a full year of Phase II support in calendar year 2015, the deployment obligation commences on the date of the Public Notice authorizing Phase II-model based support.  We acknowledge recipients that accept model-based support thus will be subject to different obligations for the time periods before and after they are authorized to receive Phase II support in calendar year 2015, and direct USAC to take that into account when conducting beneficiary compliance reviews of price cap carrier ETCs for calendar year 2015.

**B.    Transition Where Model-Based Support is Greater than Connect America Phase I Support**

95.    *Background*.  In the *USF/ICC Transformation Order*, the Commission established a process for price cap carriers to transition from Phase I to Phase II in the event they elect to receive model-based support in states where such support is greater than the frozen support they receive under Phase I.[206]  In the *April 2014 Connect America FNPRM*, the Commission sought comment on eliminating this transition period so that in such instances the price cap carrier would receive 100 percent of the annualized amount of its Connect America Phase II support in the first year of its Phase II support.[207]

96.    *Discussion*.  We adopt our proposal to eliminate the transition period for price cap carriers that elect to receive model-based support in states where such support is greater than the frozen support they receive under Phase I.[208]  Because the affected price cap carriers will be receiving more support in these states than they did in Phase I, we find that it is unnecessary to provide a transition year for these carriers to adjust to receiving Phase II support.  Instead, it is in the public interest and will further our Connect America goals immediately to provide these price cap carriers with their full Phase II support, recognizing that significant capital investments will be required to deploy voice and broadband capable networks to unserved areas.  We also conclude that it will lessen administrative costs for USAC: once the Bureau issues the Public Notice authorizing model-based support for those entities electing to make a state-level commitment, that monthly support amount will remain unchanged for the duration of the term of support, rather than making adjustments to account for a transition year.

**C.    Base Support Amount for Transition to Connect America Phase II**

97.    *Background*.  In the *April 2014 Connect America Order*, the Commission adopted a three-year transition for price cap carriers that choose to accept model-based support that is less than their Connect America Phase I frozen support.[209]  In the first year, such carriers would receive, in addition to

---

[206] *USF/ICC Transformation Order*, 26 FCC Rcd at 17733, para. 180.  Specifically, "in the first year, the carrier will receive one-half the full amount the carrier will receive under CAF Phase II and one-half the amount the carrier received under CAF Phase I for the previous year (which would be the frozen amount if the carrier declines Phase I [incremental support] or the frozen amount plus the incremental amount if the carrier accepts Phase I [incremental support]); in the second year, each carrier accepting the state-wide commitment will receive the full CAF Phase II amount." *Id*.  The Bureau sought comment on issues related to the implementation of this transition period in a Public Notice.  *See Wireline Competition Bureau Seeks Comment on Additional Connect America Fund Phase II Issues*, WC Docket No. 10-90, Public Notice, 28 FCC Rcd 16403 (Wireline Comp. Bur. 2013).

[207] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7122, paras. 215-17

[208] No parties commented on this proposal.

[209] *April 2014 Connect America Order*, 29 FCC Rcd at 7066-68, paras. 49-52.

their Phase II support, 75 percent of the difference between the annualized amount of Connect America Phase II model-based support that they accepted and the amount of Connect America Phase I frozen high-cost support that they received in 2014.[210]  In the second year, they would receive 50 percent of the difference; in the third year, they would receive 25 percent of the difference; thereafter, they would receive only Phase II model-based support.[211]  In the *April 2014 Connect America FNPRM*, the Commission proposed that such transitions from Phase I to Phase II would only apply to frozen support and would not include Phase I incremental support.[212]

98.    *Discussion.*  We adopt our proposal to clarify that for purposes of transitioning from Connect America Phase I to Phase II, we will only provide a percentage of Connect America Phase I frozen support; Phase I incremental support will not be included in this transition.[213]  Because Phase I incremental support was intended to be a one-time "immediate boost to broadband deployment" while the Commission worked on implementing Phase II, we conclude that there is no need for price cap carriers to continue to receive a percentage of that support as ongoing support as they transition to Phase II.

## VI.    REFORMS IN RATE-OF-RETURN STUDY AREAS

99.    In the *April 2014 Connect America FNPRM*, we sought comment on several proposals for near-term reform of high-cost universal service support for rate-of-return carriers.[214]  We address these here.  First, we adopt a revised methodology for applying the cap on HCLS so that support is distributed more equitably among all high-cost carriers, and so that carriers with the highest loop costs have better incentives to curb waste in the operation of their study areas.  Second, we adopt our proposals regarding the 100 percent overlap rule, concluding that the Bureau should determine whether there is a 100 percent overlap every other year, and the prior year's support should be used as the basis for the phase-down in support for any study area with a 100 percent overlap.  We conclude that the Bureau should not determine 100 percent overlap based on the existence of a subsidized provider.

100.    We do not, at this time, take action with regard to any of the proposals for long term reform for rate-of-return carriers.  Although a number of parties have submitted proposals that may have promise, we find that further analysis and development of these proposals is necessary.[215]  We expect to continue to develop the record and act on long-term reform in the coming year.

### A.    HCLS Reimbursement Rates under the Cap

101.    In the *April 2014 Connect America FNPRM*, we noted that we "continue to have significant concerns regarding the structure and incentives created under the existing high-cost mechanisms for rate-of-return carriers, such as the 'race to the top' incentives that exist under HCLS and

---

[210] *Id.* at 7067-68, para. 52.

[211] *Id.*

[212] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7123, paras. 218-19.  In the *USF/ICC Transformation Order*, the Commission stated that "[t]o the extent a carrier will receive less money from CAF Phase II than it will receive under frozen high-cost support, there will be an appropriate multi-year transition to the lower amount." *USF/ICC Transformation Order*, 26 FCC Rcd at 17733, para. 180 n.294.

[213] No parties commented on this proposal.

[214] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7134-36, paras. 259-66.

[215] *See, e.g.*, ITTA Comments at 25-32; GVNW Consulting Comments at 15-17; Reply Comments of Home Telecom, WC Docket No. 10-90 et al. (filed Sept. 8, 2014); Reply Comments of the Nebraska Rural Independent Companies, WC Docket No. 10-90 et al., at 7-10 (filed Sept. 8, 2014); Reply Comments of the Rural Broadband Alliance, WC Docket No. 10-90 et al. (filed Sept. 8, 2014)

the 'cliff effect' of the annual adjustment of the HCLS cap."[216]  We address this concern for the near-term by modifying the methodology for reimbursements under HCLS.

102.    *Background*.  Under the current HCLS rules, rate-of-return carriers receive reimbursement for a fixed percentage of their unseparated loop expenses to the extent that they exceed a benchmark set in relation to the national average cost per loop (NACPL).[217]  These rules reimburse 65 percent of the loop costs in excess of 115 percent, but less than 150 percent of the NACPL, and 75 percent of loop costs in excess of 150 percent of the NACPL.[218]  HCLS for rate-of-return carriers is subject to an indexed cap.[219]  Specifically, the total cap on HCLS is adjusted annually by a rural growth factor equal to the sum of the annual percentage changes in the gross domestic product-chain priced index and the total number of working loops.[220]  The indexed cap is enforced by raising the NACPL used in HCLS calculations until the amount of calculated support equals the cap amount.[221]

103.    The indexed cap on HCLS has seen steady reductions in recent years as a result of decreasing numbers of working loops and low inflation rates.[222]  As a result, carriers with costs close to the ever rising NACPL risk losing all HCLS for prior investments, while carriers with a higher cost per loop are sheltered from the impact of the HCLS cap.[223]  The carriers with the highest loop costs relative to the national average have minimal incentive to reduce their expenses and eliminate waste:  between HCLS and interstate common line support, it is possible for 100 percent of their incremental loop costs to be recovered through universal service.[224]  We observe that these carriers with the highest HCLS reimbursement rates have steadily increased their reported loop costs (by 36 percent since 2004), while

---

[216] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7134, para. 259.  The "race-to-the-top" is the incentive that some carriers have to incur additional operating and investment expenses because all of their incremental investment expenses and many of their incremental operating expenses are recoverable through federal high-cost support mechanisms.  The "cliff effect" occurs when support is eliminated or drastically reduced for a carrier with a cost per loop just above the support threshold when the cap on support applied.

[217] *See* 47 C.F.R. § 54.1310.  The Commission's HCLS rules were formerly codified in Part 36, subpart F.

[218] *Id.*

[219] *Id.* § 54.1302.

[220] *Id.* § 54.1303.

[221] *Id.* § 54.1309(c)(2).

[222] *See* National Exchange Carrier Association, Inc. Overview and Analysis of 2013 USF Data Submission, filed September 30, 2014, at 2 (indexed cap on HCLS for 2015 calculated as $735.2 million); National Exchange Carrier Association, Inc. Overview and Analysis of 2004 USF Submission, filed September 30, 2005 at 3 (indexed cap on HCLS for 2006 calculated at $1,047.3 million) (both filings *available at* http://www.fcc.gov/encyclopedia/necas-overview-universal-service-fund).  During this period, the cap has also been rebased on multiple occasions to reflect the ineligibility of price-cap carriers and their rate-of-return affiliates.  *See, e.g.*, *USF-ICC Transformation Order*, 26 FCC Rcd at 17760, paras. 258-59.

[223] We note that a "higher cost" carrier does not necessarily serve an area that is more costly to serve.  To the extent a carrier is experiencing access line loss, for whatever reason, its cost per loop will rise because the total costs for the study area are divided by a smaller number.  Thus, two study areas with identical cost characteristics could have significantly different reported costs per loop, based on the extent to which customers are "cutting the cord" for their landline voice service.  A study area where there are competitive alternatives in fact may have a higher cost per loop, all other things being equal.

[224] This is possible because HCLS equals 75% of a carrier's *unseparated* loop costs in excess of 150% of the NACPL.  47 C.F.R. § 54.1310(c)(2).  At the same time, 25% of the unseparated loop costs are allocated to the interstate jurisdiction for recovery.  47 C.F.R. § 36.154(c).  The carrier may receive interstate common line support (ICLS) to the extent its interstate loop costs exceed interstate common line revenues from subscriber line charges.  47 C.F.R. § 54.901(a).  As a result, a carrier may recover the entire cost of an incremental loop-related expense through ICLS and HCLS together.

carriers with lower reimbursement rates have had stable or reduced loop costs.[225]  In combination, the decreasing HCLS cap and the increasing demand from the carriers reporting the highest cost per loop create yearly increases in the NACPL used to calculate HCLS, precluding many carriers from receiving any HCLS and significantly reducing support for others with costs per loop close to the NACPL.  A comparison of the 646 study areas that submitted cost studies for each year from 2004 to 2013 shows what has occurred over the last decade:  in 2006, 579 of the 646 study areas were receiving HCLS support, but by 2015, only 461 of them are projected to receive support, meaning that 118 or 20 percent of these study areas fell "off the cliff" over this ten-year period.[226]  These features of the HCLS rule were not altered in the *USF/ICC Transformation Order*.

104.    In the *April 2014 Connect America FNPRM*, the Commission proposed to mitigate these deficiencies by reducing support proportionally among all HCLS recipients through decreased reimbursement percentages for all carriers instead of adjusting the NACPL.[227]  Specifically, we proposed to freeze the NACPL that is used to determine support and instead to decrease HCLS proportionately among all HCLS recipients.[228]  As specified in the proposed rule, the reduction would be achieved by multiplying each carrier's calculated HCLS by the ratio of the indexed HCLS cap to the aggregate amount of HCLS initially calculated for all carriers using the frozen NACPL.[229]  This effectively would freeze the NACPL at the capped amount as a date certain, such as December 31, 2014.[230]

105.    This proposal initially received widespread support from commenters responding to the FNPRM.[231]  Subsequent to the closing of the comment cycle, however, the Rural Associations argued the Commission's proposed methodology should be modified to lessen the impact on the companies with the highest reported cost per loop by continuing to raise the NACPL as is done under the current methodology.[232]  In particular, the Rural Associations propose that if HCLS as initially calculated based on the frozen NACPL exceeds the indexed cap, then the NACPL would be adjusted so the HCLS amounts equal the indexed cap plus half of the difference between the initially calculated amount and the

---

[225] *See* Letter from Mark Walker, Legal Advisor to the Chief, Wireline Competition Bureau, to Marlene H. Dortch, Secretary, FCC (Nov. 24, 2014) (*November 24 Wireline Bureau Letter*).  Among the 646 study areas that submitted cost studies (that is, not including average schedule study areas) for the 2005 through 2014 HCLS data submissions (covering the 2004 through 2013 calendar years), 376 had study area costs per loop above the 150% of the NACPL threshold in 2013.  *Id.*  These carriers increased their reported costs by an aggregate of 36% over that period.  In contrast, the 85 study areas with costs per loop between the 115% and 150% thresholds in 2014 increased their reported costs per loop by only 4%, and the 185 study areas with costs per loop below the 115% threshold in 2014 had a 14% *reduction* in costs per loop.  *Id.*  Carriers whose costs per loop are less than 115% of the NACPL are not eligible for HCLS.  It is reasonable to infer that the lack of HCLS for those companies created incentives to constrain their expenses to the extent possible.

[226] *Id.*

[227] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7134-35, paras. 259-62.

[228] *Id.*

[229] *Id*. at 7188, App. B (proposed amendment of section 54.1310(a)).

[230] *Id.* at 7135, para. 262.

[231] *See* ITTA Comments at 36-37 ("ITTA supports the Commission's adoption of this proposal and agrees it would help alleviate problems created by the structure of the current HCLS mechanism"); Western Association Comments at 6 (stating that the Commission should restore support to carriers that have "fallen off the cliff"); Rural Associations Comments at 63-65 ("the Rural Associations do not object to the specific proposal described in the Further Notice …, [but] the Commission should be mindful that such percentage reduction methods …may have unintended impacts…"); USTelecom Comments at 48-49 ("USTelecom …supports the Commission's proposal to adopt …a freeze on the NACPL and proportionate reduction of HCLS on a per-carrier basis.").

[232] Letter from Michael R. Romano, NTCA – The Rural Broadband Association to Marlene H. Dortch, FCC Secretary, WC Docket No. 10-90, et al., Attach. (filed Oct. 10, 2014).

indexed cap.[233]  The HCLS amounts calculated using this adjusted NACPL would then be reduced proportionally so that total HCLS matched the indexed cap.[234]  The Rural Associations argue that their proposal would mitigate what they consider disproportionate effects on the carriers with the highest cost per loop.[235]

106.    *Discussion*.  After full consideration of the record, we now adopt our proposal, as described in the *April 2014 Connect America Order and FNPRM*.  We find that this targeted rule change will be effective in addressing the lack of incentives to curb waste that results from the race to the top and providing a more equitable distribution of support to all high-cost rate-of-return carriers, including those currently facing a loss of support due to the cliff effect.

107.    We decline to adopt the Rural Associations' proposed modification.  Under their proposal current recipients of HCLS would continue to lose HCLS as the HCLS cap is lowered, albeit not to the same extent as occurs today.  Yet addressing the cliff effect was one of the core objectives of the Commission's proposal.  Although the Rural Associations' proposal may, to some degree, mitigate both the cliff effect and the race to the top as compared to our current methodology, based on the record before us, we find it would be less effective at addressing both objectives than the Commission's proposal.  In a set of examples provided by the Rural Associations, the two lowest cost companies in the set each would receive approximately 40 percent less in the first year after implementation of the proposed rule than they would under the Commission's proposals and would have their HCLS entirely eliminated by the fifth year of operation.[236]  Indeed, under NTCA's proposal, the cliff effect would immediately eliminate support from 11 study areas that would continue to receive support under the Commission's proposal.[237]  In other words, the cliff effect would remain significant if the Rural Associations' proposal were implemented.  Similarly, the Rural Associations' proposal significantly preserves the advantages under HCLS of being a company reporting a relatively higher cost per loop, even if it does eliminate the possibility that a carrier could recover 100 percent of any marginal loops costs it incurs.

108.    Although the Rural Associations express concern that the Commission's proposal may have a disproportionate effect on the carriers with the highest cost per loop, in their own examples, we do not believe that this will result in insufficient support for any carrier.  Using NTCA's analysis, the highest cost carrier would lose only seven percent of HCLS as compared to the current rules (and receives only three percent less than it would receive under the Commission's proposal).[238]  Because that carrier would likely also be receiving a significant amount of ICLS, the reduction as a fraction of total support would be even less than seven percent.  Moreover, the fact that reported costs have increased for some high-cost recipients at rates substantially above that for other high-cost recipients suggests that the current construct of the rule does not create structural incentives for these carriers to take measures to reduce their expenses to the extent possible.  There are several potential reasons why reported costs per loop for certain carriers are increasing at rates in excess of that for other high-cost recipients:  they are investing more, they are subject to greater competition and therefore experiencing line loss, or they are spending imprudently.  One of our goals as we consider proposals for longer-term reform is to provide a more equitable opportunity for all carriers in high-cost areas to invest in broadband-capable infrastructure.  In the

---

[233] *Id.* Attach. at 1-2.

[234] *Id.*

[235] *Id.*

[236] Letter from Michael R. Romano, NTCA – The Rural Broadband Association to Marlene H. Dortch, FCC Secretary, WC Docket No. 10-90, et al. (filed Oct. 20, 2014) (NTCA Oct. 20, 2014 *Ex Parte* Letter).

[237] *November 24 Wireline Bureau Letter*.  With no rule change, 37 study areas would no longer receive support according to this analysis. *Id.*

[238] *Id.*

meanwhile, the rule change we are adopting today will strengthen the incentive for the carriers with the highest reported costs per loop to manage their expenditures in light of the existence of the cap on HCLS.

109.    We also are not persuaded by commenters arguing that these changes are unnecessary. TCA argues that the $250 per-line per month cap effectively addresses the race to the top.[239]  In fact, the $250 per-line cap affects only a small number of the very highest cost carriers and, for the reasons explained above, does not, we conclude, comprehensively address the race to the top or the cliff effect.[240]  Those higher cost carriers not subject to the $250 per-line cap still have limited incentive to curb waste, and numerous others are hurt by the cliff effect.

110.    We do not agree with the Concerned Rural ILECs that the race to the top is a budgetary problem and could be solved by increasing the size of the HCLS budget.[241]  Although significantly increasing the HCLS budget might address the cliff effect, it would, if anything, exacerbate the race to the top by eliminating the limited constraints the HCLS mechanism currently has on carrier spending and undermining the carriers' incentives to curb wasteful expenses related to common line costs.

111.    We disagree with TCA's contention that we should not adopt our proposal due to retroactivity.[242]  As a matter of law, the proposed rule is not impermissibly retroactive.  We note that the Tenth Circuit recently rejected arguments that the changes the Commission made to the HCLS and Safety Net Additive (SNA) rules in the *USF/ICC Transformation Order* violated the presumption against retroactivity.[243]  The court there found that "the Order . . . , which makes only prospective changes to the reimbursement framework, including the elimination of SNA, is not retroactive."[244]  A rule does not operate retroactively merely because it is "applied in a case arising from conduct antedating [its] enactment" or "upsets expectations based on prior law."[245]  Rather, a rule operates retroactively if it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past."[246]  The application of the rules adopted here will not take away or impair a vested right, create a new obligation, impose a new duty, or attach a new disability in respect to the carriers' previous expenditures.  There is no statutory provision or Commission rule that provides companies with a vested right to continue to

---

[239] Comments of TCA, WC Docket No. 10-90 et al., at 9 (filed Aug. 8, 2014) (TCA Comments).

[240] 2013 Monitoring Report, Table 2.13, http://transition.fcc.gov/Bureaus/Common_Carrier/Reports/FCC-State_Link/Monitor/2013_Monitoring_Report.pdf (29 incumbent study areas with support in excess of $250 per loop per month).

[241] Comments of the Concerned Rural ILECS, WC Docket No. 10-90 et al., at 16-17 (filed Aug. 8, 2014).

[242] TCA Comments at 9-10.

[243] *In re: FCC 11-161*, 753 F.3d at 1071-73.

[244] *Id.* at 1072.  The court further noted that "it is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes.  This has never been thought to constitute retroactive lawmaking, and indeed most economic regulation would be unworkable if all laws disrupting prior expectations were deemed suspect." *Id.* (quoting *Mobile Relay* Assoc. v. FCC, 457 F.3d 1, 11 (D.C. Cir. 2006) (internal quotation marks omitted)).

[245] *Landgraf v. USI Film Products*, 511 U.S. 244, 269-70 (1994); *see also In re: FCC 11-161*, 753 F.3d at 1072 (finding that *USF/ICC Transformation Order*, "which makes only prospective changes to the reimbursement framework" is not retroactive).

[246] *Marrie v. SEC*, 374 F.3d 1196, 1207 (D.C. Cir. 2004) (quotation omitted); *see also Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 283 (4th Cir. 2004) ("to determine whether a regulatory change has retroactive effect, we must determine that a rule 'attaches new legal consequences to events completed before its enactment'") (quoting *INS v. St. Cyr*, 533 U.S. 289, 321 (2001)).

receive support at particular levels or through the use of a specific methodology.[247]  Although application of these rules may affect the amount of support a carrier receives for expenditures made in 2013, it does not change the legal landscape in which those expenditures were made.  Rather, as the Commission observed in the *USF/ICC Transformation Order*, "section 254 directs the Commission to provide support that is sufficient to achieve universal service goals, [but] that obligation does not create any entitlement or expectation that ETCs will receive any particular level of support or even any support at all."[248]

112.    Moreover, as a matter of policy, we are not persuaded that even the highest cost rate-of-return carriers will be unduly harmed by this rule.  As noted above, in the Rural Associations' examples, the highest cost company sees a reduction of only six percent of its HCLS (and a smaller fraction of its total high-cost support) as a result of this rule.[249]  TCA nonetheless argues that this rule change "unfairly penalizes" rate-of-return carriers "that have made investments to bring broadband to their customers in accordance with the FCC's goals."[250]  TCA provides no basis, however, for distinguishing between carriers that have, in fact, prudently invested in broadband facilities and those that have failed to curb wasteful expenses.  We note that if any rate-of-return carrier suffers significant harm as a result of this rule change and the carrier's earlier prudent investment, it may seek waiver of our rules.[251]

113.    We decline to adopt the Eastern Rural Telecom Association's (ERTA) proposal that the frozen NACPL be indexed to inflation or some other low-growth factor as a method of removing the cliff effect.[252]  We find that the other steps taken here will effectively address this issue.  Moreover, because we anticipate that we will adopt more comprehensive reforms for rate-of-return carriers in the coming year, indexing the NACPL is unlikely to have a material effect.

114.    We recognize that NTCA's analysis is sensitive to a number of forecasting assumptions, including line growth or loss and changes in cost per loop.  For that reason, we will closely monitor the effects of this rule change on rate-of-return carriers and will revisit this issue in the event that it has unanticipated results.  In sum, however, we are not convinced based on the record before us that the Rural Associations' proposal is superior to what we proposed in the *April 2014 Connect America NPRM*.

---

[247] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17770-71, para. 293; 47 U.S.C. § 254; *see also Rural Cellular Association v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) ("[the] purpose of universal service is to benefit the customer, not the carrier") (quotation omitted).  We note that the Commission has been seeking comment on whether and how to change the support methodology for rural carriers since 2004, which should have made it evident to those carriers that they are not guaranteed a particular level of support.  *See Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Order, 19 FCC Rcd 11538 (2004).  Indeed, the Commission's proposals to reform support for rural carriers have ranged from the modest, targeted reforms adopted in the *USF/ICC Transformation Order* to more sweeping proposals to auction all high-cost support.  *See, e.g.*, *Federal-State Joint Board on Universal Service*, WC Docket No. 05-337, CC Docket No. 96-45, Notice of Proposed Rulemaking, 23 FCC Rcd 2495 (2008).

[248] *USF/ICC Transformation Order*, 26 FCC Rcd at 17745, para. 221; *see also Members of the Peanut Quota Holders Assoc. v. United States*, 421 F.3d 1323 (Fed. Cir. 2005), *cert. denied* 548 U.S. 904 (2006) ("The government is free to create programs that convey benefits in the form of property, but, unless the statute itself or surrounding circumstances indicate that such conveyances are intended to be irrevocable, the government does not forfeit its right to withdraw those benefits or qualify them as it chooses.").

[249] NTCA Oct. 20, 2014 *Ex Parte* Letter, Attach.

[250] TCA Comments at 10.

[251] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17839-42, paras. 539-44; *see also Connect America Fund et al.*, WC Docket No. 10-90 et al., Fifth Order on Reconsideration, 27 FCC Rcd 14549, 14556-60, paras. 18-32 (2012) (*Fifth Order on Reconsideration*).  The *Fifth Order on Reconsideration* addressed in some detail the circumstances supporting grant of waiver and the documentation that would support such a showing.

[252] Comments of the Eastern Rural Telecom Association, WC Docket No. 10-90 et al., at 2-3 (filed Aug. 8, 2014).

### B.      100 Percent Overlap Rule

115.    *Background.*  In the *April 2014 Connect America Order*, we codified a rule previously adopted by the Commission in 2011 to eliminate support in rate-of-return study areas where there is a 100 percent overlap with an unsubsidized competitor.[253]  We proposed to adopt a timeline for periodic determination of whether there is a 100 percent overlap, with the Bureau reviewing the study area boundary data in conjunction with data collected on the FCC Form 477 and the National Broadband Map every other year to determine whether and where 100 percent overlaps exist.[254]  We proposed to adjust the baseline for support reductions to be the amount of support received in the immediately preceding year before a determination is made that there is a 100 percent overlap, rather than 2010 support amounts.[255]  We also sought comment regarding whether this rule should be modified to apply to areas with "qualifying competitors" (including subsidized competitors) as well.[256]

116.    *Discussion.*  The Commission previously directed the Bureau "to publish a finalized methodology for determining areas of overlap and a list of companies for which there is a 100 percent overlap."[257]  We expect the Bureau will, in 2015, review study area boundary data in conjunction with other data collected via FCC Form 477 or the State Broadband Initiative to determine whether and where 100 percent overlaps exist.  The Bureau will publish its preliminary determination of those areas subject to 100 percent overlap and then provide an opportunity for comment on these preliminary determinations, building on experience gained in conducting the Phase II challenge process in price cap areas.  Once the comment period is complete, the Bureau then will finalize its determination of where there is a 100 percent overlap.  We direct the Bureau to repeat this process every other year to determine whether additional study areas have become subject to the 100 percent overlap rule.[258]  Finally, we adopt our proposal to base support reduction phase down on the amount of support awarded in the year prior to the determination, rather than 2010.[259]  Because implementation of the 100 percent overlap determinations for rate-of-return carriers has taken longer than initially anticipated, we believe that basing reductions on current support will lead to a smoother transition.

117.    We decline to modify the 100 percent overlap rule to eliminate support in any study area with a qualifying competitor, as opposed to an unsubsidized competitor.  As explained above, the reason we are removing high-cost census blocks with a qualifying competitor from eligibility for Connect

---

[253] *April 2014 Connect America Order*, 29 FCC Rcd at 7068, para. 54.  In codifying the rule, we inadvertently failed to specify that the rule only applies to rate-of-return study areas.  We now modify the codified rule to conform to the Commission's decision in 2011.  Because of our action here today, we dismiss in part USTelecom's petition for clarification as to whether section 54.319 of the Commission's rules applies to price cap areas.  *See* Petition for Reconsideration and/or Clarification of the United States Telecom Association of the "Report and Order" and the "Order", WC Docket No. 10-90 et al., at 2-4 (filed Aug. 8, 2014).

[254] *April 2014 Connect America FNRPM*, 29 FCC Rcd at 7136, para. 266.

[255] *Id.*

[256] *Id.* at 7111, para. 178.

[257] *USF/ICC Transformation Order*, 26 FCC Rcd at 17733, para. 180.

[258] *See* NCTA Comments at 3-4 (supporting biennial review using FCC Form 477 data).  Several small carrier associations filed a petition for clarification and/or reconsideration regarding whether there would be a "further evidentiary process or additional requirements to validate the actual presence of an unsubsidized competitor beyond simple reconciliation and review of mapping and FCC Form 477 data."  *See* Petition for Clarification and/or Reconsideration of the National Exchange Carrier Association, Inc.; NTCA – The Rural Broadband Association; Eastern Rural Telecom Association; and WTA – Advocates for Rural Broadband, WC Docket No. 10-90, et al., at 2 (filed Aug. 8, 2014).  As we have clarified herein that there will be an opportunity for public comment on the Bureau's preliminary determinations of which study areas are subject to 100 percent overlaps by an unsubsidized competitor, we dismiss this petition as moot.

[259] *April 2014 Connect America Order*, 29 FCC Rcd at 7136, para. 266.

America Phase II model support is to provide an opportunity for all parties to compete for support for those areas through a competitive bidding process.[260]  There is no comparable process in place in rate-of-return study areas for several subsidized competitors to compete with each other for support to serve the study area.  In the case of rate-of-return carriers, removing study areas from eligibility where there are qualifying competitors would mean that there is no mechanism to provide support for high-cost areas that presumably need support in order for consumers to have access to voice and broadband services, once the phase-down in competitive ETC support is complete.

## VII.    ACCOUNTABILITY AND OVERSIGHT

118.    In this section, we take several steps to strengthen the uniform national framework for accountability that the Commission adopted in the *USF/ICC Transformation Order*.[261]  First, we codify a broadband reasonable comparability rates certification requirement for all recipients of high-cost support that are subject to obligations to deploy broadband to fixed locations.  Second, we require price cap carriers that accept model-based support to submit specific location information with their service quality improvement plans and progress reports to enhance our ability to monitor their use of Connect America support.  Third, we adjust the framework for reduction in support for late-filed section 54.313 and 54.314 reports and certifications.  Fourth, we adopt measures to be used in the event specific ETCs do not meet certain terms and conditions of high-cost support.

### A.    Reasonably Comparable Rates Certification for Broadband

119.    *Background.*  In the *April 2014 Connect America FNPRM* the Commission proposed to codify a broadband reasonable comparability rate certification requirement that will apply generally to all recipients of high-cost support that are required to offer broadband as a condition of receiving ongoing high-cost support in areas served by price cap and rate-of-return carriers.[262]  Such a requirement for voice services was codified in the *USF/ICC Transformation Order*.[263]

120.    *Discussion.*  We amend section 54.313(a) to include a new subsection 12 that requires recipients of high-cost and/or Connect America Fund support that are subject to broadband performance obligations to submit a broadband reasonable comparability rate certification with their annual section 54.313 report (FCC Form 481).[264]  In that certification, support recipients must certify that the pricing of the broadband offering they are relying upon to meet their broadband performance obligation is no more

---

[260] *See supra* Section IV.A.

[261] *USF/ICC Transformation Order*, 26 FCC Rcd at 17848-66, paras. 568-614.  *See also April 2014 Connect America FNPRM*, 29 FCC Rcd at 7147-54, paras. 309-31.

[262] *April 2014 Connect America FNPRM,* 29 FCC Rcd at 7148-49, paras. 311-16.  In the *USF/ICC Transformation Order*, the Commission required that as a condition of receiving Connect America Fund support, recipients must offer broadband services in supported areas with rates that are reasonably comparable to similar offerings in urban areas.  *USF/ICC Transformation Order*, 26 FCC Rcd at 17695, para. 86.  *See also* 47 U.S.C. § 254(b).  The Commission stated that it would "consider rural rates to be 'reasonably comparable' to urban rates . . . if rural rates fall within a reasonable range of urban rates for reasonably comparable broadband service."  *USF/ICC Transformation Order*, 26 FCC Rcd at 17708 para. 113.  It also directed the Wireline Competition Bureau and the Wireless Telecommunications Bureau to develop a "specific methodology" to determine the reasonable range and to conduct an annual survey to "derive a national range of rates for broadband service."  *Id.* at paras. 113-14.

[263] 47 U.S.C. § 54.313(a)(10).

[264] This requirement does not apply to recipients of Mobility Fund Phase I support or competitive ETCs.  *See Mobility Fund Phase I Auction Scheduled for September 27, 2012 Notice and Filing Requirements and Other Procedures for Auction 901*, AU Docket No. 12-25, Public Notice, 27 FCC Rcd 4725, 4772, paras. 174-80 (Wireless Telecom. Bur. and Wireline Comp. Bur. 2012) (adopting a separate rate certification for recipients of Mobility Fund I); *USF/ICC Transformation Order*, 26 FCC Rcd at 17853, para. 583 (stating that competitive ETCs "will not be required to submit any of the new information or certifications . . . related solely to the new broadband public interest obligations").

than the applicable benchmark as specified in a public notice annually issued by the Wireline Competition Bureau, or is no more than the non-promotional prices charged for a comparable fixed wireline service in urban areas in the state or U.S. Territory where that high-cost support recipient receives support.[265] Recognizing that high-cost support recipients are permitted to offer a variety of broadband service offerings as long as they offer at least one standalone voice service plan and one service plan that provides broadband that meets our requirements,[266] we only require that they make the above certification for one of their broadband service offerings that satisfies all of the Commission's requirements, including that the service be offered throughout the high-cost support recipient's supported area in the relevant state or U.S. Territory, or for rate-of-return carriers, be made available upon reasonable request. We conclude that requiring high-cost support recipients to make this certification will ensure that the Commission can monitor their compliance with conditions that fulfill the section 254(b) principle that "[c]onsumers in all regions of the Nation . . . should have access to telecommunications and information services . . . that are available at rates that are reasonably comparable to rates charged for similar services in urban areas."[267]

121.     We require high-cost support recipients that elect to certify that their pricing of services in rural areas is no greater than their pricing in urban areas to rely upon the non-promotional prices charged for comparable *fixed wireline* services.[268] We decline to permit high-cost support recipients to certify that the pricing they offer for their broadband services is no more than the non-promotional prices charged for comparable "broadband" services.[269] We note that the applicable benchmark adopted by the Bureau is two standard deviations above the average urban rates for a specific set of service characteristics, consistent with the Commission's precedent for the voice reasonable comparability benchmark.[270] We also already provide a presumption for high-cost support recipients that offer rates that exceed the applicable benchmark that those rates are reasonably comparable if they are the same as rates being offered in urban areas for a comparable fixed wireline service. Fixed wireless services tend to be more expensive than fixed wireline services even when data usage allowances and the speeds offered are

---

[265] *See, e.g.*, Comments of Missouri Public Service Commission, WC Docket No. 10-90 et al., at 4-5 (filed Aug. 5, 2014) (Missouri PSC Comments) (supporting the codification of a reasonably comparable broadband rates certification because "[s]uch certification will help ensure rural consumers have affordable broadband service rates"). For purposes of developing this benchmark for high-cost support recipients, the Bureau defined an urban area as any "urban area" or "urban cluster" that sits within a Metropolitan Statistical Area, as defined by the Census Bureau. A carrier need only make the offering in part of the "urban area" or "urban cluster" to qualify. *See Phase II Service Obligations Order*, 28 FCC Rcd at 15064, para. 12.

[266] *See Phase II Service Obligations Order*, 28 FCC Rcd at 15062, para. 6 n.12.

[267] 47 U.S.C. § 254(b); *USF/ICC Transformation Order*, 26 FCC Rcd at 17708-09, paras. 113-14.

[268] In response to the *April 2014 Connect America FNPRM*, several commenters raised specific concerns about how the national broadband reasonable comparability benchmark will be calculated and applied. *See, e.g.*, Rural Associations Comments at 71-74 (expressing concerns that "a benchmark cannot be calculated in an accurate and equitable manner with the data available at this time"). In the *USF/ICC Transformation Order*, the Commission directed the Wireline Competition Bureau and the Wireless Telecommunications Bureau to develop a specific methodology for determining this benchmark and to conduct an annual survey of urban broadband rates to derive a national range of rates. *USF/ICC Transformation Order*, 26 FCC Rcd 17708, paras. 113-14. The Wireline Competition Bureau recently adopted a method for determining the average urban rate for fixed broadband services, announced illustrative broadband rate benchmarks for 2014, and waived the reasonable comparability benchmark for Alaska carriers in 2015. *See Connect America Fund*, WC Docket No. 10-90, Report and Order, DA 14-1569 (Wireline Comp. Bur. rel. Oct. 29, 2014) (*Broadband Reasonable Comparability Benchmarks Order*). Thus, we do not discuss the general arguments regarding how the benchmark would be calculated here.

[269] AT&T Comments at 43. *See also Phase II Service Obligations Order*, 28 FCC Rcd at 15064, para. 10 (concluding that the relevant comparison for price cap carriers accepting model-based support is the rates charged for fixed wireline services).

[270] *Broadband Reasonable Comparability Benchmarks Order* at para. 7.

Federal Communications Commission    FCC 14-190

taken into account.[271]  Moreover, consumers living in urban areas typically have the choice of obtaining broadband service from at least one fixed wireline provider.  We therefore conclude it is appropriate to use fixed wireline services in urban areas as the reference point for reasonably comparable rates, recognizing that rates in rural areas may be higher than urban areas.

122.     This certification will be included in the FCC Form 481 to be filed in 2016, addressing performance during 2015, after the requirement has received Paperwork Reduction Act (PRA) approval from the Office of Management and Budget.[272]  All parties subject to a broadband public interest requirement to serve fixed locations that file this report in 2016 will be required to make the certification, and annually thereafter.

123.     Recipients of funding through the Phase II competitive bidding process must submit their first certification with the first section 54.313 annual report they are required to submit after support is authorized, and each year thereafter with their annual report.

### B.    Monitoring Progress in Meeting Deployment Obligations

124.     *Background.*  In the *USF/ICC Transformation Order*, the Commission required that all recipients of high-cost support file with their section 54.313 annual reports a progress report on their service quality improvement plans.[273]  Above, we modified the interim build-out requirements for price cap carriers accepting model-based support and established a six year deployment schedule.[274]

125.     *Discussion.*  Here, we take action to enhance our ability to monitor the use of Connect America support and ensure that price cap carriers that accept model-based support use that support for its intended purpose.  Specifically, as proposed by USTelecom, we require all price cap carriers accepting model-based support to include in the annual progress report that they submit each year with their section 54.313 annual reports a list of the geocoded locations to which they have newly deployed facilities capable of delivering broadband meeting the requisite requirements with Connect America support in the prior year.[275]  The list must identify which locations are located in a Phase II-funded block and which locations are located in extremely high-cost census blocks.[276]  The first list must be submitted with their July 2016 annual report, reflecting deployment status through the end of 2015.  This first list should also include the geocoded locations that a price cap carrier had already built out to with service meeting the Commission's requirements before receiving Phase II support.  In subsequent years, the list should provide the relevant information for newly built locations in the prior calendar year.[277]  The last list that price cap carriers submit with their July 2021 annual reports must include the total number and geocodes

---

[271] Data from our Urban Rate Survey show that on average, when controlled for speed and data usage, the monthly rates charges by fixed wireless providers are $29.14 more expensive per month than the monthly rates charged by all other fixed technologies in urban areas.  *See* Federal Communications Commission, Urban Rate Survey Data, http://www.fcc.gov/encyclopedia/urban-rate-survey-data (last visited Dec. 11, 2014).

[272] Paperwork Reduction Act of 1995, Public Law 104-13; *see* 44 U.S.C. § 3507(a).  We note that we must obtain PRA approval before any ETC will be required to file the reasonably comparable rates certification for broadband.

[273] *USF/ICC Transformation Order*, 26 FCC Rcd at 17852, para. 580; 47 C.F.R. § 54.313(a)(1).

[274] *See supra* Section III.C.1.  *USF/ICC Transformation Order*, 26 FCC Rcd at 17729, para. 171 n.279.

[275] Letter from Jonathan Banks, Senior Vice President, Law & Policy, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 1 (filed Sept. 26, 2014).  *See also* Letter from Mary L Henze, Assistant Vice President, Federal Regulatory, AT&T et al., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 10-90, at 3-4 (filed Nov. 4, 2014) (AT&T et al. Nov. 4, 2014 *Ex Parte* Letter).

[276] *Id.*

[277] We note that for the July 2018 report, at least 5% of the reported locations throughout all of the holding company's Phase II states must be locations that previously lacked 4/1 Mbps.  *See supra* Section III.C.1.

**Federal Communications Commission**                                    FCC 14-190

of all supported locations to which they have deployed facilities capable of delivering broadband meeting the requisite requirements.

126.    We conclude that it is in the public interest to require price cap carriers accepting model-based support to provide this data on an annual basis.[278]  The Commission and USAC will analyze the data to determine how Connect America support is being used to "improve broadband availability, service quality, and capacity," consistent with a recent recommendation of the Government Accountability Office.[279]  We also intend to make such data available to the public on our website in a user-friendly manner so that the public will be able to see at a granular level how high-cost funds are being used to invest in new broadband infrastructure to bring new services to the area.[280]  We find that the benefits in collecting this data outweigh any potential burdens on the price cap carriers in reporting this data annually, given that we expect that price cap carriers will already be collecting such data for their own business purposes and to be prepared to respond to the compliance reviews that we direct USAC to undertake.[281]

127.    We will also collect from price cap carriers in their annual section 54.313 reports the total amount of Connect America Phase II support, if any, they used for capital expenditures in the previous calendar year.[282]  We conclude that the benefit to the Commission of being able to determine how price cap carriers are using Phase II funding outweighs any potential burden on price cap carriers in submitting this information given that we expect that price cap carriers will track their capital expenditures for Phase II in the regular course of business.

128.    We direct USAC to review Phase II recipients' compliance with deployment obligations and the Commission's public interest obligations at the state level – that is, whether the carrier is meeting interim and final deployment obligations for the total number of locations required for the state.  As discussed above, we conclude that conducting compliance reviews at the state level would be less administratively burdensome for the Commission, USAC, and the recipients of Phase II support than at the census block level.[283]  We expect USAC to review compliance with the deployment obligations for all price cap recipients over the course of the Phase II support term.[284]  This will ensure we are able to fulfill

---

[278] *See* Letter from Mary L. Henze, Assistant Vice President, Federal Regulatory, AT&T et al., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 10-90, at 2 (filed Nov. 24, 2014) ("[T]he Commission would be remiss not to collect the targeted information it needs to monitor whether [Connect America] Phase II recipients are meeting their obligations and the program is meeting its broadband deployment goals.").

[279] *See* Government Accountability Office, FCC Should Improve the Accountability and Transparency of High-Cost Program Funding GAO 14-587 (July 2014), http://www.gao.gov/assets/670/664939.pdf.

[280] *Id.*

[281] *See* 47 C.F.R. § 54.313(e) (requiring that price cap carriers that receive Phase II model-based support certify that they have met the required deployment milestones).

[282] 47 C.F.R. 54.313; AT&T et al. Nov. 4, 2014 *Ex Parte* Letter at 3-4.  *See also* Karen Brinkmann, Counsel to ACS et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Nov. 14, 2014) (stating that the Commission "may require" price cap carriers to report how much support in a given year is used for network deployment, but should not prescribe the precise division).

[283] *See supra* Section III.C.2.

[284] There are 145 unique price cap carrier-state combinations eligible for the offer of model-based support.  In addition to validating that the submitted locations are within Phase II-eligible census blocks for all carriers, we expect USAC to do an in-depth review of compliance with the interim milestones for a subset of the accepting price cap carrier-state combinations every year.  Such in-depth review could include, but is not limited to, confirming service availability through customer subscription records or online service qualification tools showing that service is available at a particular location at a statistically valid sample of locations within the state.  We envision that over the course of the term of model-based support, USAC will perform an in-depth review at least once for every carrier-state combination where the offer of model-based support is accepted.  USAC is not required to do an in-

(continued….)

our responsibility to monitor each Phase II recipient's use of high-cost support in areas subject to the state-level commitment.

### C.    Reduction in Support for Late Filing

129.    *Background.*  Under the current rules, ETCs that fail to meet certification and data submission deadlines lose support on a quarterly basis until they make a proper filing.[285]  In the *April 2014 Connect America FNPRM*, we proposed modifying the reduction in support for late-filed section 54.313 and 54.314 reports and certifications to better calibrate the reduction of support with the length in delay of filing.[286]

130.    *Discussion.*  We adopt a rule to reduce on a pro-rata daily basis the support for ETCs that miss certification and data submission deadlines.[287]  Based on our experience to date with the current support reduction scheme, we have determined that reducing support for late filers on a quarterly basis is unduly harsh given that most late filings are inadvertent, particularly for those recipients that file closer to the beginning of the quarter than the end of the quarter.[288]  We conclude that readjusting the support reductions to more closely calibrate the reduction of support with the period of non-compliance is a more reasonable approach for handling the recurring problem of an occasional failure to file.[289]

131.    We will impose a minimum reduction of support of seven days given the importance of ETCs meeting filing deadlines.  After the initial seven days, support will be reduced further on a day-by-day basis until the high-cost recipient files the required report or certification, plus the minimum seven-day reduction.[290]  Reducing support on a day-by-day basis plus an additional seven-day reduction is an appropriate measure to create incentives for high-cost recipients to make their filings as soon as they have determined that they have missed the applicable deadlines.

132.    We recognize that despite its best efforts, an ETC may miss a deadline due to an administrative oversight but still file within a few days of the deadline.  For a late filer, we find that it is appropriate to provide a one-time grace period of three days so that an ETC that quickly rectifies its error within three days of the deadline will not be subject to the seven-day minimum loss of support.[291]  We

---

(Continued from previous page) ————————————

depth review of compliance with the deployment obligation, however, in any state where the number of locations for a particular carrier is so small that it would not be cost-effective to undertake such a review.

[285] 47 C.F.R. §§ 54.313(j), 54.314(d).

[286] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7149-52, paras. 317-25.

[287] This support reduction scheme applies to all ETCs that file section 54.313 reports or that are the subject of section 54.314 certifications.  We note that although recipients of the Mobility Fund are not required to file section 54.313 reports, they will be subject to this support reduction scheme to the extent that they or the relevant state, if applicable, do not file a timely section 54.314 certification.  *See* 47 C.F.R § 54.314.

[288] *See, e.g.*, *Streamlined Process for Resolving Requests for Review of Decisions by the Universal Service Administrative Company*, CC Docket No. 96-45 et al., Public Notice, 29 FCC Rcd 11094, 11097 (Wireline Comp. Bur. 2014) (granting waivers of high-cost filing deadlines where the data was filed promptly after the deadlines).

[289] *See* GVNW Consulting Comments at 19 (supporting "the Commission's proposed changes to the level of support reductions that result from failure to file certain mandated forms at a date certain as a step in the right direction"); UTC Comments at 28 (supporting "the Commission's proposal to modify support for failure to timely file annual reports and certifications" but suggesting some modifications); Comments of the Rural Wireless Carriers, WC Docket No. 10-90 et al., at 50 (filed Aug. 8, 2014) (Rural Wireless Carriers Comments) (generally supporting "the Commission's proposals to recalibrate its rules" but suggesting some modifications).

[290] Thus, a high-cost recipient that misses the deadline by four days would lose seven days of support.  A high-cost recipient that misses the deadline by 14 days would lose 21 days of support.

[291] Thus, an ETC that files a report or certification within two days of the deadline would not lose support, an ETC that files a report or certification within five days of the deadline would lose seven days of support, and an ETC that files a report or certification within 14 days of the deadline would lose 21 days of support, and so on.  *See*

(continued….)

direct USAC to send a letter to such an ETC notifying the ETC that its filing was late but cured within the grace period. If the ETC again files any high-cost filing late, the grace period will not be available. Repeated mistakes, even inadvertent, are indicative of a lack of adequate policies and procedures to ensure timely filing.[292] If an ETC misses a filing deadline more than once due to its inadvertence, we find that the support reductions that we adopt should provide an incentive to ETCs to revise their procedures to ensure that such inadvertence does not become a pattern.[293]

133.     We disagree with arguments that we should lengthen the one-time grace period because new ETCs receiving support may be unfamiliar with high-cost filing requirements or that ETCs may inadvertently forget to file.[294] We impose support reductions on late filers to impress upon high-cost recipients the importance of understanding obligations that come with high-cost funding and the need for the Commission and USAC to receive the data in a timely manner so that we can properly administer the Universal Service Fund. A one-time grace period of three days achieves an appropriate balance between requiring strict compliance with our rules and providing an opportunity for ETCs that may be first time filers or that make an uncharacteristic mistake to rectify quickly an error.

134.     Although ETCs are required to submit separate filings for each operating company, we note that many holding companies administer the filings for all of their operating companies that may hold an ETC designation.[295] We expect that holding companies will take measures to ensure that all of their operating companies meet the required deadlines. Thus, we will apply the grace period at the holding company level.[296] If an ETC misses the deadline and exercises the grace period in a prior year, that grace period will not be available for all subsequent years to another one of the holding company's operating companies that holds an ETC designation to serve a different study area.

---

(Continued from previous page) ──────────────────────

Comments of the Alaska Rural Coalition, WC Docket No. 10-90 et al., at 54 (filed Aug. 8, 2014) (ARC Comments) (supporting a "grace period if an ETC misses the filing deadline by only a few days"); Missouri PSC Comments at 5 ("The FCC's proposals appear to be reasonable in the sense the proposals contemplate a grace period . . . ."); GVNW Consulting Comments at 19 (supporting "the Commission proposal with respect to grace periods").

[292] *Contra* ARC Comments at 54 (arguing that the grace period should be available more than once because "[s]mall carriers with very small regulatory staffs struggle to meet the ever increasing obligations"); Reply Comments of Rural Wireless Carriers, WC Docket No. 10-90 et al., at 64 (filed Sept. 8, 2014) (supporting ARC's comments). While we acknowledge that smaller carriers may have smaller staffs to handle regulatory requirements, we expect that all ETCs will ensure that they have the proper procedures in place to ensure they are able to meet the obligations of accepting high-cost support. We also disagree with the Rural Associations' claims that late filings are mitigated because the July 1 filing deadline is during a "short-staffed" time for the Commission and USAC, and the October 1 certification for deadline does not impact support amounts. *See* Rural Associations Comments at 78. First, the Commission and USAC's operations do not grind to a halt simply because a holiday occurs close to the filing deadline. Moreover, any kind of delay in getting the required data or certifications will affect the Commission and USAC's administrative processes and will require USAC and the Commission to expend resources to track down missing filings.

[293] The Commission's decision to impose support reductions is an appropriately tailored measure to motivate ETCs to put in place adequate procedures to ensure timely filings in the first place. *Contra* Rural Associations Comments at 76-77. We expect that a number of entities may bid in the Phase II competitive bidding process that have never received universal service support before. We intend for the support reduction scheme we adopt today also to motivate these new entrants to establish procedures that will ensure they file on time.

[294] UTC Comments at 28.

[295] We thus are not persuaded by arguments that a grace period should be provided to each operating company. *See* Rural Wireless Carriers Comments at 50 (arguing that "since each ETC operating company must separately comply with filing deadlines, it would be more reasonable to apply the one-time grace period separately to each operating company").

[296] ETCs must report their holding company in their section 54.313(a)(8) annual reports. 47 C.F.R. § 54.313(a)(8).

135.    We are not persuaded by the Rural Associations' argument, relying on precedent related to the Eighth Amendment to the Constitution "Excessive Fines" clause, that the support reductions are "unreasonable" and "excessive penalties."[297] Because ETCs have no property interest in or right to continued universal service support,[298] nor any right to support other than as provided for by our rules, the reduction of an ETC's universal support payment does not constitute a payment by the ETC to the government that is subject to the Excessive Fines clause of the Eighth Amendment.[299]

136.    In any case, even if that framework were viewed as applicable, given the important role these data and certifications play in the administration of the Universal Service Fund, we find that the support reductions that we adopt are sufficiently proportional to the harm caused by late filings.[300] The reductions increase as the length in delay of the filings increase, and thus are proportional to the amount of harm that is caused when the Commission, state commissions, and USAC are delayed in being able to monitor the use of universal service funds. Moreover, by basing the support reductions on each ETC's daily support amount, we have calibrated the amount of support that a late filer will have reduced with the benefit they receive from the Universal Service Fund. Contrary to the arguments of some commenters,[301] we find that the benefits for consumers nationwide of an effective oversight scheme outweigh the potential impact of support reductions on the customers of late filing ETCs. Congress gave the Commission broad discretion under section 254 to determine support levels and adjust them as needed, and hence any reductions in support provided for under our rules are well within our legislative mandate.[302]

137.    We are not persuaded by suggestions that the Commission should refrain from imposing support reductions for untimely filings and instead rely on our enforcement authority in the event of non-compliance.[303] If the Commission were to conduct an enforcement proceeding every time an ETC misses a deadline, that would divert Commission resources from other Commission priorities. Instead, by adopting a clear and predictable support reduction scheme, the Commission, USAC, and ETCs will know exactly what consequences will result under the rules if filings are missed, rather than having to handle each issue on a case-by-case basis. Similarly, we are not persuaded that support reductions are unnecessary because ETCs are already motivated to file on time to avoid a delay in receiving their

---

[297] U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). *See* Rural Associations Comments at 78-79 (citing *Hindt v. State*, 421 A.2d 1325, 1333 (Del. 1980)).

[298] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17770-71, para. 293 & nn.481-82 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Members of the Peanut Quota Holders Assoc. v. U.S.*, 421 F.3d 1323, 1334 (Fed. Cir. 2005), *cert denied*, 548 U.S. 904 (2006); 47 U.S.C. § 254).

[299] *See U.S. v. Bajakajian*, 524 U.S. 321, 328-29 (1998) (citing *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)) (stating that "fine" was "at the time the Constitution was adopted . . . 'understood to mean a payment to a sovereign as punishment for some offense'"); *id*. at 328, 334 (holding that "the Excessive Fines Clause . . . limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense," and that "a *punitive* forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense") (emphasis added, internal quotation marks and citations omitted).

[300] *See id*. at 334 (where the Eighth Amendment applies, "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense").

[301] Rural Associations Comments at 77-78.

[302] *See, e.g.*, *Bajakajian*, 524 U.S. at 336 ("judgments about the appropriate punishment for an offense belong in the first instance to the legislature").

[303] Rural Associations Comments at 74-79. *See also* GVNW Consulting Comments at 19 n.15.

support.[304]  Support reductions provide more of an incentive to file on time because ETCs actually lose support under the mechanism established in our rules rather than simply have it delayed if they do not meet a deadline.

138.     Given our decision to modify the support reductions for late filings, we adopt our proposal to require strict adherence to filing deadlines.[305]  We will cease the practice of finding there is good cause for a waiver of high-cost filing deadlines in circumstances where an ETC has missed the deadline due to an administrative or clerical oversight and where that ETC has promised to revise its procedures to ensure future compliance, as proposed in the *April 2014 Connect America FNPRM*.[306]  We expect all ETCs, even those new to the Commission's processes or with small staffs, to implement appropriate procedures to ensure compliance with the Commission's filing deadlines and other regulatory requirements.

### D.     Measures To Address Non-Compliance

139.     *Background.*  In *USF/ICC Transformation Order*, the Commission concluded that "entities receiving [Connect America] support will receive reduced support should they fail to fulfill their public interest obligations, such as by failing to meet deployment milestones, to provide broadband at the speeds required by [the *USF/ICC Transformation Order*], or to provide service at reasonably comparable rates."[307]  The Commission delegated to the Wireline Competition Bureau and the Wireless Telecommunications Bureau the task of implementing support reductions.[308]  The Commission sought comment in the *USF/ICC Transformation FNPRM* on how to implement the support reductions and on other non-compliance measures,[309] and further developed the record on this issue in the *April 2014 Connect America FNPRM*.[310]

140.     *Discussion.*  Today, we adopt specific measures that the Wireline Competition Bureau will take in the event that certain ETCs do not meet their high-cost support deployment obligations for

---

[304] Reply Comments of the Rural Associations, WC Docket No. 10-90 et al., at 24 (filed Sept. 8, 2014) (Rural Associations Reply).

[305] We note that the Commission has strictly enforced filing deadlines in other contexts.  *See, e.g.*, *Vanessa Cintron, Noble Ventures, Inc., On Request for Inspection of Records*, FOIA Control No. 2014-282, Memorandum Opinion and Order (2014) (dismissing an application for review that was filed three days late and noting "[w]hile losing the right of appeal when a deadline is missed by a brief time 'may seem unduly harsh . . . short of exceptional circumstances (which are not present here), courts have generally respected statutory and regulatory deadlines'"); *Totally Jesus Network, Inc. Application for a New NCE FM Station at Gold Beach , Oregon, et al.*, File No. BNPED-20071018AON, Memorandum Opinion and Order, 29 FCC Rcd 6414 (2014) (affirming a decision to dismiss an application for a new noncommercial FM station after the applicant experienced technical difficulties and filed nine days past the filing deadline).

[306] *See April 2014 Connect America FNPRM*, 29 FCC Rcd at 7150, para. 318 n.545.  Generally, the Commission's rules may be waived if good cause is shown.  47 C.F.R. § 1.3.  The Commission may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest.  *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (*Northeast Cellular*).  In addition, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.  *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969); *Northeast Cellular*, 897 F.2d at 1166.  Waiver of the Commission's rules is appropriate only if both (i) special circumstances warrant a deviation from the general rule, and (ii) such deviation will serve the public interest.  *Northeast Cellular*, 897 F.2d at 1166.  "[D]eadlines can only be waived under 'unusual or compelling circumstances.'"  *NetworkIP, LLC v. FCC*, 548 F.3d 116, 126 (D.C. Cir. 2008) (citation omitted).

[307] *USF/ICC Transformation Order*, 26 FCC Rcd at 17863, para. 618.  *See also* 47 C.F.R. § 54.320.

[308] *USF/ICC Transformation Order*, 26 FCC Rcd at 17863, para. 618.

[309] *Id.* at 18067-68, paras. 1110-16.

[310] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7153-54, paras. 327-31.

fixed services or do not offer rates for fixed services that are reasonably comparable to rates offered in urban areas.[311]

141.     In addition, we remind all ETCs that they may also be subject to other sanctions for non-compliance with the terms and conditions of high-cost funding, including, but not limited to, potential revocation of ETC designation and suspension or debarment.[312]  We emphasize that we will enforce the terms and conditions of high-cost support vigorously.  The Enforcement Bureau may initiate an enforcement proceeding in situations where waiver is not appropriate.  In proposing any forfeiture, consistent with the Commission's rules, the Enforcement Bureau shall take into account the nature, circumstances, extent, and gravity of the violations.[313]

### 1.     Non-Compliance with Deployment Obligations

142.     For ETCs that must meet specific build-out milestones, we adopt a framework for support reductions that are calibrated to the extent of an ETC's non-compliance with these deployment milestones.[314]  We conclude that adopting support reductions that scale with the extent of an ETC's non-compliance will create incentives for ETCs to come into compliance as soon as possible, and that a support reduction scheme that is tied to specific milestones is a clear, straightforward approach.[315]

143.     The Commission has given rate-of-return carriers greater flexibility to build out their networks by requiring that they deploy service meeting the Commission's requirements upon reasonable request.[316]  Because rate-of-return carriers are not at this time required to build out to a certain number of locations, we conclude it is appropriate to handle matters regarding their potential non-compliance on a case-by-case basis.[317]

144.     *Trigger for Default.*  A default will occur if an ETC is receiving support and then fails to meet its high-cost support deployment obligations.[318]  For example, a default will occur if a recipient of

---

[311] The Wireline Competition Bureau, Wireless Telecommunications Bureau, and the Office of Engineering and Technology recently sought comment to further develop the record on a proposed methodology for high-cost recipients to measure and report speed and latency performance to fixed locations.  *Wireline Competition Bureau, Wireless Telecommunications Bureau, and the Office of Engineering and Technology Seek Comment on Proposed Methodology for Connect America High-Cost Universal Service Support Recipients to Measure and Report Speed and Latency Performance to Fixed Locations*, WC Docket No. 10-90, Public Notice, 29 FCC Rcd 12623 (Wireline Comp. Bur. et al. 2014).  Those issues will be addressed at a future date.

[312] 47 C.F.R. § 54.320.

[313] 47 C.F.R. § 1.80(b)(8).

[314] This includes recipients of Phase II Connect America support, but does not include recipients of rural broadband experiment support.  We adopted a separate support reduction mechanism for the rural broadband experiments that consisted of uniform increasing support reductions (withholding 5% of monthly support the first six months of non-compliance, and 25% of monthly support the next six months of non-compliance).  *Rural Broadband Experiments Order*, 29 FCC Rcd at 8799, para. 92.  Because we expect that most of the winning rural broadband experiments will be much smaller than Phase II projects in terms of the number of locations that will be served, we conclude that the administrative advantage of employing a simple, uniform support reduction mechanism for rural broadband experiment recipients outweighs the benefits that might be achieved by adopting a more complex mechanism to calibrate support reductions with the extent of non-compliance.  This support reduction scheme also does not apply to the Mobility Fund Phase I.

[315] Such an approach was proposed by USTelecom.  *See* USTelecom Oct. 30, 2014 *Ex Parte* Letter at 2.

[316] *USF/ICC Transformation Order*, 26 FCC Rcd 17740, para. 206.

[317] *See* Rural Associations Comments at 79-80 (suggesting that the Commission "establish a separate set of reasonably attainable performance compliance standards and procedures" for rate-of-return carriers).

[318] There are a number of different ways that a default could come to the Commission's attention.  For example, the ETC may be unable to make required certifications that it is in compliance, a Commission or USAC compliance

(continued….)

Phase II funding fails to meet a build-out milestone.  We direct USAC to confirm that Phase II ETCs are in fact meeting the terms and conditions of that support by verifying the build-out certifications that recipients of Phase II support are required to provide to ensure that Connect America funds are being used to deploy infrastructure to eligible locations.[319]

145.    To the extent that an ETC determines that it will not meet a build-out milestone, that ETC must notify the Commission, USAC, and the relevant state or U.S. Territory, and Tribal government as appropriate, no later than ten business days after the relevant deadline, rather than waiting until the filing of the next annual report.[320]  We also expect that the states, U.S. Territories, and Tribal governments will continue to aid us in our joint oversight role and notify us when an ETC is not meeting its obligations.

146.    *Support Reductions for ETCs with Defined Build-Out Milestones.*  If an ETC begins receiving support and the Wireline Competition Bureau subsequently determines that the ETC has defaulted, the Bureau will issue a letter documenting the default, and USAC will take the steps outlined below in the following month.  The measures that will be taken will be dependent on the extent of an ETC's non-compliance.[321]

147.    Specifically, for interim milestones that occur during the support term:

- Tier 1:  If an ETC has a compliance gap of <u>at least five percent but less than 15 percent</u> of the number of locations that the ETC is required to have built out to by the interim milestone,[322] the Bureau will issue a letter to that effect.[323]  The ETC will then be required to file quarterly reports

(Continued from previous page) ———————————————

review or a Commission investigation may show that the ETC is not in compliance, or an outside party like a customer may report to the Commission or USAC that the ETC has failed to meet the terms and conditions of high-cost support.  In addition, the states may bring matters to our attention in conjunction with the annual section 54.314 certification process.  47 C.F.R. § 54.314.

[319] 47 C.F.R. § 54.313.  Such verification could be performed, for instance, by reviewing documentary evidence such as customer subscription records or online service qualification tools showing that service is available at a particular location.

[320] If, for example, the interim milestone must be achieved by December 31, 2018, the price cap carrier would be required to inform the Commission, USAC, and the relevant state, U.S. Territory, or Tribal government, if applicable, within ten business days of that date, rather than in the annual report that would be filed on July 1, 2019, reporting on calendar year 2018.

[321] *See USF/ICC Transformation FNPRM*, 26 FCC Rcd at 18068, para. 1111 (seeking comment on adopting a support framework that would establish levels of non-performance resulting in the loss of specific percentages of support); USTelecom Oct. 30, 2014 *Ex Parte* Letter at 2.  We note that several commenters supported the proposal in the *April 2014 Connect America FNPRM* of reducing 5% of an ETC's funding for the first six months and then 25% of an ETC's funding for the next six months.  *See April 2014 Connect America FNPRM,* 29 FCC Rcd at 7153, para. 329; UTC Comments at 29 (supporting "reducing support to the provider on a percentage basis . . . ."); Missouri PSC Comments at 5 (supporting such support reductions "because [they] provide[] a greater incentive for a carrier to monitor compliance obligations and remedy any instance of non-compliance in a timely manner").  Based on our review of the record, we now conclude that the approach we adopt today better accounts for the fact that some ETCs may miss milestones by a few locations while other ETCs may miss milestones by many locations.

[322] For example, assume a price cap carrier is required serve a total of 100 locations by the end of its term.  By the end of 2017, that price cap carrier must serve 40% of those locations (i.e., 40 locations).  If at the end of 2017, the price cap carrier has only built out to 36 locations, it will have tier 1 status (this would be a compliance gap of 10%: 40 minus 36 = 4, 4 is 10% of 40).

[323] We do not impose reporting obligations if an ETC has missed an interim milestone by less than 5% of the required number of locations for that interim milestone.  We conclude that a shortfall of less than 5% of locations for a given interim milestone should not be a concern warranting additional monitoring.  We reserve the right to impose quarterly reporting in individual instances, however, if the carrier shows no progress in addressing the shortfall by the fifth year.

identifying the geocoded locations to which the ETC has newly deployed facilities capable of delivering broadband meeting the requisite requirements with Connect America support in the previous quarter.[324]  The ETC must continue to file these quarterly reports until the ETC reports that it has reduced the compliance gap to less than five percent of the required number of locations for that interim milestone and the Bureau issues a letter to that effect.

- Tier 2:  If an ETC has a compliance gap of <u>at least 15 percent but less than 25 percent</u> of the number of locations that the ETC is required to have built out to by the interim milestone, USAC will withhold 15 percent of the ETC's monthly support for the state and the ETC will be required to file quarterly reports.  Once the ETC has reported that it has reduced the compliance gap to less than 15 percent of the required number of locations for that interim milestone for that state, the Bureau will issue a letter to that effect, USAC will stop withholding support, and the ETC will receive all of the support that had been withheld.[325]  The ETC will then move to Tier 1 status.

- Tier 3:  If an ETC has a compliance gap of <u>at least 25 percent but less than 50 percent</u> of the number of locations that the ETC is required to have built out to by the interim milestone, USAC will withhold 25 percent of the ETC's monthly support for the state and the ETC will be required to file quarterly reports.  Once the ETC has reported that it has reduced the compliance gap to less than 25 percent of the required number of locations for that interim milestone, the Bureau will issue a letter to that effect, the ETC will move to Tier 2 status, and USAC will withhold 15 percent of its monthly support for that state until the ETC reports that it is eligible to move to Tier 1 status.  Once the ETC has reported that it qualifies for Tier 1 status, and the Bureau issues a letter to that effect, it will be eligible to have all of its support restored, the ETC will receive all of the support that had been withheld, and it will move to Tier 1.

- Tier 4:  If an ETC has a compliance gap of <u>50 percent or more</u> of the number of locations that the ETC is required to have built out to by the interim milestone, USAC will withhold 50 percent of the ETC's monthly support for the state, and the ETC will be required to file quarterly reports.  As with the other tiers, as the ETC reports that it has lessened the extent of its non-compliance, and the Bureau issues a letter to that effect, it will move down the tiers until it reaches Tier 1 (or no longer is out of compliance with the relevant interim milestone).  At that point, the ETC will be eligible to have all of its support restored, the ETC will receive all of the support that had been withheld, and, if it now is meeting the interim milestone, it will no longer be required to file quarterly reports.

  On the other hand, if after having 50 percent of its support withheld for six months the ETC has not reported that it is eligible for Tier 3 status (or one of the other lower tiers), USAC will withhold 100 percent of the ETC's support for that state and will commence recovery action for a percentage of support that is equal to the ETC's compliance gap plus ten percent of the ETC's support that has been paid to that point.  For example, if an ETC has not built out to 75 percent of the required number of locations in a state, USAC would recover 85 percent of the ETC's support that had been paid to that point.  We conclude that recovering the additional ten percent of the

---

[324] The first report will be due three months after the issuance of a letter stating that the ETC is in default.  The next report will be due three months from the first report, and so on until the ETC files a report stating that it has come into full compliance.  ETCs that file their quarterly reports late will be subject to the support reduction scheme we adopt above for late section 54.313 and 54.314 filings.  *See* 47 C.F.R. §§ 54.313(j), 54.314(d).

[325] An ETC may skip tiers as it is coming into compliance.  If, for example, the ETC reports that it is serving all but less than 5% of the required number of locations before it reports that it is serving all but less than 15% of locations, and the Bureau issues a letter to that effect, that ETC may cease filing quarterly reports and will have its full support restored.

ETC's support that has been disbursed up to that point will deter ETCs from deciding that they would rather return the support than meet their commitments for the supported area. Because these are high-cost areas that lack unsubsidized providers at the outset of the support term, an ETC's refusal to serve these locations could potentially leave the locations with no options for reasonably comparable service.

- If at any point during the support term the ETC reports that it is eligible for Tier 1 status, it will have its support fully restored including any support that had been withheld, USAC will repay any funds that were recovered, and the ETC will move to Tier 1 status.

148.    As noted above, we require ETCs to report to the Commission, USAC, and the relevant state or U.S. Territory, and Tribal government as appropriate, within ten business days of the final build-out milestone if they have missed this milestone.[326]  If an ETC misses the final build-out milestone, it must identify by what percentage it has missed the final build-out milestone.  Absent an extension of time for circumstances beyond the ETC's control, the ETC will then have twelve months from the date of the final build-out milestone deadline to come into full compliance with this milestone.[327]  If an ETC does not report that it has come into full compliance within twelve months, the Bureau will issue a letter to this effect.[328]  USAC will then recover an amount of support that is equal to 1.89 times the average amount of support per location received in the state over the six-year term for the relevant number of locations that the ETC has failed to deploy to, plus ten percent of the ETC's total Phase II support received in the state over the six-year term.[329]  As explained above, we conclude that recovering an additional ten percent of the ETC's total Phase II support will deter ETCs from deciding to return their support rather than build out to more than a de minimis number of locations.

149.    If after the ETC's support term has ended, USAC determines in the course of a compliance review that the ETC has not retained sufficient evidence to demonstrate that it has built out to all of the locations required by the final build-out milestone, USAC must recover support from that ETC. Specifically, if the ETC does not have sufficient evidence to demonstrate that it has built out to the total number of required locations, USAC will recover an amount of support that is equal to 1.89 times the average amount of support per location received in the state over the six-year term for the relevant

---

[326] We conclude that the benefit to the public interest of the Commission, USAC, and the relevant state, U.S. Territory, or Tribal government, if applicable, being able to monitor ETCs' compliance with their final build-out milestone soon after the milestone, rather than waiting for ETCs to report this information in their final section 54.313 annual reports a year later, outweighs the potential burden on ETCs of having to notify these entities of their status in meeting the final build-out milestone.  We expect that ETCs will have this information readily available because they will have been monitoring their compliance with build-out milestones throughout their support terms.

[327] As discussed above, price cap carriers must identify by December 31, 2015 any specific census blocks where they do not intend to meet their deployment commitments, covering at least 2% of their total eligible locations in a state, and then have the option of identifying up to an additional 3% of the total eligible locations in that state by the end of the term that they will not serve.  If a price cap carrier chooses to elect this option and notifies the Commission by December 31, 2015, it will be deemed in full compliance if it serves all eligible locations in a state except for the locations that the price cap carrier has identified it will not serve, i.e., up to 5% of eligible locations in the state.  *See supra* Section III.C.2.

[328] Providing twelve months to cure non-compliance before USAC initiates recovery action will enable ETCs to take full advantage of the relevant construction season in a given state in calendar year 2021.  Our overriding objective is to create a framework that incents full performance.

[329] For instance, if a price cap carrier that is receiving $10,000 in support per year were required to serve 100 locations in a state, but only deployed to 90 locations, USAC would be required to recover support for the ten unserved locations as discussed above, plus 10% of the total.  Assuming the average support per location in the state were $100, the carrier would be required to refund $11,340 in support for the ten locations ($100 x 10 locations x 6 years x 1.89), plus $6,000, representing 10% of the total Phase II support received in the state over the course of the six-year term (10% of $10,000 times 6 years).

54

**Federal Communications Commission**              **FCC 14-190**

number of locations for which the ETC has failed to retain sufficient evidence, plus ten percent of the ETC's total support received in that state over the six-year term. We expect that ETCs will have strong incentives to adopt policies and procedures to retain sufficient evidence to aid the Commission and USAC in our oversight responsibility.

      150.    Table 2 below summarizes the regime we adopt today.

**Table 2: Non-Compliance Measures**

| Tier | Compliance Gap | Non-Compliance Measure |
|---|---|---|
| 1 | 5% to less than 15% | Quarterly reporting |
| 2 | 15% to less than 25% | Quarterly reporting + withhold 15% of monthly support |
| 3 | 25% to less than 50% | Quarterly reporting + withhold 25% of monthly support |
| 4 | 50% or more | Quarterly reporting + withhold 50% of monthly support for six months; after six months withhold 100% of monthly support and recover percentage of support equal to compliance gap plus 10% of support disbursed to date |
|  |  |  |
| Recovery after Last Milestone | If carrier elects the flexibility option: its compliance gap will be determined by the percentage of total locations it does not build to after subtracting the percentage of locations it has identified it will not serve (e.g., if a carrier is offered 100 total locations, and it elects not to serve 4 locations but by the end of the term it has not served 20 locations, its compliance gap is 16% (20% minus 4%=16%))<br><br>If carrier does not elect flexibility option: anything less than 100% compliance | Twelve months to come into full compliance; after twelve months recover support equal to 1.89 times the average amount of support per location received in the state over the six-year term for the relevant locations, plus 10% of total Phase II support |

      151.    We provide the following example in Table 3 of how these compliance measures will be implemented for a price cap carrier that accepts the state-level commitment. For simplicity, we assume the price cap carrier must serve 100 total locations and does not elect the flexibility option.

**Table 3:  Non-Compliance Measures Example**

| Milestone | Tier | Compliance Gap |
|---|---|---|
| December 31, 2017 - 40% of total locations (40 locations) | | |
| | 1 | Serves 35 to 38 locations |
| | 2 | Serves 31 to 34 locations |
| | 3 | Serves 21 to 30 locations |
| | 4 | Serves 20 locations or fewer |
| December 31, 2018 - 60% of total locations (60 locations) | | |
| | 1 | Serves 52 to 57 locations |
| | 2 | Serves 46 to 51 locations |
| | 3 | Serves 31 to 45 locations |
| | 4 | Serves 30 locations or fewer |
| December 31, 2019 - 80% of total locations (80 locations) | | |
| | 1 | Serves 69 to 76 locations |
| | 2 | Serves 61 to 68 locations |
| | 3 | Serves 41 to 60 locations |
| | 4 | Serves 40 locations or fewer |
| December 31, 2020 - 100% of total locations (100 locations) | | |
| | Recovery | Serves 99 locations or fewer |

152.    We conclude that the approach we adopt today is preferable to the other alternative we sought comment on—permitting ETCs to submit a plan to USAC for coming into compliance before support reductions would begin.[330]  Such an approach would likely to be resource-intensive for Commission staff and USAC because each default would need to be handled on a case-by-case basis.  When there are clear milestones that must be met, such an approach is unnecessary.  Moreover, it likely would take a significant amount of time for an ETC to develop a compliance plan and for the plan to be approved, and then it will take even more time for the ETC to come into full compliance.  During this extended period consumers will be without service meeting the Commission's requirements.  We find that the more automatic support reduction scheme we adopt above will more quickly motivate ETCs to come into compliance and is a clearer, less resource-intensive process for the Commission, USAC, and ETCs.

153.    *Non-Compliance Measures for Rate-of-Return Carriers.*  We will determine on a case-by-case basis whether rate-of-return carriers are fulfilling their obligation to provide voice and broadband services meeting the Commission's requirements upon reasonable request.  We clarify that rate-of-return carriers should report any requests that are deemed unreasonable as unfulfilled requests in their section 54.313 annual reports.[331]  We expect that USAC will verify that rate-of-return carriers have sufficient evidence to demonstrate that any unfulfilled requests were in fact unreasonable.  Rate-of-return carriers should consult the *Declaratory Ruling* contained in the *April 2014 Connect America Order* for guidance on what constitutes an unreasonable request to determine the types of evidence they should retain to demonstrate that unfilled requests were unreasonable.[332]  We decline at this time to specify a schedule of support reductions for rate-of-return carriers because they are not subject to defined build-out

---

[330] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7153, para. 328.

[331] All ETCs are currently required to report in their section 54.313 annual reports the number of requests for service that were unfulfilled in the prior calendar year.  47 C.F.R. § 54.313(a)(3).

[332] *April 2014 Connect America Order*, 29 FCC Rcd at 7070-75, paras. 59-72.

milestones.[333]  To the extent USAC determines in the course of an audit that a carrier has insufficient evidence to support a decision to deny a request for service, such findings shall be reported as "other matters."  Because rate-of-return carriers are not required to serve a set number of locations, and we only recently issued guidance on the reasonable request standard, we do not have sufficient experience to create specific milestones that would require support reductions.  However, we reserve the right to adopt a more automatic support reduction framework for rate-of-return carriers at a future date.

154.    *Adjustment of Deployment Obligations.*  In the event an ETC is unable to meet the required deployment obligations due to circumstances beyond its control (e.g., a severe weather event, an inability to secure a right of way, or an unforeseen obstacle that prevents building to a location), that ETC may petition for an extension of time or waiver of the relevant build-out milestone pursuant to section 1.3 of the Commission's rules.[334]  We note that to the extent the ETC is seeking an extension or waiver of a specific build-out milestone, we expect that the ETC would file its petition seeking that relief no later than 30 days prior to the build-out milestone.  We encourage ETCs that submit such petitions to continue to work diligently towards meeting the terms and conditions of their support while their petitions are pending.  If the petitioning ETC is unable to meet the terms and conditions by the time the build-out milestone occurs, then the Bureau will issue a letter finding default, and if applicable, reporting obligations and support reductions will begin as described above.  If an extension of time or waiver subsequently is granted, the petitioning ETC will have all of the funds that have been withheld or recovered restored and will be entitled to receive its subsequent disbursements.

## 2.    Non-Compliance with Reasonably Comparable Pricing Obligations

155.    In the *USF/ICC Transformation Order*, the Commission concluded that "entities receiving [Connect America] support will receive reduced support should they fail to fulfill their public interest obligations, such as by failing . . . to provide service at reasonably comparable rates."[335]  In the *April 2014 Connect America FNPRM*, the Commission sought comment to more fully develop the record on the appropriate remedy for failure to meet the Commission's reasonably comparable pricing benchmarks.[336]

156.    We conclude that this issue is best dealt with on a case-by-case basis for the time being for all ETCs that must certify that the rates they offer are reasonably comparable.  We find that it would not be appropriate to apply a uniform support reduction to all ETCs that fail to offer reasonably comparable prices.  It would be inequitable to reduce support by the same percentage amount regardless of whether the ETC was charging prices a few dollars above what is considered to be reasonably comparable or charging much higher prices.  Similarly, because the pricing benchmarks for voice and broadband are presumptions, not mandates, we must provide an opportunity for affected ETCs to present information to rebut the presumption.  Because there may be a variety of factors that go into determining whether prices are reasonably comparable (e.g., speeds and data usage limits being offered), we are not prepared at this time to establish a method for scaling the support reductions based on a level of non-compliance.  We find that it would be beneficial to consider each potential instance of non-compliance separately and gather more information to inform future judgments as to what is a reasonable approach.

---

[333] *See* Rural Associations Comments at 79-81.

[334] 47 C.F.R. § 1.3.  *See also supra* note 306 (citing to waiver standard); Comments of the Indiana Utility Regulatory Commission, WC Docket No. 10-90 et al., at 7 (filed Jan. 18, 2012) ("Regulators should have flexibility to distinguish between ETCs that commit fraud or are recalcitrant in their reporting requirements as opposed to ETCs that put forth a good faith effort to comply with the spirit and intent of the program yet miss certain milestones due to hardships or unforeseen circumstances.").

[335] *USF/ICC Transformation Order*, 26 FCC Rcd at 17863, para. 618.  *See also* 47 C.F.R. § 54.320.

[336] *April 2014 Connect America FNPRM*, 29 FCC Rcd at 7153, para. 330.  *See also* 47 C.F.R. § 54.313(a)(10); *supra* Section VII.A.

157.    We direct USAC to gather additional information when ETCs fail to make the reasonably comparable certification about their voice or broadband rates in their section 54.313 annual report and transmit that information to the Commission.  The ETC may present factual evidence explaining the unique circumstances that preclude it from offering service at a rate meeting the requisite benchmark.[337] Based on this information, the Commission will be in a better position at a future date to determine the appropriate steps to take when there is non-compliance with this requirement.[338]

## VIII.    PROCEDURAL MATTERS

### A.    Paperwork Reduction Act Analysis

158.    This document contains new information collection requirements subject to the PRA.  It will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies are invited to comment on the new information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002,[339] we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.  We describe impacts that might affect small businesses, which includes most businesses with fewer than 25 employees, in the Final Regulatory Flexibility Analysis (FRFA) in Appendix B, *infra*.

### B.    Congressional Review Act

159.    The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[340]

### C.    Final Regulatory Flexibility Analysis

160.    The Regulatory Flexibility Act of 1980 (RFA) requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  Accordingly, we have prepared a FRFA concerning the possible impact of the rule changes contained in the Report and Order on small entities.  The FRFA is set forth in Appendix B.

### D.    Additional Information

161.    *People with Disabilities*.  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

162.    *Additional Information*.  For additional information on this proceeding, contact Alexander Minard of the Wireline Competition Bureau, Telecommunications Access Policy Division,

---

[337] *See* Rural Associations Comments at 72-73, 80-81; Rural Associations Reply at 22-23.  We note that the Commission has clarified that rate-of-return carriers should take into account the reasonable comparability benchmark when determining whether a request for upgraded service is reasonable.  *April 2014 Connect America Order*, 29 FCC Rcd at 7072, para. 65.  To the extent that rate-of-return carriers are already offering service to customers that meets the Commission's requirements but find that they are unable to charge rates that meet the reasonably comparable benchmarks due to circumstances outside their control, they should submit factual evidence demonstrating these circumstances.

[338] Pending the Commission's development of standards for determining when it would be appropriate to recover support in such instances, any instances in which a carrier's rates are above the reasonably comparability benchmark should be noted by USAC as an "Other Matter" in any audits it may conduct.

[339] Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

[340] *See* 5 U.S.C. § 801(a)(1)(A).

Alexander.Minard@fcc.gov, (202) 418-7400, or Suzanne Yelen of the Wireline Competition Bureau, Industry Analysis and Technology Division, Suzanne.Yelen@fcc.gov, (202) 418-7400.

## IX.     ORDERING CLAUSES

163.     Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 2, 4(i), 5, 10, 201-206, 214, 218-220, 251, 252, 254, 256, 303(r), 332, 403, and 405 of the Communications Act of 1934, as amended, and section 706 of the Telecommunications Act of 1996, 47 U.S.C. §§ 151, 152, 154(i), 155, 160, 201-206, 214, 218-220, 251, 252, 254, 256, 303(r), 332, 403, 405, 1302, and sections 1.1, 1.427, and 1.429 of the Commission's rules, 47 C.F.R. §§ 1.1, 1.427, and 1.429, that this Report and Order, IS ADOPTED, effective thirty (30) days after publication of the text or summary thereof in the Federal Register, except for those rules and requirements involving Paperwork Reduction Act burdens, which shall become effective immediately upon announcement in the Federal Register of OMB approval, and except as otherwise provided below.  It is our intention in adopting these rules that if any of the rules that we retain, modify, or adopt herein, or the application thereof to any person or circumstance, are held to be unlawful, the remaining portions of the rules not deemed unlawful, and the application of such rules to other persons or circumstances, shall remain in effect to the fullest extent permitted by law.

164.     IT IS FURTHER ORDERED that the requirement for non-contiguous carriers that wish to elect Phase II frozen support in lieu of model-based support discussed in paragraph 47, and the requirement that bidders in the rural broadband experiments that wish to remain in consideration for rural broadband experiment support discussed in paragraph 83, are effective upon release.

165.     IT IS FURTHER ORDERED that for the reasons stated in footnote 190 we find good cause exists to make excluding from the offer of model-based support any census block included in a non-winning rural broadband experiment application submitted in funding category one discussed in paragraph 84 effective upon Federal Register publication.

166.     IT IS FURTHER ORDERED that Part 54 of the Commission's rules, 47 C.F.R. Part 54, IS AMENDED as set forth in Appendix A, and such rule amendments SHALL BE EFFECTIVE thirty (30) days after publication of the rules amendments in the Federal Register, except to the extent they contain information collections subject to PRA review.  The rules that contain information collections subject to PRA review SHALL BECOME EFFECTIVE immediately upon announcement in the Federal Register of OMB approval and an effective date.

167.     IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 4(i), 4(j), 10, 214, and 254 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 160, 214 and 254, the petition for forbearance filed by the United States Telecom Association on October 6, 2014, IS GRANTED IN PART to the extent described herein.

168.     IT IS FURTHER ORDERED that, pursuant to the authority contained in section 405 of the Communications Act of 1934, as amended, 47 U.S.C. § 405, and section 1.429 of the Commission's rules, 47 C.F.R. § 1.429, the Petition for Reconsideration filed by the United States Telecom Association on August 8, 2014, IS DISMISSED to the extent described herein.

169.     IT IS FURTHER ORDERED that, pursuant to the authority contained in section 405 of the Communications Act of 1934, as amended, 47 U.S.C. § 405, and section 1.429 of the Commission's rules, 47 C.F.R. § 1.429, the Petition for Reconsideration filed by the National Exchange Carrier Association, Inc., et al. on August 8, 2014, IS DISMISSED to the extent described herein.

170.     IT IS FURTHER ORDERED that the Commission SHALL SEND a copy of this Report and Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

Federal Communications Commission                    FCC 14-190

171.    IT IS FURTHER ORDERED, that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

### Final Rules

For the reasons discussed in the Report and Order, the Federal Communications Commission amends 47 C.F.R. part 54 to read as follows:

## PART 54 – UNIVERSAL SERVICE

1. The authority citation for part 54 is modified to read as follows:

Authority:  Sections 1, 4(i), 5, 201, 205, 214, 219, 220, 254, 303(r), and 403 of the Communications Act of 1934, as amended, and section 706 of the Telecommunications Act of 1996, as amended; 47 U.S.C. 151, 154(i), 155, 201, 205, 214, 219, 220, 254, 303(r), 403, and 1302 unless otherwise noted.

2. Amend § 54.5 by inserting the following term and definition immediately beneath "LAN." "'LAN' is a local area network, which is a set of high-speed links connecting devices, generally computers, on a single shared medium, usually on the user's premises."

### § 54.5 Terms and Definitions.

*****

Qualifying competitor. A "qualifying competitor" is a facilities-based terrestrial provider of residential fixed voice and broadband service access meeting or exceeding 3 Mbps downstream and 768 kbps upstream.

*****

3. Amend § 54.201 to revise paragraph (d) to read as follows:

### § 54.201 Definitions of eligible telecommunications carriers, generally.

*****

(d) A common carrier designated as an eligible telecommunications carrier under this section shall be eligible to receive universal service support in accordance with section 254 of the Act and, except as described in paragraph (d)(3) of this section, shall throughout the service area for which the designation is received:

(1) ***

(2) ***

(3) Exception.  Price cap carriers that serve census blocks that are identified by the forward-looking cost model as low-cost, census blocks that are served by an unsubsidized competitor as defined in § 54.5 meeting the requisite public interest obligations specified in § 54.309, or census blocks where a subsidized competitor is receiving federal high-cost support to deploy modern networks capable of providing voice and broadband to fixed locations, are not required to comply with paragraphs (d)(1) and (d)(2) of this section in these specific geographic areas. Such price cap carriers remain obligated to maintain existing voice telephony service in these specific geographic areas unless and until a discontinuance is granted pursuant to § 63.71.

\*\*\*\*\*

4. Add § 54.308 to subpart D to read as follows:

### § 54.308 Broadband Public Interest Obligations for Recipients of High-Cost Support.

(a) Rate-of-return carrier recipients of high-cost support are required to offer broadband service at actual speeds of at least 10 Mbps downstream/1 Mbps upstream, with latency suitable for real-time applications, including Voice over Internet Protocol, and usage capacity that is reasonably comparable to comparable offerings in urban areas, at rates that are reasonably comparable to rates for comparable offerings in urban areas, upon reasonable request.  If a request for broadband service at actual speeds of at least 10 Mbps downstream/1 Mbps upstream is unreasonable, and offering broadband service at actual speeds of at least 4 Mbps downstream/1 Mbps upstream is reasonable, rate-of-return recipients of high-cost support are required to offer broadband service at actual speeds of at least 4 Mbps downstream/1 Mbps upstream.  For purposes of determining reasonable comparability of rates, recipients are presumed to meet this requirement if they offer rates at or below the applicable benchmark to be announced annually by public notice issued by the Wireline Competition Bureau, or no more than the non-promotional prices charged for a comparable fixed wireline service in urban areas in the state or U.S. Territory where the eligible telecommunications carrier receives support.

5. Revise § 54.309 to read as follows:

### § 54.309 Connect America Fund Phase II Public Interest Obligations.

(a) Recipients of Connect America Phase II model-based support are required to offer broadband service at actual speeds of at least 10 Mbps downstream/1 Mbps upstream, with latency suitable for real-time applications, including Voice over Internet Protocol, and usage capacity that is reasonably comparable to comparable offerings in urban areas, at rates that are reasonably comparable to rates for comparable offerings in urban areas.  For purposes of determining reasonable comparability of rates, recipients are presumed to meet this requirement if they offer rates at or below the applicable benchmark to be announced annually by public notice issued by the Wireline Competition Bureau, or no more than the non-promotional prices charged for a comparable fixed wireline service in urban areas in the state or U.S. Territory where the eligible telecommunications carrier receives support.

6. Amend § 54.310 to revise paragraphs (b) and (c) to read as follows:

### § 54.310 Connect America Fund for Price Cap Territories – Phase II.

\*\*\*\*\*

(b) Term of Support. Connect America Phase II model-based support shall be provided to price cap carriers that elect to make a state-level commitment for six years. Connect America Phase II support awarded through a competitive bidding process shall be provided for ten years.

(c) Deployment Obligation. Recipients of Connect America Phase II model-based support must complete deployment to 40 percent of supported locations by December 31, 2017, to 60 percent of supported locations by December 31, 2018, to 80 percent of supported locations by December 31, 2019, and to 100 percent of supported locations by December 31, 2020.  Compliance shall be determined based on the total number of supported locations in a state.

(1) For purposes of meeting the obligation to deploy to the requisite number of supported locations in a state, recipients may serve unserved locations in census blocks with costs above the extremely high-cost threshold instead of locations in eligible census blocks, provided that they meet the public interest

obligations set forth in § 54.309 for those locations and provided that the total number of locations covered is greater than or equal to the number of supported locations in the state.

(2) Recipients of Connect America Phase II model-based support may elect to deploy to 95 percent of the number of supported locations in a given state with a corresponding reduction in support computed based on the average support per location in the state times 1.89.

*****

7. Amend § 54.313 to revise paragraphs (a), (e), and (j) to read as follows:

### § 54.313 Annual reporting requirements for high-cost recipients.

(a) Any recipient of high-cost support shall provide the following, with the information and data required by paragraphs (a)(1) through (7) of this section separately broken out for both voice service and broadband service:

*****

(12) A certification that the pricing of a service that meets the Commission's broadband public interest obligations is no more than the applicable benchmark to be announced annually in a public notice issued by the Wireline Competition Bureau, or is no more than the non-promotional price charged for a comparable fixed wireline service in urban areas in the states or U.S. Territories where the eligible telecommunications carrier receives support.

*****

(e) In addition to the information and certifications in paragraph (a) of this section, any price cap carrier that elects to receive Connect America Phase II model-based support shall provide:

(1) On July 1, 2016 an initial service quality improvement plan that includes a list of the geocoded locations already meeting the § 54.309 public interest obligations at the end of calendar year 2015, and the total amount of Phase II support, if any, the price cap carrier used for capital expenditures in 2015.

(2) On July 1, 2017 and every year thereafter ending July 1, 2021, a progress report on the company's service quality improvement plan, including the following information:

(i) A certification that it is meeting the interim deployment milestones as set forth;

(ii) The number, names, and addresses of community anchor institutions to which the eligible telecommunications carrier newly began providing access to broadband service in the preceding calendar year;

(iii) A list of the geocoded locations to which the eligible telecommunications carrier newly deployed facilities capable of delivering broadband meeting the § 54.309 public interest obligations with Connect America support in the prior year. The final progress report filed on July 1, 2021 must include the total number and geocodes of all the supported locations that a price cap carrier has built out to with service meeting the § 54.309 public interest obligations; and

(iv) The total amount of Phase II support, if any, the price cap carrier used for capital expenditures in the previous calendar year.

(3) On July 1, 2018, a certification that the recipient offered broadband meeting the requisite public interest obligations specified in § 54.309 to 40% of its supported locations in the state on December 31, 2017.

(4) On July 1, 2019, a certification that the recipient offered broadband meeting the requisite public interest obligations specified in § 54.309 to 60% of its supported locations in the state on December 31, 2018.

(5) On July 1, 2020, a certification that the recipient offered broadband meeting the requisite public interest obligations specified in § 54.309 to 80% of its supported locations in the state on December 31, 2019.

(6) On July 1, 2021, a certification that the recipient offered broadband meeting the requisite public interest obligations specified in § 54.309 to 100% of its supported locations in the state on December 31, 2020.

*****

(j) Filing deadlines.

(1) In order for a recipient of high-cost support to continue to receive support for the following calendar year, or retain its eligible telecommunications carrier designation, it must submit the annual reporting information required by this section annually by July 1 of each year. Eligible telecommunications carriers that file their reports after the July 1 deadline shall receive a reduction in support pursuant to the following schedule:

(i) An eligible telecommunications carrier that files after the July 1 deadline, but by July 8, will have its support reduced in an amount equivalent to seven days in support;

(ii) An eligible telecommunications carrier that files on or after July 9 will have its support reduced on a pro-rata daily basis equivalent to the period of non-compliance, plus the minimum seven-day reduction.

(2) Grace period. An eligible telecommunications carrier that submits the annual reporting information required by this section after July 1 but before July 5 will not receive a reduction in support if the eligible telecommunications carrier and its holding company, operating companies, and affiliates as reported pursuant to § 54.313(a)(8) have not missed the July 1 deadline in any prior year.

*****

8. Amend § 54.314 to revise paragraph (d) to read as follows:

## § 54.314 Certification of support for eligible telecommunications carriers.

*****

(d) Filing deadlines.

(1) In order for an eligible telecommunications carrier to receive federal high-cost support, the state or the eligible telecommunications carrier, if not subject to the jurisdiction of a state, must file an annual certification, as described in paragraph (c) of this section, with both the Administrator and the Commission by October 1 of each year. If a state or eligible telecommunications carrier files the annual certification after the October 1 deadline, the carrier subject to the certification shall receive a reduction in

its support pursuant to the following schedule:

(i) An eligible telecommunications carrier subject to certifications filed after the October 1 deadline, but by October 8, will have its support reduced in an amount equivalent to seven days in support;

(ii) An eligible telecommunications carrier subject to certifications filed on or after October 9 will have its support reduced on a pro-rata daily basis equivalent to the period of non-compliance, plus the minimum seven-day reduction.

(2) Grace period. If an eligible telecommunications carrier or state submits the annual certification required by this section after October 1 but before October 5, the eligible telecommunications carrier subject to the certification will not receive a reduction in support if the eligible telecommunications carrier and its holding company, operating companies, and affiliates as reported pursuant to § 54.313(a)(8) have not missed the October 1 deadline in any prior year.

9. Amend § 54.319 to revise paragraphs (a) and (b) and to add a new paragraph (c) to read as follows:

### § 54.319 Elimination of high-cost support in areas with 100 percent coverage by an unsubsidized competitor.

(a) Universal service support shall be eliminated in an incumbent rate-of-return local exchange carrier study area where an unsubsidized competitor, or combination of unsubsidized competitors, as defined in section 54.5, offers to 100 percent of residential and business locations in the study area voice and broadband service at speeds of at least 10 Mbps downstream/1 Mbps upstream, with latency suitable for real-time applications, including Voice over Internet Protocol, and usage capacity that is reasonably comparable to comparable offerings in urban areas, at rates that are reasonably comparable to rates for comparable offerings in urban areas.

(b) After a determination there is a 100 percent overlap, the incumbent local exchange carrier shall receive the following amount of high-cost support:

(1) In the first year, two-thirds of the lesser of the incumbent's total high-cost support in the immediately preceding calendar year or $3000 times the number of reported lines as of year-end for the immediately preceding calendar year;

(2) In the second year, one-third of the lesser of the incumbent's total high-cost support in the immediately preceding calendar year or $3000 times the number of reported lines as of year-end for the immediately preceding calendar year;

(3) In the third year and thereafter, no support shall be paid.

(c) The Wireline Competition Bureau shall update its analysis of where there is a 100 percent overlap on a biennial basis.

10. Amend § 54.320 to add a new paragraph (d) to read as follows:

### § 54.320 Compliance and recordkeeping for the high-cost program.

*****

(d) Eligible telecommunications carriers subject to defined build-out milestones must notify the Commission and USAC, and the relevant state, U.S. Territory, or Tribal government, if applicable, within

10 business days after the applicable deadline if they have failed to meet a build-out milestone.

(1) Interim build-out milestones. Upon notification that an eligible telecommunications carrier has defaulted on an interim build-out milestone after it has begun receiving high-cost support, the Wireline Competition Bureau will issue a letter evidencing the default.  The issuance of this letter shall initiate reporting obligations and withholding of a percentage of the eligible telecommunication carrier's total monthly high-cost support, if applicable, starting the month following the issuance of the letter:

(i) Tier One. If an eligible telecommunications carrier has a compliance gap of at least five percent but less than 15 percent of the number of locations that the eligible telecommunications carrier is required to have built out to by the interim milestone, the Wireline Competition Bureau will issue a letter to that effect. Starting three months after the issuance of this letter, the eligible telecommunications carrier will be required to file a report every three months identifying the geocoded locations to which the eligible telecommunications carrier has newly deployed facilities capable of delivering broadband meeting the requisite requirements with Connect America support in the previous quarter. Eligible telecommunications carriers that do not file these quarterly reports on time will be subject to support reductions as specified in § 54.313(j). The eligible telecommunications carrier must continue to file quarterly reports until the eligible telecommunications carrier reports that it has reduced the compliance gap to less than five percent of the required number of locations for that interim milestone and the Wireline Competition Bureau issues a letter to that effect.

(ii) Tier Two. If an eligible telecommunications carrier has a compliance gap of at least 15 percent but less than 25 percent of the number of locations that the eligible telecommunications carrier is required to have built out to by the interim milestone, USAC will withhold 15 percent of the eligible telecommunications carrier's monthly support for that state and the eligible telecommunications carrier will be required to file quarterly reports. Once the eligible telecommunications carrier has reported that it has reduced the compliance gap to less than 15 percent of the required number of locations for that interim milestone for that state, the Wireline Competition Bureau will issue a letter to that effect, USAC will stop withholding support, and the eligible telecommunications carrier will receive all of the support that had been withheld. The eligible telecommunications carrier will then move to Tier 1 status.

(iii) Tier Three. If an eligible telecommunications carrier has a compliance gap of at least 25 percent but less than 50 percent of the number of locations that the eligible telecommunications carrier is required to have built out to by the interim milestone, USAC will withhold 25 percent of the eligible telecommunications carrier's monthly support for that state and the eligible telecommunications carrier will be required to file quarterly reports. Once the eligible telecommunications carrier has reported that it has reduced the compliance gap to less than 25 percent of the required number of locations for that interim milestone for that state, the Wireline Competition Bureau will issue a letter to that effect, the eligible telecommunications carrier will move to Tier 2 status.

(iv) Tier Four. If an eligible telecommunications carrier has a compliance gap of 50 percent or more of the number of locations that the eligible telecommunications carrier is required to have built out to by the interim milestone:

(A) USAC will withhold 50 percent of the eligible telecommunications carrier's monthly support for that state, and the eligible telecommunications carrier will be required to file quarterly reports. As with the other tiers, as the eligible telecommunications carrier reports that it has lessened the extent of its non-compliance, and the Wireline Competition Bureau issues a letter to that effect, it will move down the tiers until it reaches Tier 1 (or no longer is out of compliance with the relevant interim milestone).

(B) If after having 50 percent of its support withheld for six months the eligible telecommunications carrier has not reported that it is eligible for Tier 3 status (or one of the other

lower tiers), USAC will withhold 100 percent of the eligible telecommunications carrier's monthly support and will commence a recovery action for a percentage of support that is equal to the eligible telecommunications carrier's compliance gap plus 10 percent of the ETC's support that has been disbursed to that date.

(v) If at any point during the support term, the eligible telecommunications carrier reports that it is eligible for Tier 1 status, it will have its support fully restored, USAC will repay any funds that were recovered or withheld, and it will move to Tier 1 status.

(2) Final build-out milestone. Upon notification that the eligible telecommunications carrier has not met a final build-out milestone, the eligible telecommunications carrier will have twelve months from the date of the final build-out milestone deadline to come into full compliance with this milestone. If the eligible telecommunications carrier does not report that it has come into full compliance with this milestone within twelve months, the Wireline Competition Bureau will issue a letter to this effect. USAC will then recover the percentage of support that is equal to 1.89 times the average amount of support per location received in the state over the six-year term for the relevant number of locations plus 10 percent of the eligible telecommunications carrier's total Phase II support over the six-year term for that state.

(3) Compliance reviews. If subsequent to the eligible telecommunications carrier's support term, USAC determines in the course of a compliance review that the eligible telecommunications carrier does not have sufficient evidence to demonstrate that it has built out to all of the locations required by the final build-out milestone, USAC shall recover a percentage of support from the eligible telecommunications carrier as specified in paragraph (d)(2) of this section.

11. Amend § 54.1309 to revise paragraphs (a) and (c) and add paragraph (d) as follows:

### § 54.1309 National and study area average unseparated loop costs.

(a) *National average unseparated loop cost per working loop.* Except as provided in paragraphs (c) and (d) of this section, this is equal to the sum of the Loop Costs for each study area in the country as calculated pursuant to §54.1308(a) divided by the sum of the working loops reported in §54.1305(h) for each study area in the country. The national average unseparated loop cost per working loop shall be calculated by the National Exchange Carrier Association. Until June 30, 2015 the national average unseparated loop cost for purposes of calculating expense adjustments for rural incumbent local exchange carriers, as that term is defined in §54.5 of this part is frozen at $240.00.

(1) ***

(2) ***

(3) ***

*****

(c) Until June 30, 2015, the national average unseparated loop Cost per working loop shall be the greater of:

(1) ***

(2) An amount calculated to produce the maximum rural incumbent local exchange carrier portion of the nationwide loop cost expense adjustment allowable pursuant to § 54.1302(a).

(d) Beginning July 1, 2015, the national average unseparated loop cost per working loop shall be frozen at

Federal Communications Commission                                    FCC 14-190

the national average unseparated loop cost per working loop as recalculated by the National Exchange Carrier Association to reflect the March 2015 update filing.

12. Revise § 54.1310 to read as follows:

**§ 54.1310 Expense adjustment.**

(a) Until June 30, 2015, for study areas reporting 200,000 or fewer working loops pursuant to § 54.1305(h), the expense adjustment (additional interstate expense allocation) is equal to the sum of paragraphs (a)(1) and (2) of this section.

(1) Sixty-five percent of the study area average unseparated loop cost per working loop as calculated pursuant to § 54.1309(b) in excess of 115 percent of the national average for this cost but not greater than 150 percent of the national average for this cost as calculated pursuant to § 54.1309(a) multiplied by the number of working loops reported in §54.1305(h) for the study area; and

(2) Seventy-five percent of the study area average unseparated loop cost per working loop as calculated pursuant to § 54.1309(b) in excess of 150 percent of the national average for this cost as calculated pursuant to § 54.1309(a) multiplied by the number of working loops reported in §54.1305(h) for the study area.

(b) Beginning July 1, 2015, the expense adjustment for each study area calculated pursuant to paragraph (a) of this section will be adjusted as follows:

(1) If the aggregate expense adjustments for all study areas exceed the maximum rural incumbent local exchange carrier portion of nationwide loop cost expense adjustment allowable pursuant to section 54.1302(a) of this subpart (the HCLS cap), then each study area's expense adjustment will be reduced by multiplying it by the ratio of the HCLS cap to the aggregate expense adjustments for all study areas.

(2) If the aggregate expense adjustments for all study areas are less than the HCLS cap set pursuant to section 54.1302(a) of this subpart, then the expense adjustments for all study areas pursuant to paragraph (a) of this section shall be recalculated using a cost per loop calculated to produce an aggregate amount equal to the HCLS cap in place of the national average cost per loop.

(c) The expense adjustment calculated pursuant to § 54.1310(a) and (b) shall be adjusted each year to reflect changes in the amount of high-cost loop support resulting from adjustments calculated pursuant to § 54.1306(a) made during the previous year. If the resulting amount exceeds the previous year's fund size, the difference will be added to the amount calculated pursuant to §54.1310(a) and (b) for the following year. If the adjustments made during the previous year result in a decrease in the size of the funding requirement, the difference will be subtracted from the amount calculated pursuant to §54.1310(a) and (b) for the following year.

Federal Communications Commission                                              FCC 14-190

# APPENDIX B

## Final Regulatory Flexibility Analysis

1.        As required by the Regulatory Flexibility Act of 1980 (RFA),[1] as amended, an Initial Regulatory Flexibility Analyses (IRFA) was incorporated in the *Further Notice of Proposed Rule Making* (*April 2014 Connect America FNPRM*).[2]  The Commission sought written public comment on the proposals in the *April 2014 Connect America FNPRM*, including comment on the IRFA.[3]  The Commission did not receive any relevant comments on the *April 2014 Connect America FNPRM* IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[4]

### A.    Need for, and Objectives of, the Report and Order

2.        With this Report and Order (Order), the Commission takes another momentous stride towards fully implementing a modernized universal service regime capable of meeting consumer demands for 21st century networks.[5]  We finalize the decisions necessary to proceed with the offer of support to price cap carriers in early 2015, thereby paving the way for the deployment of new broadband infrastructure to millions of unserved Americans.  In the coming months, we will turn our attention to finalizing the rules for the Phase II competitive bidding process that will occur in those states where the price cap carrier declines the offer of model-based support.

3.        Throughout the universal service reform process, we have sought to ensure that all consumers "have access to . . . advanced telecommunications and information services"[6] and benefit from the historic technology transitions that are transforming our nation's communications services.  This Report and Order continues down that path.  We adopt several revisions to Connect America Phase II to account for changes in the marketplace since the *USF/ICC Transformation Order* was adopted.  In particular, we revise the minimum speed requirement that recipients of high-cost universal service must offer.  We find that it is in the public interest to require recipients of high-cost support subject to broadband performance obligations to serve fixed locations to provide at least a minimum broadband speed of 10 Mbps downstream.

4.        We adopt targeted changes to the framework established for the offer of model-based support to price cap carriers.  Specifically, we make an adjustment to the term of support, adopt more evenly spaced interim deployment milestones, and conclude that adjustments of up to five percent in the number of locations that must be served with corresponding support reductions are appropriate to ensure that deployment obligations recognize conditions in the real world.  We also forbear from the federal high-cost universal service obligation of price cap carriers to offer voice service in low-cost areas where they do not receive high-cost support, in areas served by an unsubsidized competitor, and in areas where the price cap carrier is replaced by another eligible telecommunications carrier (ETC).

5.        In addition, we address where Phase II support will be available, both for the offer of model-based support to price cap carriers and the subsequent Phase II competitive bidding process.  First,

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612 has been amended by the Contract With America Advancement Act of 1996, Public Law No. 104-121, 110 Stat. 847 (1996) (CWAAA).  Title II of the CWAAA is the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

[2] *April 2014 Connect America Order and/or FNPRM,* 29 FCC Rcd at 7100-7154, paras. 138-331.

[3] The Commission also sought relevant comment in the 2011 *USF/ICC Transformation Order and FNPRM* IRFA. *See USF/ICC Transformation Order,* 26 FCC Rcd at 18364, Appendix P.

[4] *See* 5 U.S.C. § 604.

[5] *See supra* Section I.

[6] 47 U.S.C. § 254(b)(3).

we will exclude from the offer of Phase II model-based support any census block served by a subsidized facilities-based terrestrial competitor that offers fixed residential voice and broadband services meeting or exceeding the 3 Mbps downstream/768 kbps upstream (3 Mbps/768 kbps) performance metrics, as determined by the Wireline Competition Bureau (Bureau) upon completion of the Phase II challenge process.[7]  We also reaffirm the Commission's decision to exclude from the offer of model-based support any census block served by an unsubsidized competitor that meets or exceeds the 3 Mbps/768 kbps performance metrics.[8]  Second, we conclude that those high-cost blocks served by a subsidized carrier that are excluded from the offer of model-based support—including blocks with service meeting or exceeding the new 10 Mbps downstream/1 Mbps upstream (10/1 Mbps) speed requirement—will be eligible for support in the Phase II competitive bidding process.  Third, we conclude that any area served by an unsubsidized facilities-based terrestrial competitor that offers 10/1 Mbps will be ineligible for support in the Phase II competitive bidding process.  Fourth, we exclude from the offer of model-based support those areas that are the subject of category one bids that were not selected for the rural broadband experiments and where a losing bidder has filed specific information indicating that it wishes to remain in consideration for rural broadband experiment support.

6.      In the *Connect America Fund FNPRM*, we sought comment on a number of near-term and longer-term reforms for rate-of-return carriers, including developing and implementing a "Connect America Fund" for rate-of-return carriers.[9]  Although a number of parties have submitted proposals that may have promise, we find that further analysis and development of these proposals is necessary.  We will continue to explore the possibility of a voluntary path to model-based support for those rate-of-return carriers that choose to pursue it.  We also expect to continue to develop the record and act in the coming year on alternatives for those who do not elect to receive model-based support.

7.      In this Order, we focus on near-term reforms for rate-of-return carriers.  Specifically, we adopt a revised methodology for applying the cap on high-cost loop support to distribute that support on a more equitable basis.  We also address the proposals from the *April 2014 Connect America FNPRM* regarding the 100 percent overlap rule.

8.      In the *USF/ICC Transformation Order*, the Commission established a "uniform national framework for accountability" that replaced the various data and certification filing deadlines that carriers previously were required to meet.[10]  In this Order, we take several steps to strengthen that framework, including codifying the reasonable comparability pricing requirement for broadband services, adjusting the reductions in support for late-filed annual ETC reports and certifications, and providing greater specificity regarding how we will address non-compliance with the Commission's service obligations for voice and broadband.

9.      The actions we take today, combined with the implementation of the rural broadband experiments and the reforms we implemented earlier in the year, will allow us to continue to advance further down the path outlined in the *USF/ICC Transformation Order*.  We expect the Bureau to complete the Connect America Phase II challenge process and then make a final determination as to which census blocks will be eligible for the offer of model-based Phase II support by early 2015.[11]  That final determination will allow us to extend the offers of Phase II model-based support to price cap carriers to fund the deployment of voice and broadband-capable infrastructure in their territories.[12]  The carriers will then have 120 days to consider the offer, and in those states where the price cap carrier declines the offer

---

[7] *See supra* Section IV. A.

[8] *See id.*

[9] *See supra* Section VI.

[10] *See supra* Section VII.

[11] *See supra* Section I.

[12] *See id.*

of support, we will move forward with the Phase II competitive bidding process to determine support recipients.

**B.      Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

10.      There were no relevant comments filed that specifically addressed the rules and policies proposed in the *April 2014 Connect America FNPRM* IRFA.  Nonetheless, the agency considered the potential impact of the rules proposed in the IRFA on small entities and reduced the compliance burden for all small entities in order to reduce the economic impact of the rules enacted herein on such entities.

**C.      Description and Estimate of the Number of Small Entities to which the Proposed Rules Will Apply**

11.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[13]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[14]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[15]  A "small-business concern" is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[16]

12.      **Small Businesses**.  Nationwide, there are a total of approximately 28.2 million small businesses, according to the SBA.[17]

13.      **Wired Telecommunications Carriers**.  The SBA has developed a small business size standard for Wired Telecommunications Carriers, which consists of all such companies having 1,500 or fewer employees.[18]  According to Census Bureau data for 2007, there were 3,188 firms in this category, total, that operated for the entire year.[19]  Of this total, 3144 firms had employment of 999 or fewer employees, and 44 firms had employment of 1000 employees or more.[20]  Thus, under this size standard, the majority of firms can be considered small.

14.      **Local Exchange Carriers (LECs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[21]  According to Commission data,

---

[13] *See* 5 U.S.C. § 603(b)(3).

[14] *See* 5 U.S.C. § 601(6).

[15] *See* 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[16] *See* 15 U.S.C. § 632.

[17] *See* SBA, Office of Advocacy, "Frequently Asked Questions," https://www.sba.gov/sites/default/files/FAQ_March_2014_0.pdf (accessed Dec. 2014).

[18] 13 C.F.R. § 121.201, NAICS code 517110.

[19] U.S. Census Bureau, 2007 Economic Census, Subject Series:  Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 517110" (issued Nov. 2010).

[20] *See id.*

[21] 13 C.F.R. § 121.201, NAICS code 517110.

1,307 carriers reported that they were incumbent local exchange service providers.[22]  Of these 1,307 carriers, an estimated 1,006 have 1,500 or fewer employees and 301 have more than 1,500 employees.[23] Consequently, the Commission estimates that most providers of local exchange service are small entities that may be affected by the rules and policies proposed in the Order.

15.     **Incumbent Local Exchange Carriers (incumbent LECs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to incumbent local exchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[24]  According to Commission data, 1,307 carriers reported that they were incumbent local exchange service providers.[25]  Of these 1,307 carriers, an estimated 1,006 have 1,500 or fewer employees and 301 have more than 1,500 employees.[26]  Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by rules adopted pursuant to the Order

16.     We have included small incumbent LECs in this present RFA analysis.  As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (e.g., a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[27]  The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[28]  We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

17.     Competitive Local Exchange Carriers (competitive LECs), Competitive Access Providers (CAPs), Shared-Tenant Service Providers, and Other Local Service Providers.  Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers.  The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[29]  According to Commission data, 1,442 carriers reported that they were engaged in the provision of either competitive local exchange services or competitive access provider services.[30]  Of these 1,442 carriers, an estimated 1,256 have 1,500 or fewer employees and 186 have more than 1,500 employees.[31]  In addition, 17 carriers have reported that they are Shared-Tenant Service Providers, and all 17 are estimated to have 1,500 or

---

[22] *See Trends in Telephone Service*, Federal Communications Commission, Wireline Competition Bureau, Industry Analysis and Technology Division at Table 5.3 (Sept. 2010) (*Trends in Telephone Service*).

[23] *See id.*

[24] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[25] *See Trends in Telephone Service* at Table 5.3.

[26] *See id.*

[27] 5 U.S.C. § 601(3).

[28] *See* Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, Federal Communications Commission (May 27, 1999).  The Small Business Act contains a definition of "small business concern," which the RFA incorporates into its own definition of "small business."  *See* 15 U.S.C. § 632(a); *see also* 5 U.S.C. § 601(3).  SBA regulations interpret "small business concern" to include the concept of dominance on a national basis.  *See* 13 C.F.R. § 121.102(b).

[29] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[30] *See Trends in Telephone Service* at Table 5.3.

[31] *See id.*

fewer employees.[32]  In addition, 72 carriers have reported that they are Other Local Service Providers.[33]  Of the 72, seventy have 1,500 or fewer employees and two have more than 1,500 employees.[34]  Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, Shared-Tenant Service Providers, and Other Local Service Providers are small entities that may be affected by rules adopted pursuant to the Order.

18.      **Interexchange Carriers (IXCs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to interexchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[35]  According to Commission data, 359 companies reported that their primary telecommunications service activity was the provision of interexchange services.[36]  Of these 359 companies, an estimated 317 have 1,500 or fewer employees and 42 have more than 1,500 employees.[37]  Consequently, the Commission estimates that the majority of interexchange service providers are small entities that may be affected by rules adopted pursuant to the Order.

19.      **Prepaid Calling Card Providers**.  Neither the Commission nor the SBA has developed a small business size standard specifically for prepaid calling card providers.  The appropriate size standard under SBA rules is for the category Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[38]  According to Commission data, 193 carriers have reported that they are engaged in the provision of prepaid calling cards.[39]  Of these, an estimated all 193 have 1,500 or fewer employees and none have more than 1,500 employees.[40]  Consequently, the Commission estimates that the majority of prepaid calling card providers are small entities that may be affected by rules adopted pursuant to the Order.

20.      **Local Resellers**.  The SBA has developed a small business size standard for the category of Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[41]  According to Commission data, 213 carriers have reported that they are engaged in the provision of local resale services.[42]  Of these, an estimated 211 have 1,500 or fewer employees and two have more than 1,500 employees.[43]  Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by rules adopted pursuant to the Order.

21.      **Toll Resellers**.  The SBA has developed a small business size standard for the category of Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[44]  According to Commission data, 881 carriers have reported that they are engaged in

---

[32] *See id.*

[33] *See id.*

[34] *See id.*

[35] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[36] *See Trends in Telephone Service* at Table 5.3.

[37] *See id.*

[38] *See* 13 C.F.R. § 121.201, NAICS code 517911.

[39] *See Trends in Telephone Service* at Table 5.3.

[40] *See id.*

[41] *See* 13 C.F.R. § 121.201, NAICS code 517911.

[42] *See Trends in Telephone Service* at Table 5.3.

[43] *See id.*

[44] *See* 13 C.F.R. § 121.201, NAICS code 517911.

the provision of toll resale services.[45]  Of these, an estimated 857 have 1,500 or fewer employees and 24 have more than 1,500 employees.[46]  Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by rules adopted pursuant to the Order.

22.    **Other Toll Carriers**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to Other Toll Carriers.  This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[47]  According to Commission data, 284 companies reported that their primary telecommunications service activity was the provision of other toll carriage.[48]  Of these, an estimated 279 have 1,500 or fewer employees and five have more than 1,500 employees.[49]  Consequently, the Commission estimates that most Other Toll Carriers are small entities that may be affected by the rules and policies adopted pursuant to the Order.

23.    **800 and 800-Like Service Subscribers**.[50]  Neither the Commission nor the SBA has developed a small business size standard specifically for 800 and 800-like service (toll free) subscribers.  The appropriate size standard under SBA rules is for the category Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[51]  The most reliable source of information regarding the number of these service subscribers appears to be data the Commission collects on the 800, 888, 877, and 866 numbers in use.[52]  According to our data, as of September 2009, the number of 800 numbers assigned was 7,860,000; the number of 888 numbers assigned was 5,588,687; the number of 877 numbers assigned was 4,721,866; and the number of 866 numbers assigned was 7,867,736.[53]  We do not have data specifying the number of these subscribers that are not independently owned and operated or have more than 1,500 employees, and thus are unable at this time to estimate with greater precision the number of toll free subscribers that would qualify as small businesses under the SBA size standard.  Consequently, we estimate that there are 7,860,000 or fewer small entity 800 subscribers; 5,588,687 or fewer small entity 888 subscribers; 4,721,866 or fewer small entity 877 subscribers; and 7,867,736 or fewer small entity 866 subscribers.

24.    **Wireless Telecommunications Carriers (except Satellite)**.  Since 2007, the SBA has recognized wireless firms within this new, broad, economic census category.[54]  Prior to that time, such firms were within the now-superseded categories of Paging and Cellular and Other Wireless Telecommunications.[55]  Under the present and prior categories, the SBA has deemed a wireless business

---

[45] *See Trends in Telephone Service* at Table 5.3.

[46] *See id.*

[47] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[48] *See Trends in Telephone Service* at Table 5.3.

[49] *See id.*

[50] We include all toll-free number subscribers in this category, including those for 888 numbers.

[51] *See* 13 C.F.R. § 121.201, NAICS code 517911.

[52] *See Trends in Telephone Service* at Tables 18.7-18.10.

[53] *See id.*

[54] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[55] U.S. Census Bureau, 2012 NAICS Definitions, "517211 Paging," http://www.census.gov/econ/isp/sampler.php?naicscode=517210&naicslevel=6#; U.S. Census Bureau, 2012 NAICS Definitions, "517212 Cellular and Other Wireless Telecommunications," http://www.census.gov/econ/isp/sampler.php?naicscode=517210&naicslevel=6#.

Federal Communications Commission                                FCC 14-190

to be small if it has 1,500 or fewer employees.[56]  For this category, census data for 2007 show that there were 1,383 firms that operated for the entire year.[57]  Of this total, 1,368 firms had employment of 999 or fewer employees and 15 had employment of 1000 employees or more.[58]  Similarly, according to Commission data, 413 carriers reported that they were engaged in the provision of wireless telephony, including cellular service, Personal Communications Service (PCS), and Specialized Mobile Radio (SMR) Telephony services.[59]  Of these, an estimated 261 have 1,500 or fewer employees and 152 have more than 1,500 employees.[60]  Consequently, the Commission estimates that approximately half or more of these firms can be considered small.  Thus, using available data, we estimate that the majority of wireless firms can be considered small.

25.     **Broadband Personal Communications Service**.  The broadband personal communications service (PCS) spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block.  The Commission defined "small entity" for Blocks C and F as an entity that has average gross revenues of $40 million or less in the three previous calendar years.[61]  For Block F, an additional classification for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[62]  These standards defining "small entity" in the context of broadband PCS auctions have been approved by the SBA.[63]  No small businesses, within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B.  There were 90 winning bidders that qualified as small entities in the Block C auctions.  A total of 93 small and very small business bidders won approximately 40 percent of the 1,479 licenses for Blocks D, E, and F.[64]  In 1999, the Commission re-auctioned 347 C, E, and F Block licenses.[65]  There were 48 small business winning bidders.  In 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction 35.[66]  Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses.  Subsequent events, concerning Auction 35, including judicial and agency determinations, resulted in a total of 163 C and F Block licenses being available for grant.  In 2005, the Commission

---

[56] 13 C.F.R. § 121.201, NAICS code 517210.  The now-superseded, pre-2007 C.F.R. citations were 13 C.F.R. § 121.201, NAICS codes 517211 and 517212 (referring to the 2002 NAICS).

[57] U.S. Census Bureau, Subject Series: Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 517210" (issued Nov. 2010).

[58] *Id*.  Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "100 employees or more."

[59] *See Trends in Telephone Service* at Table 5.3.

[60] *See id*.

[61] *See generally Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap*, WT Docket No. 96-59, GN Docket No. 90-314, Report and Order, 11 FCC Rcd 7824 (1996) (*Broadband PCS Auction Order*); *see also* 47 C.F.R. § 24.720(b)(1).

[62] *See generally Broadband PCS Auction Order*; *see also* 47 C.F.R. § 24.720(b)(2).

[63] *See, e.g.*, *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fifth Report and Order, 9 FCC Rcd 5532 (1994).

[64] *See* FCC News, Broadband PCS, D, E and F Block Auction Closes, No. 71744 (rel. Jan. 14, 1997).  *See also Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees*, WT Docket No. 97-82, Second Report and Order and Further Notice of Proposed Rulemaking, 12 FCC Rcd 16436 (1997).

[65] *See C, D, E, and F Block Broadband PCS Auction Closes*, Public Notice, 14 FCC Rcd 6688 (Wireless Tel. Bur. 1999).

[66] *See C and F Block Broadband PCS Auction Closes; Winning Bidders Announced*, Public Notice, 16 FCC Rcd 2339 (Wireless Tel. Bur. 2001).

completed an auction of 188 C block licenses and 21 F block licenses in Auction 58.  There were 24 winning bidders for 217 licenses.[67]  Of the 24 winning bidders, 16 claimed small business status and won 156 licenses.  In 2007, the Commission completed an auction of 33 licenses in the A, C, and F Blocks in Auction 71.[68]  Of the 14 winning bidders, six were designated entities.[69]  In 2008, the Commission completed an auction of 20 Broadband PCS licenses in the C, D, E and F block licenses in Auction 78.[70]

26.    **Advanced Wireless Services**.  In 2008, the Commission conducted the auction of Advanced Wireless Services ("AWS") licenses.[71]  This auction, which as designated as Auction 78, offered 35 licenses in the AWS 1710-1755 MHz and 2110-2155 MHz bands (AWS-1).  The AWS-1 licenses were licenses for which there were no winning bids in Auction 66.  That same year, the Commission completed Auction 78.  A bidder with attributed average annual gross revenues that exceeded $15 million and did not exceed $40 million for the preceding three years ("small business") received a 15 percent discount on its winning bid.  A bidder with attributed average annual gross revenues that did not exceed $15 million for the preceding three years ("very small business") received a 25 percent discount on its winning bid.  A bidder that had combined total assets of less than $500 million and combined gross revenues of less than $125 million in each of the last two years qualified for entrepreneur status.[72]  Four winning bidders that identified themselves as very small businesses won 17 licenses.[73]  Three of the winning bidders that identified themselves as a small business won five licenses.  Additionally, one other winning bidder that qualified for entrepreneur status won 2 licenses.

27.    **Narrowband Personal Communications Services**.  In 1994, the Commission conducted an auction for Narrowband PCS licenses.  A second auction was also conducted later in 1994.  For purposes of the first two Narrowband PCS auctions, "small businesses" were entities with average gross revenues for the prior three calendar years of $40 million or less.[74]  Through these auctions, the Commission awarded a total of 41 licenses, 11 of which were obtained by four small businesses.[75]  To ensure meaningful participation by small business entities in future auctions, the Commission adopted a two-tiered small business size standard in the *Narrowband PCS Second Report and Order.*[76]  A "small

---

[67] *See Broadband PCS Spectrum Auction Closes; Winning Bidders Announced for Auction No. 58*, Public Notice, 20 FCC Rcd 3703 (Wireless Tel. Bur. 2005).

[68] *See Auction of Broadband PCS Spectrum Licenses Closes; Winning Bidders Announced for Auction No. 71*, Public Notice, 22 FCC Rcd 9247 (Wireless Tel. Bur. 2007).

[69] *Id*.

[70] *See Auction of AWS-1 and Broadband PCS Licenses Rescheduled For August 13, 3008, Notice of Filing Requirements, Minimum Opening Bids, Upfront Payments and Other Procedures For Auction 78*, AU Docket No. 08-46, Public Notice, 23 FCC Rcd 7496 (Wireless Tel. Bur. 2008).

[71] *See id*.  Auction 78 also included an auction of Broadband PCS licenses.

[72] *Id*. at 7521-22.

[73] *See Auction of AWS-1 and Broadband PCS Licenses Closes, Winning Bidders Announced for Auction 78,* Public Notice, 23 FCC Rcd 12749 (Wireless Tel. Bur. 2008).

[74] *Implementation of Section 309(j) of the Communications Act – Competitive Bidding Narrowband PCS*, PP Docket No. 93-253, GEN Docket No. 90-314, ET Docket No. 92-100, Third Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 10 FCC Rcd 175, 196, para. 46 (1994).

[75] *See Announcing the High Bidders in the Auction of Ten Nationwide Narrowband PCS Licenses, Winning Bids Total $617,006,674*, Public Notice, PNWL 94-004 (rel. Aug. 2, 1994); *Announcing the High Bidders in the Auction of 30 Regional Narrowband PCS Licenses; Winning Bids Total $490,901,787*, Public Notice, PNWL 94-27 (rel. Nov. 9, 1994).

[76] *Amendment of the Commission's Rules to Establish New Personal Communications Services*, GEN Docket No. 90-314, ET Docket No. 92-100, PP Docket No. 93-253, Narrowband PCS, Second Report and Order and Second Further Notice of Proposed Rule Making, 15 FCC Rcd 10456, 10476, para. 40 (2000) (*Narrowband PCS Second Report and Order*).

business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $40 million.[77]  A "very small business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $15 million.[78]  The SBA has approved these small business size standards.[79]  A third auction was conducted in 2001.  Here, five bidders won 317 (Metropolitan Trading Areas and nationwide) licenses.[80]  Three of these claimed status as a small or very small entity and won 311 licenses.

28.      **Paging (Private and Common Carrier)**.  In the *Paging Third Report and Order*, we developed a small business size standard for "small businesses" and "very small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[81]  A "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years.  Additionally, a "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $3 million for the preceding three years.  The SBA has approved these small business size standards.[82]  According to Commission data, 291 carriers have reported that they are engaged in Paging or Messaging Service.[83]  Of these, an estimated 289 have 1,500 or fewer employees, and two have more than 1,500 employees.[84]  Consequently, the Commission estimates that the majority of paging providers are small entities that may be affected by our action.  An auction of Metropolitan Economic Area licenses commenced on February 24, 2000, and closed on March 2, 2000.  Of the 2,499 licenses auctioned, 985 were sold.  Fifty-seven companies claiming small business status won 440 licenses.[85]  A subsequent auction of MEA and Economic Area ("EA") licenses was held in the year 2001.  Of the 15,514 licenses auctioned, 5,323 were sold.[86]  One hundred thirty-two companies claiming small business status purchased 3,724 licenses.  A third auction, consisting of 8,874 licenses in each of 175 EAs and 1,328 licenses in all but three of the 51 MEAs, was held in 2003.  Seventy-seven bidders claiming small or very small business status won 2,093 licenses.[87]  A fourth auction, consisting of 9,603 lower and upper paging band licenses was held in the year 2010.  Twenty-nine bidders claiming small or very small business status won 3,016 licenses.[88].

---

[77] *Id.*

[78] *Id.*

[79] *See* Letter to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission, from A. Alvarez, Administrator, SBA (Dec. 2, 1998) (*Alvarez Letter 1998*).

[80] *See Narrowband PCS Auction Closes*, Public Notice, 16 FCC Rcd 18663 (Wireless Tel. Bur. 2001).

[81] *See Revision of Part 22 and Part 90 of the Commission's Rules to Facilitate Future Development of Paging Systems*, WT Docket No. 96-18, PR Docket No. 93-253, Memorandum Opinion and Order on Reconsideration and Third Report and Order, 14 FCC Rcd 10030, 10085–88, paras. 98–107 (1999) (*Paging Third Report and Order*)

[82] *See Alvarez Letter 1998*.

[83] *See Trends in Telephone Service* at Table 5.3.

[84] *See id*.

[85] *See id.*

[86] *See Lower and Upper Paging Band Auction Closes*, Public Notice, 16 FCC Rcd 21821 (Wireless Tel. Bur. 2002).

[87] *See Lower and Upper Paging Bands Auction Closes*, Public Notice, 18 FCC Rcd 11154 (Wireless Tel. Bur. 2003). The current number of small or very small business entities that hold wireless licenses may differ significantly from the number of such entities that won in spectrum auctions due to assignments and transfers of licenses in the secondary market over time.  In addition, some of the same small business entities may have won licenses in more than one auction.

[88] *See Auction of Lower and Upper Paging Bands Licenses Closes*, Public Notice, 25 FCC Rcd 18164 (Wireless Tel. Bur. 2010).

29.    **220 MHz Radio Service – Phase I Licensees**.  The 220 MHz service has both Phase I and Phase II licenses.  Phase I licensing was conducted by lotteries in 1992 and 1993.  There are approximately 1,515 such non-nationwide licensees and four nationwide licensees currently authorized to operate in the 220 MHz band.  The Commission has not developed a small business size standard for small entities specifically applicable to such incumbent 220 MHz Phase I licensees.  To estimate the number of such licensees that are small businesses, we apply the small business size standard under the SBA rules applicable to Wireless Telecommunications Carriers (except Satellite).  Under this category, the SBA deems a wireless business to be small if it has 1,500 or fewer employees.[89]  The Commission estimates that nearly all such licensees are small businesses under the SBA's small business size standard that may be affected by rules adopted pursuant to the Order.

30.    **220 MHz Radio Service – Phase II Licensees**.  The 220 MHz service has both Phase I and Phase II licenses.  The Phase II 220 MHz service is subject to spectrum auctions.  In the *220 MHz Third Report and Order*, we adopted a small business size standard for "small" and "very small" businesses for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[90]  This small business size standard indicates that a "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years.[91]  A "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that do not exceed $3 million for the preceding three years.[92]  The SBA has approved these small business size standards.[93]  Auctions of Phase II licenses commenced on September 15, 1998, and closed on October 22, 1998.[94]  In the first auction, 908 licenses were auctioned in three different-sized geographic areas: three nationwide licenses, 30 Regional Economic Area Group (EAG) Licenses, and 875 Economic Area (EA) Licenses.  Of the 908 licenses auctioned, 693 were sold.  Thirty-nine small businesses won licenses in the first 220 MHz auction.  The second auction included 225 licenses:  216 EA licenses and 9 EAG licenses.  Fourteen companies claiming small business status won 158 licenses.[95]

31.    **Specialized Mobile Radio**.  The Commission awards small business bidding credits in auctions for Specialized Mobile Radio ("SMR") geographic area licenses in the 800 MHz and 900 MHz bands to entities that had revenues of no more than $15 million in each of the three previous calendar years.[96]  The Commission awards very small business bidding credits to entities that had revenues of no more than $3 million in each of the three previous calendar years.[97]  The SBA has approved these small business size standards for the 800 MHz and 900 MHz SMR Services.[98]  The Commission has held

---

[89] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[90] *See Amendment of Part 90 of the Commission's Rules to Provide for the Use of the 220-222 MHz Band by the Private Land Mobile Radio Service*, PR Docket No. 89-552, GN Docket No. 93-252, PP Docket No. 93-253, Third Report and Order and Fifth Notice of Proposed Rulemaking, 12 FCC Rcd 10943, 11068–70, paras. 291–295 (1997) (*220 MHz Third Report and Order*).

[91] *See id*. at 11068–69, para. 291.

[92] *See id*. at 11068–70, paras. 291–95.

[93] *See* Letter to D. Phython, Chief, Wireless Telecommunications Bureau, Federal Communications Commission, from Aida Alvarez, Administrator, SBA (Jan. 6, 1998) (*Alvarez to Phython Letter 1998*).

[94] *See Phase II 220 MHz Service Auction Closes*, Public Notice, 14 FCC Rcd 605 (Wireless Tel. Bur. 1998).

[95] *See Phase II 220 MHz Service Spectrum Auction Closes*, Public Notice, 14 FCC Rcd 11218 (Wireless Tel. Bur.1999).

[96] 47 C.F.R. §§ 90.810, 90.814(b), 90.912.

[97] 47 C.F.R. §§ 90.810, 90.814(b), 90.912.

[98] *See* Letter from Aida Alvarez, Administrator, SBA, to Thomas Sugrue, Chief, Wireless Telecommunications Bureau, Federal Communications Commission (Aug. 10, 1999) (*Alvarez Letter 1999*).

auctions for geographic area licenses in the 800 MHz and 900 MHz bands. The 900 MHz SMR auction was completed in 1996.[99] Sixty bidders claiming that they qualified as small businesses under the $15 million size standard won 263 geographic area licenses in the 900 MHz SMR band.[100] The 800 MHz SMR auction for the upper 200 channels was conducted in 1997. Ten bidders claiming that they qualified as small businesses under the $15 million size standard won 38 geographic area licenses for the upper 200 channels in the 800 MHz SMR band.[101] A second auction for the 800 MHz band was conducted in 2002 and included 23 BEA licenses. One bidder claiming small business status won five licenses.[102]

32.    The auction of the 1,053 800 MHz SMR geographic area licenses for the General Category channels was conducted in 2000. Eleven bidders won 108 geographic area licenses for the General Category channels in the 800 MHz SMR band qualified as small businesses under the $15 million size standard.[103] In an auction completed in 2000, a total of 2,800 Economic Area licenses in the lower 80 channels of the 800 MHz SMR service were awarded.[104] Of the 22 winning bidders, 19 claimed small business status and won 129 licenses. Thus, combining all three auctions, 40 winning bidders for geographic licenses in the 800 MHz SMR band claimed status as small business.

33.    In addition, there are numerous incumbent site-by-site SMR licensees and licensees with extended implementation authorizations in the 800 and 900 MHz bands. We do not know how many firms provide 800 MHz or 900 MHz geographic area SMR pursuant to extended implementation authorizations, nor how many of these providers have annual revenues of no more than $15 million. One firm has over $15 million in revenues. In addition, we do not know how many of these firms have 1,500 or fewer employees.[105] We assume, for purposes of this analysis, that all of the remaining existing extended implementation authorizations are held by small entities, as that small business size standard is approved by the SBA.

34.    **Broadband Radio Service and Educational Broadband Service**.  Broadband Radio Service systems, previously referred to as Multipoint Distribution Service ("MDS") and Multichannel Multipoint Distribution Service ("MMDS") systems, and "wireless cable," transmit video programming to subscribers and provide two-way high speed data operations using the microwave frequencies of the Broadband Radio Service ("BRS") and Educational Broadband Service ("EBS") (previously referred to as the Instructional Television Fixed Service ("ITFS")).[106] In connection with the 1996 BRS auction, the Commission established a small business size standard as an entity that had annual average gross revenues of no more than $40 million in the previous three calendar years.[107] The BRS auctions resulted

---

[99] *FCC Announces Winning Bidders in the Auction of 1,020 Licenses to Provide 900 MHz SMR in Major Trading Areas*, Public Notice, 11 FCC Rcd 18599 (Wireless Tel. Bur. 1996).

[100] *Id.*

[101] *See Correction to Public Notice DA 96-586 "FCC Announces Winning Bidders in the Auction of 1020 Licenses to Provide 900 MHz SMR in Major Trading Areas,"* Public Notice, 11 FCC Rcd 18637 (Wireless Tel. Bur. 1996).

[102] *See Multi-Radio Service Auction Closes*, Public Notice, 17 FCC Rcd 1446 (Wireless Tel. Bur. 2002).

[103] *See 800 MHz Specialized Mobile Radio (SMR) Service General Category (851-854 MHz) and Upper Band (861-865 MHz) Auction Closes; Winning Bidders Announced*, Public Notice, 15 FCC Rcd 17162 (Wireless Tel. Bur. 2000).

[104] *See 800 MHz SMR Service Lower 80 Channels Auction Closes; Winning Bidders Announced*, Public Notice, 16 FCC Rcd 1736 (Wireless Tel. Bur. 2000).

[105] *See generally* 13 C.F.R. § 121.201, NAICS code 517210.

[106] *Amendment of Parts 21 and 74 of the Commission's Rules with Regard to Filing Procedures in the Multipoint Distribution Service and in the Instructional Television Fixed Service and Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, MM Docket No. 94-131 and PP Docket No. 93-253, Report and Order, 10 FCC Rcd 9589, 9593 para. 7 (1995).

[107] 47 C.F.R. § 21.961(b)(1).

in 67 successful bidders obtaining licensing opportunities for 493 Basic Trading Areas ("BTAs"). Of the 67 auction winners, 61 met the definition of a small business. BRS also includes licensees of stations authorized prior to the auction. At this time, we estimate that of the 61 small business BRS auction winners, 48 remain small business licensees. In addition to the 48 small businesses that hold BTA authorizations, there are approximately 392 incumbent BRS licensees that are considered small entities.[108] After adding the number of small business auction licensees to the number of incumbent licensees not already counted, we find that there are currently approximately 440 BRS licensees that are defined as small businesses under either the SBA or the Commission's rules. The Commission has adopted three levels of bidding credits for BRS: (i) a bidder with attributed average annual gross revenues that exceed $15 million and do not exceed $40 million for the preceding three years (small business) is eligible to receive a 15 percent discount on its winning bid; (ii) a bidder with attributed average annual gross revenues that exceed $3 million and do not exceed $15 million for the preceding three years (very small business) is eligible to receive a 25 percent discount on its winning bid; and (iii) a bidder with attributed average annual gross revenues that do not exceed $3 million for the preceding three years (entrepreneur) is eligible to receive a 35 percent discount on its winning bid.[109] In 2009, the Commission conducted Auction 86, which offered 78 BRS licenses.[110] Auction 86 concluded with ten bidders winning 61 licenses.[111] Of the ten, two bidders claimed small business status and won 4 licenses; one bidder claimed very small business status and won three licenses; and two bidders claimed entrepreneur status and won six licenses.

35.    In addition, the SBA's Cable Television Distribution Services small business size standard is applicable to EBS. There are presently 2,032 EBS licensees. All but 100 of these licenses are held by educational institutions. Educational institutions are included in this analysis as small entities.[112] Thus, we estimate that at least 1,932 licensees are small businesses. Since 2007, Cable Television Distribution Services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies."[113] The SBA defines a small business size standard for this category as any such firms having 1,500 or fewer employees. The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees. According to Census Bureau data for 2007, there were a total of 955 firms in this previous category that operated for the entire year.[114] Of this total, 939 firms had employment of 999 or fewer employees, and 16 firms had employment of

---

[108] 47 U.S.C. § 309(j). Hundreds of stations were licensed to incumbent MDS licensees prior to implementation of section 309(j) of the Communications Act of 1934, 47 U.S.C. § 309(j). For these pre-auction licenses, the applicable standard is SBA's small business size standard.

[109] 47 C.F.R. § 27.1218. *See also Auction of Broadband Radio Service (BRS) Licenses, Scheduled for October 27, 2009, Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 86,* Public Notice, 24 FCC Rcd 8277, 8296 (Wireless Tel. Bur. 2009).

[110] *Id.* at 8280.

[111] *Auction of Broadband Radio Service Licenses Closes; Winning Bidders Announced for Auction 86,*, Public Notice, 24 FCC Rcd 13572 (Wireless Tel. Bur. 2009).

[112] The term "small entity" within SBREFA applies to small organizations (nonprofits) and to small governmental jurisdictions (cities, counties, towns, townships, villages, school districts, and special districts with populations of less than 50,000). 5 U.S.C. §§ 601(4)-(6). We do not collect annual revenue data on EBS licensees.

[113] U.S. Census Bureau, 2012 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition), http://www.census.gov/econ/isp/sampler.php?naicscode=517110&naicslevel=6.

[114] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, Employment Size of Firms for the United States: 2007, NAICS code 5171102 (issued Nov. 2010).

1000 employees or more.[115] Thus, under this size standard, the majority of firms can be considered small and may be affected by rules adopted pursuant to the Order.

36.     **Lower 700 MHz Band Licenses**. The Commission previously adopted criteria for defining three groups of small businesses for purposes of determining their eligibility for special provisions such as bidding credits.[116] The Commission defined a "small business" as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years.[117] A "very small business" is defined as an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years.[118] Additionally, the Lower 700 MHz Band had a third category of small business status for Metropolitan/Rural Service Area ("MSA/RSA") licenses, identified as "entrepreneur" and defined as an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $3 million for the preceding three years.[119] The SBA approved these small size standards.[120] The Commission conducted an auction in 2002 of 740 Lower 700 MHz Band licenses (one license in each of the 734 MSAs/RSAs and one license in each of the six Economic Area Groupings (EAGs)). Of the 740 licenses available for auction, 484 licenses were sold to 102 winning bidders.[121] Seventy-two of the winning bidders claimed small business, very small business or entrepreneur status and won a total of 329 licenses.[122] The Commission conducted a second Lower 700 MHz Band auction in 2003 that included 256 licenses: 5 EAG licenses and 476 Cellular Market Area licenses.[123] Seventeen winning bidders claimed small or very small business status and won 60 licenses, and nine winning bidders claimed entrepreneur status and won 154 licenses.[124] In 2005, the Commission completed an auction of 5 licenses in the Lower 700 MHz Band, designated Auction 60. There were three winning bidders for five licenses. All three winning bidders claimed small business status.[125]

37.     In 2007, the Commission reexamined its rules governing the 700 MHz band in the *700 MHz Second Report and Order*.[126] The *700 MHz Second Report and Order* revised the band plan for the

---

[115] *See id.*

[116] *See Reallocation and Service Rules for the 698-746 MHz Spectrum Band (Television Channels 52-59),* GN Docket No. 01-74, Report and Order, 17 FCC Rcd 1022 (2002).

[117] *See id*. at 1087-88, para. 172.

[118] *See id*.

[119] *See id*. at 1088, para. 173.

[120] *See Alvarez Letter 1999.*

[121] *See Lower 700 MHz Band Auction Closes; Winning Bidders Announced*, Public Notice, 17 FCC Rcd 17272 (Wireless Tel. Bur. 2002).

[122] *Id*.

[123] *See* Lower 700 MHz Band Auction Closes*; Winning Bidders Announced*, Public Notice, 18 FCC Rcd 11873 (Wireless Tel. Bur. 2003).

[124] *See id.*

[125] *Auction of Lower 700 MHz Band Licenses Closes; Winning Bidders Announced for Auction No. 60*, Public Notice, 20 FCC Rcd 13424 (Wireless Tel. Bur. 2005).

[126] *See Service Rules for the 698-746, 747-762 and 777-792 MHz Band, WT Docket No. 06-150, Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, CC Docket No. 94-102, Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephone, Biennial Regulatory Review – Amendment of Parts 1, 22, 24, 27, and 90 to Streamline and Harmonize Various Rules Affecting Wireless Radio Services, Former Nextel Communications, Inc. Upper700 MHz Guard Band Licenses and Revisions to Part 27 of the Commission's Rules, Implementing a Nationwide, Broadband Interoperable Public Safety Network in the 700 MHz Band, Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State, and Local Public Safety Communications Requirements Through the Year 2010, WT Docket Nos. 96-86, 01-309,*

(continued….)

commercial (including Guard Band) and public safety spectrum, adopted services rules, including stringent build-out requirements, an open platform requirement on the C Block, and a requirement on the D Block licensee to construct and operate a nationwide, interoperable wireless broadband network for public safety users.[127]  An auction of A, B and E block licenses in the Lower 700 MHz band was held in 2008.[128]  Twenty winning bidders claimed small business status (those with attributable average annual gross revenues that exceed $15 million and do not exceed $40 million for the preceding three years).  Thirty three winning bidders claimed very small business status (those with attributable average annual gross revenues that do not exceed $15 million for the preceding three years).  In 2011, the Commission conducted Auction 92, which offered 16 Lower 700 MHz band licenses that had been made available in Auction 73 but either remained unsold or were licenses on which a winning bidder defaulted.  Two of the seven winning bidders in Auction 92 claimed very small business status, winning a total of four licenses.[129]

38.      **Upper 700 MHz Band Licenses.**  In the *700 MHz Second Report and Order*, the Commission revised its rules regarding Upper 700 MHz band licenses.[130]  In 2008, the Commission conducted Auction 73 in which C and D block licenses in the Upper 700 MHz band were available.[131]  Three winning bidders claimed very small business status (those with attributable average annual gross revenues that do not exceed $15 million for the preceding three years).

39.      **700 MHz Guard Band Licensees**.  In the *700 MHz Guard Band Order*, we adopted a small business size standard for "small businesses" and "very small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[132]  A "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years.[133]  Additionally, a "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years.[134]  An auction of 52 Major Economic Area (MEA) licenses commenced on September 6, 2000, and closed on September 21, 2000.[135]  Of the 104 licenses auctioned, 96 licenses were sold to nine bidders.  Five of these bidders were small businesses that won a total of 26 licenses.  A second auction of 700 MHz Guard Band licenses commenced on February 13, 2001 and closed on February 21, 2001.  All eight of the licenses auctioned were sold to three bidders.  One of these bidders was a small business that won a total of two licenses.[136]

(Continued from previous page) ————————————————

03-264, 06-169, PS Docket No. 06-229, *Second Report and Order*, 22 FCC Rcd 15289 (2007) (*700 MHz Second Report and Order*).

[127] *Id*.

[128] *See Auction of 700 MHz Band Licenses Closes; Winning Bidders Announced for Auction 73*, Public Notice, 23 FCC Rcd 4572 (Wireless Tel. Bur. 2008) (*Auction 73 Closure Public Notice*).

[129] *See Auction of 700 MHz Band Licenses Closes, Winning Bidders Announced for Auction 92*, Public Notice, 26 FCC Rcd 10494 (Wireless Tel. Bur. 2011).

[130] *700 MHz Second Report and Order*.

[131] *See Auction 73 Closure Public Notice*.

[132] *See Service Rules for the 746-764 and 776-794 MHz Bands, and Revisions to Part 27 of the Commission's Rules*, WT Docket No. 99-168, Second Report and Order, 15 FCC Rcd 5299 (2000) (*700 MHz Guard Band Order*).

[133] *See id*. at 5343–45, paras. 106–10.

[134] *See id*.

[135] *See 700 MHz Guard Band Auction Closes; Winning Bidders Announced*, Public Notice, 15 FCC Rcd 18026 (Wireless Tel. Bur. 2000).

[136] *See 700 MHz Guard Bands Auction Closes; Winning Bidders Announced*, Public Notice, 16 FCC Rcd 4590 (Wireless Tel. Bur. 2001).

40.    **Cellular Radiotelephone Service**.  Auction 77 was held to resolve one group of mutually exclusive applications for Cellular Radiotelephone Service licenses for unserved areas in New Mexico.[137]  Bidding credits for designated entities were not available in Auction 77.[138]  In 2008, the Commission completed the closed auction of one unserved service area in the Cellular Radiotelephone Service, designated as Auction 77.  Auction 77 concluded with one provisionally winning bid for the unserved area totaling $25,002.[139]

41.    **Private Land Mobile Radio ("PLMR")**.  PLMR systems serve an essential role in a range of industrial, business, land transportation, and public safety activities.  These radios are used by companies of all sizes operating in all U.S. business categories, and are often used in support of the licensee's primary (non-telecommunications) business operations.  For the purpose of determining whether a licensee of a PLMR system is a small business as defined by the SBA, we use the broad census category, Wireless Telecommunications Carriers (except Satellite).  This definition provides that a small entity is any such entity employing no more than 1,500 persons.[140]  The Commission does not require PLMR licensees to disclose information about number of employees, so the Commission does not have information that could be used to determine how many PLMR licensees constitute small entities under this definition.  We note that PLMR licensees generally use the licensed facilities in support of other business activities, and therefore, it would also be helpful to assess PLMR licensees under the standards applied to the particular industry subsector to which the licensee belongs.[141]

42.    As of March 2010, there were 424,162 PLMR licensees operating 921,909 transmitters in the PLMR bands below 512 MHz.  We note that any entity engaged in a commercial activity is eligible to hold a PLMR license, and that any revised rules in this context could therefore potentially impact small entities covering a great variety of industries.

43.    **Rural Radiotelephone Service**.  The Commission has not adopted a size standard for small businesses specific to the Rural Radiotelephone Service.[142]  A significant subset of the Rural Radiotelephone Service is the Basic Exchange Telephone Radio System (BETRS).[143]  In the present context, we will use the SBA's small business size standard applicable to Wireless Telecommunications Carriers (except Satellite), i.e., an entity employing no more than 1,500 persons.[144]  There are approximately 1,000 licensees in the Rural Radiotelephone Service, and the Commission estimates that there are 1,000 or fewer small entity licensees in the Rural Radiotelephone Service that may be affected by the rules and policies proposed herein.

44.    **Air-Ground Radiotelephone Service**.  The Commission has not adopted a small business size standard specific to the Air-Ground Radiotelephone Service.[145]  We will use SBA's small business size standard applicable to Wireless Telecommunications Carriers (except Satellite), i.e., an

---

[137] *See Closed Auction of Licenses for Cellular Unserved Service Area Scheduled for June 17, 2008, Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 77*, Public Notice, 23 FCC Rcd 6670 (Wireless Tel. Bur. 2008).

[138] *Id*. at 6685.

[139] *See Auction of Cellular Unserved Service Area License Closes, Winning Bidder Announced for Auction 77, Down Payment due July 2, 2008, Final Payment due July 17, 2008*, Public Notice, 23 FCC Rcd 9501 (WTB 2008).

[140] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[141] *See* generally 13 C.F.R. § 121.201.

[142] The service is defined in 47 C.F.R. § 22.99.

[143] BETRS is defined in 47 C.F.R. §§ 22.757 and 22.759.

[144] 13 C.F.R. § 121.201, NAICS code 517210.

[145] *See* 47 C.F.R. § 22.99.

entity employing no more than 1,500 persons.[146]  There are approximately 100 licensees in the Air-Ground Radiotelephone Service, and we estimate that almost all of them qualify as small under the SBA small business size standard and may be affected by rules adopted pursuant to the Order.

45.      **Aviation and Marine Radio Services**.  Small businesses in the aviation and marine radio services use a very high frequency (VHF) marine or aircraft radio and, as appropriate, an emergency position-indicating radio beacon (and/or radar) or an emergency locator transmitter.  The Commission has not developed a small business size standard specifically applicable to these small businesses.  For purposes of this analysis, the Commission uses the SBA small business size standard for the category Wireless Telecommunications Carriers (except Satellite), which is 1,500 or fewer employees.[147]  Census data for 2007, which supersede data contained in the 2002 Census, show that there were 1,383 firms that operated that year.[148]  Of those 1,383, 1,368 had fewer than 100 employees, and 15 firms had more than 100 employees.  Most applicants for recreational licenses are individuals.  Approximately 581,000 ship station licensees and 131,000 aircraft station licensees operate domestically and are not subject to the radio carriage requirements of any statute or treaty.  For purposes of our evaluations in this analysis, we estimate that there are up to approximately 712,000 licensees that are small businesses (or individuals) under the SBA standard.  In addition, between December 3, 1998 and December 14, 1998, the Commission held an auction of 42 VHF Public Coast licenses in the 157.1875-157.4500 MHz (ship transmit) and 161.775-162.0125 MHz (coast transmit) bands.  For purposes of the auction, the Commission defined a "small" business as an entity that, together with controlling interests and affiliates, has average gross revenues for the preceding three years not to exceed $15 million dollars.[149]  In addition, a "very small" business is one that, together with controlling interests and affiliates, has average gross revenues for the preceding three years not to exceed $3 million dollars.[150]  There are approximately 10,672 licensees in the Marine Coast Service, and the Commission estimates that almost all of them qualify as "small" businesses under the above special small business size standards and may be affected by rules adopted pursuant to the Order.

46.      **Fixed Microwave Services**.  Fixed microwave services include common carrier,[151] private operational-fixed,[152] and broadcast auxiliary radio services.[153]  At present, there are approximately 22,015 common carrier fixed licensees and 61,670 private operational-fixed licensees and broadcast auxiliary radio licensees in the microwave services.  The Commission has not created a size standard for a

---

[146] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[147] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[148] U.S. Census Bureau, 2012 Economic Census, Sector 51, 2012 NAICS code 517210, https://bhs.econ.census.gov/ec12/in-51/in-51_form_default.html.

[149] *See generally Amendment of the Commission's Rules Concerning Maritime Communications*, PR Docket No. 92-257, Third Report and Order and Memorandum Opinion and Order, 13 FCC Rcd 19853, 19884–88 paras. 64–73 (1998).

[150] *See id*.

[151] *See* 47 C.F.R. §§ 101 *et seq*. (formerly, Part 21 of the Commission's Rules) for common carrier fixed microwave services (except Multipoint Distribution Service).

[152] Persons eligible under parts 80 and 90 of the Commission's Rules can use Private Operational-Fixed Microwave services.  *See* 47 C.F.R. Parts 80 and 90.  Stations in this service are called operational-fixed to distinguish them from common carrier and public fixed stations.  Only the licensee may use the operational-fixed station, and only for communications related to the licensee's commercial, industrial, or safety operations.

[153] Auxiliary Microwave Service is governed by Part 74 of Title 47 of the Commission's Rules.  *See* 47 C.F.R. Part 74.  This service is available to licensees of broadcast stations and to broadcast and cable network entities.  Broadcast auxiliary microwave stations are used for relaying broadcast television signals from the studio to the transmitter, or between two points such as a main studio and an auxiliary studio.  The service also includes mobile television pickups, which relay signals from a remote location back to the studio.

small business specifically with respect to fixed microwave services.  For purposes of this analysis, the Commission uses the SBA small business size standard for Wireless Telecommunications Carriers (except Satellite), which is 1,500 or fewer employees.[154]  The Commission does not have data specifying the number of these licensees that have more than 1,500 employees, and thus is unable at this time to estimate with greater precision the number of fixed microwave service licensees that would qualify as small business concerns under the SBA's small business size standard.  Consequently, the Commission estimates that there are up to 22,015 common carrier fixed licensees and up to 61,670 private operational-fixed licensees and broadcast auxiliary radio licensees in the microwave services that may be small and may be affected by the rules and policies adopted herein.  We note, however, that the common carrier microwave fixed licensee category includes some large entities.

47.    **Offshore Radiotelephone Service**.  This service operates on several UHF television broadcast channels that are not used for television broadcasting in the coastal areas of states bordering the Gulf of Mexico.[155]  There are presently approximately 55 licensees in this service.  The Commission is unable to estimate at this time the number of licensees that would qualify as small under the SBA's small business size standard for the category of Wireless Telecommunications Carriers (except Satellite). Under that SBA small business size standard, a business is small if it has 1,500 or fewer employees.[156]  Census data for 2007, which supersede data contained in the 2002 Census, show that there were 1,383 firms that operated that year.[157]  Of those 1,383, 1,368 had fewer than 100 employees, and 15 firms had more than 100 employees.  Thus, under this category and the associated small business size standard, the majority of firms can be considered small.

48.    **39 GHz Service**.  The Commission created a special small business size standard for 39 GHz licenses – an entity that has average gross revenues of $40 million or less in the three previous calendar years.[158]  An additional size standard for "very small business" is:  an entity that, together with affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[159]  The SBA has approved these small business size standards.[160]  The auction of the 2,173 39 GHz licenses began on April 12, 2000 and closed on May 8, 2000.  The 18 bidders who claimed small business status won 849 licenses.  Consequently, the Commission estimates that 18 or fewer 39 GHz licensees are small entities that may be affected by rules adopted pursuant to the Order.

49.    **Local Multipoint Distribution Service**.  Local Multipoint Distribution Service (LMDS) is a fixed broadband point-to-multipoint microwave service that provides for two-way video telecommunications.[161]  The auction of the 986 LMDS licenses began and closed in 1998.  The Commission established a small business size standard for LMDS licenses as an entity that has average

---

[154] *See* 13 C.F.R. § 121.201, NAICS code 517210.

[155] This service is governed by Subpart I of Part 22 of the Commission's Rules.  *See* 47 C.F.R. §§ 22.1001-22.1037.

[156] *Id*.

[157] U.S. Census Bureau, 2012 Economic Census, Sector 51, 2012 NAICS code 517210, https://bhs.econ.census.gov/ec12/in-51/in-51_form_default.html.

[158] *See Amendment of the Commission's Rules Regarding the 37.0-38.6 GHz and 38.6-40.0 GHz Bands*, ET Docket No. 95-183, PP Docket No. 93-253, Report and Order, 12 FCC Rcd 18600, 18661–64, paras. 149–151 (1997).

[159] *See id.*

[160] *See* Letter to Kathleen O'Brien Ham, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission, from Aida Alvarez, Administrator, SBA (Feb. 4, 1998).

[161] *See Rulemaking to Amend Parts 1, 2, 21, 25, of the Commission's Rules to Redesignate the 27.5-29.5 GHz Frequency Band, Reallocate the 29.5-30.5 Frequency Band, to Establish Rules and Policies for Local Multipoint Distribution Service and for Fixed Satellite Services*, CC Docket No. 92-297, Second Report and Order, Order on Reconsideration, and Fifth Notice of Proposed Rule Making, 12 FCC Rcd 12545, 12689-90, para. 348 (1997).

gross revenues of less than $40 million in the three previous calendar years.[162]  An additional small business size standard for "very small business" was added as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[163]  The SBA has approved these small business size standards in the context of LMDS auctions.[164]  There were 93 winning bidders that qualified as small entities in the LMDS auctions.  A total of 93 small and very small business bidders won approximately 277 A Block licenses and 387 B Block licenses.  In 1999, the Commission re-auctioned 161 licenses; there were 32 small and very small businesses winning that won 119 licenses.

50.    **218-219 MHz Service**.  The first auction of 218-219 MHz spectrum resulted in 170 entities winning licenses for 594 Metropolitan Statistical Area (MSA) licenses.  Of the 594 licenses, 557 were won by entities qualifying as a small business.  For that auction, the small business size standard was an entity that, together with its affiliates, has no more than a $6 million net worth and, after federal income taxes (excluding any carry over losses), has no more than $2 million in annual profits each year for the previous two years.[165]  In the *218-219 MHz Report and Order and Memorandum Opinion and Order*, we established a small business size standard for a "small business" as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and their affiliates, has average annual gross revenues not to exceed $15 million for the preceding three years.[166]  A "very small business" is defined as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and its affiliates, has average annual gross revenues not to exceed $3 million for the preceding three years.[167]  These size standards will be used in future auctions of 218-219 MHz spectrum.

51.    **2.3 GHz Wireless Communications Services**.  This service can be used for fixed, mobile, radiolocation, and digital audio broadcasting satellite uses.  The Commission defined "small business" for the wireless communications services ("WCS") auction as an entity with average gross revenues of $40 million for each of the three preceding years, and a "very small business" as an entity with average gross revenues of $15 million for each of the three preceding years.[168]  The SBA has approved these definitions.[169]  The Commission auctioned geographic area licenses in the WCS service. In the auction, which was conducted in 1997, there were seven bidders that won 31 licenses that qualified as very small business entities, and one bidder that won one license that qualified as a small business entity.

52.    **1670-1675 MHz Band**.  An auction for one license in the 1670-1675 MHz band was conducted in 2003.  The Commission defined a "small business" as an entity with attributable average annual gross revenues of not more than $40 million for the preceding three years and thus would be eligible for a 15 percent discount on its winning bid for the 1670-1675 MHz band license.  Further, the Commission defined a "very small business" as an entity with attributable average annual gross revenues of not more than $15 million for the preceding three years and thus would be eligible to receive a 25

[162] *See id.*

[163] *See id.*

[164] *See Alvarez to Phythyon Letter 1998.*

[165] *See generally Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fourth Report and Order, 9 FCC Rcd 2330 (1994).

[166] *See generally Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218-219 MHz Service*, WT Docket No. 98-169, Report and Order and Memorandum Opinion and Order, 15 FCC Rcd 1497 (1999) (*218-219 MHz Report and Order and Memorandum Opinion and Order*).

[167] *See id.*

[168] *Amendment of the Commission's Rules to Establish Part 27, the Wireless Communications Service (WCS)*, GN Docket No. 96-228, Report and Order, 12 FCC Rcd 10785, 10879 para. 194 (1997).

[169] *See Alvarez Letter 1998.*

percent discount on its winning bid for the 1670-1675 MHz band license. One license was awarded. The winning bidder was not a small entity.

53.    **3650–3700 MHz band.** In March 2005, the Commission released a *Report and Order and Memorandum Opinion and Order* that provides for nationwide, non-exclusive licensing of terrestrial operations, utilizing contention-based technologies, in the 3650 MHz band (i.e., 3650–3700 MHz).[170] As of April 2010, more than 1270 licenses have been granted and more than 7433 sites have been registered. The Commission has not developed a definition of small entities applicable to 3650–3700 MHz band nationwide, non-exclusive licensees. However, we estimate that the majority of these licensees are Internet Access Service Providers (ISPs) and that most of those licensees are small businesses.

54.    **24 GHz – Incumbent Licensees.** This analysis may affect incumbent licensees who were relocated to the 24 GHz band from the 18 GHz band, and applicants who wish to provide services in the 24 GHz band. For this service, the Commission uses the SBA small business size standard for the category "Wireless Telecommunications Carriers (except satellite)," which is 1,500 or fewer employees.[171] To gauge small business prevalence for these cable services we must, however, use the most current census data. Census data for 2007, which supersede data contained in the 2002 Census, show that there were 1,383 firms that operated that year.[172] Of those 1,383, 1,368 had fewer than 100 employees, and 15 firms had more than 100 employees. Thus under this category and the associated small business size standard, the majority of firms can be considered small. The Commission notes that the Census' use of the classifications "firms" does not track the number of "licenses". The Commission believes that there are only two licensees in the 24 GHz band that were relocated from the 18 GHz band, Teligent[173] and TRW, Inc. It is our understanding that Teligent and its related companies have less than 1,500 employees, though this may change in the future. TRW is not a small entity. Thus, only one incumbent licensee in the 24 GHz band is a small business entity.

55.    **24 GHz – Future Licensees.** With respect to new applicants in the 24 GHz band, the size standard for "small business" is an entity that, together with controlling interests and affiliates, has average annual gross revenues for the three preceding years not in excess of $15 million.[174] "Very small business" in the 24 GHz band is an entity that, together with controlling interests and affiliates, has average gross revenues not exceeding $3 million for the preceding three years.[175] The SBA has approved these small business size standards.[176] These size standards will apply to a future 24 GHz license auction, if held.

56.    **Satellite Telecommunications.** Since 2007, the SBA has recognized satellite firms within this revised category, with a small business size standard of $15 million.[177] The most current

---

[170] The service is defined in section 90.1301 *et seq.* of the Commission's Rules, 47 C.F.R. § 90.1301 *et seq.*

[171] 13 C.F.R. § 121.201, NAICS code 517210.

[172] U.S. Census Bureau, 2012 Economic Census, Sector 51, 2012 NAICS code 517210, https://bhs.econ.census.gov/ec12/in-51/in-51_form_default.html.

[173] Teligent acquired the DEMS licenses of FirstMark, the only licensee other than TRW in the 24 GHz band whose license has been modified to require relocation to the 24 GHz band.

[174] *See Amendments to Parts 1, 2, 87 and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, WT Docket No. 99-327, Report and Order, 15 FCC Rcd 16934, 16967 para. 77 (2000) (*24 GHz Order*); *see also* 47 C.F.R. § 101.538(a)(2).

[175] *See 24 GHz Order*, 15 FCC Rcd at 16967, para. 77; *see also* 47 C.F.R. § 101.538(a)(1).

[176] *See* Letter to Margaret W. Wiener, Deputy Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission, from Gary M. Jackson, Assistant Administrator, SBA (July 28, 2000).

[177] *See* 13 C.F.R. § 121.201, NAICS code 517410.

Census Bureau data are from the economic census of 2007, and we will use those figures to gauge the prevalence of small businesses in this category. Those size standards are for the two census categories of "Satellite Telecommunications" and "Other Telecommunications." Under the "Satellite Telecommunications" category, a business is considered small if it had $15 million or less in average annual receipts.[178] Under the "Other Telecommunications" category, a business is considered small if it had $25 million or less in average annual receipts.[179]

57.    The first category of Satellite Telecommunications "comprises establishments primarily engaged in providing point-to-point telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[180] For this category, Census Bureau data for 2007 show that there were a total of 512 firms that operated for the entire year.[181] Of this total, 464 firms had annual receipts of under $10 million, and 18 had receipts of $10 million to $24,999,999.[182] Consequently, we estimate that the majority of Satellite Telecommunications firms are small entities that might be affected by rules adopted pursuant to the Order.

58.    The second category of Other Telecommunications "primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Establishments providing Internet services or voice over Internet protocol (VoIP) services via client-supplied telecommunications connections are also included in this industry."[183] For this category, Census Bureau data for 2007 show that there were a total of 2,383 firms that operated for the entire year.[184] Of this total, 2,346 firms had annual receipts of under $25 million.[185] Consequently, we estimate that the majority of Other Telecommunications firms are small entities that might be affected by our action.

59.    **Cable and Other Program Distribution.** Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies."[186] The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.[187] According to Census Bureau data for 2007, there were a total of 955 firms in this

---

[178] *Id*.

[179] *See* 13 C.F.R. § 121.201, NAICS code 517919.

[180] U.S. Census Bureau, 2007 NAICS Definitions, "517410 Satellite Telecommunications".

[181] *See* 13 C.F.R. § 121.201, NAICS code 517410.

[182] *See id.* An additional 38 firms had annual receipts of $25 million or more.

[183] U.S. Census Bureau, 2012 NAICS Definitions, "517919 Other Telecommunications," http://www.census.gov/econ/isp/sampler.php?naicscode=517919&naicslevel=6.

[184] *See* 13 C.F.R. § 121.201, NAICS code 517919.

[185] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 517919" (issued Nov. 2010).

[186] U.S. Census Bureau, 2012 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition), http://www.census.gov/econ/isp/sampler.php?naicscode=517110&naicslevel=6.

[187] 13 C.F.R. § 121.201, NAICS code 517110.

Federal Communications Commission                                        FCC 14-190

previous category that operated for the entire year.[188]  Of this total, 939 firms had employment of 999 or fewer employees, and 16 firms had employment of 1000 employees or more.[189]  Thus, under this size standard, the majority of firms can be considered small and may be affected by rules adopted pursuant to the Order.

        60.    **Cable Companies and Systems**.  The Commission has developed its own small business size standards, for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[190]  Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[191]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[192]  Industry data indicate that, of 7,208 systems nationwide, 6,139 systems have under 10,000 subscribers, and an additional 379 systems have 10,000-19,999 subscribers.[193]  Thus, under this second size standard, most cable systems are small and may be affected by rules adopted pursuant to the Order.

        61.    **Cable System Operators**.  The Act also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[194]  The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[195]  Industry data indicate that, of 1,076 cable operators nationwide, all but ten are small under this size standard.[196]  We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[197] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

---

[188] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, Employment Size of Firms for the United States: 2007, NAICS code 5171102 (issued Nov. 2010).

[189] *See id*.

[190] *See* 47 C.F.R. § 76.901(e).  The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues.  *See Implementation of Sections of the 1992 Cable Television Consumer Protection and Competition Act: Rate Regulation*, MM Docket Nos. 92-266, 93-215, Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393, 7408 para. 28 (1995).

[191] These data are derived from R.R. BOWKER, BROADCASTING & CABLE YEARBOOK 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); WARREN COMMUNICATIONS NEWS, TELEVISION & CABLE FACTBOOK 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[192] *See* 47 C.F.R. § 76.901(c).

[193] WARREN COMMUNICATIONS NEWS, TELEVISION & CABLE FACTBOOK 2006, "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2005).  The data do not include 718 systems for which classifying data were not available.

[194] 47 U.S.C. § 543(m)(2); *see also* 47 C.F.R. § 76.901(f) & nn.1–3.

[195] 47 C.F.R. § 76.901(f); *see FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, 16 FCC Rcd 2225 (Cable Services Bureau 2001).

[196] These data are derived from R.R. BOWKER, BROADCASTING & CABLE YEARBOOK 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); WARREN COMMUNICATIONS NEWS, TELEVISION & CABLE FACTBOOK 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[197] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.

62.    **Open Video Services**.  The open video system ("OVS") framework was established in 1996, and is one of four statutorily recognized options for the provision of video programming services by local exchange carriers.[198]  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  Because OVS operators provide subscription services,[199] OVS falls within the SBA small business size standard covering cable services, which is "Wired Telecommunications Carriers."[200]  The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.  According to Census Bureau data for 2007, there were a total of 955 firms in this previous category that operated for the entire year.[201]  Of this total, 939 firms had employment of 999 or fewer employees, and 16 firms had employment of 1000 employees or more.[202]  Thus, under this second size standard, most cable systems are small and may be affected by rules adopted pursuant to the Order.  In addition, we note that the Commission has certified some OVS operators, with some now providing service.[203]  Broadband service providers ("BSPs") are currently the only significant holders of OVS certifications or local OVS franchises.[204]  The Commission does not have financial or employment information regarding the entities authorized to provide OVS, some of which may not yet be operational.  Thus, again, at least some of the OVS operators may qualify as small entities.

63.    **Internet Service Providers**.  Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies."[205]  The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.[206]  According to Census Bureau data for 2007, there were 3,188 firms in this category, total, that operated for the entire year.[207]  Of this total, 3144 firms had employment of 999 or fewer employees, and 44 firms had employment of 1000 employees or more.[208]  Thus, under this size standard, the majority of firms can be considered small.  In addition, according to Census Bureau data for 2007, there were a total of 396 firms

---

[198] 47 U.S.C. § 571(a)(3)-(4).  *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, MB Docket No. 06-189, Thirteenth Annual Report, 24 FCC Rcd 542, 606, para. 135 (2009) (*Thirteenth Annual Cable Competition Report*).

[199] *See* 47 U.S.C. § 573.

[200] U.S. Census Bureau, 2012 NAICS Definitions, "517110 Wired Telecommunications Carriers," http://www.census.gov/econ/isp/sampler.php?naicscode=517110&naicslevel=6.

[201] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, Employment Size of Firms for the United States: 2007, NAICS code 5171102 (issued Nov. 2010).

[202] *See id*.

[203] A list of OVS certifications may be found at http://www.fcc.gov/encyclopedia/current-filings-certification-open-video-systems.

[204] *See Thirteenth Annual Cable Competition Report*, 24 FCC Rcd at 606-07 para. 135.  BSPs are newer firms that are building state-of-the-art, facilities-based networks to provide video, voice, and data services over a single network.

[205] U.S. Census Bureau, 2012 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition), http://www.census.gov/econ/isp/sampler.php?naicscode=517110&naicslevel=6.

[206] 13 C.F.R. § 121.201, NAICS code 517110.

[207] U.S. Census Bureau, 2007 Economic Census, Subject Series:  Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 517110" (issued Nov. 2010).

[208] *See id*.

**Federal Communications Commission**                                            **FCC 14-190**

in the category Internet Service Providers (broadband) that operated for the entire year.[209]  Of this total, 394 firms had employment of 999 or fewer employees, and two firms had employment of 1000 employees or more.[210]  Consequently, we estimate that the majority of these firms are small entities that may be affected by rules adopted pursuant to the Order.

64.    **Internet Publishing and Broadcasting and Web Search Portals**.  Our action may pertain to interconnected VoIP services, which could be provided by entities that provide other services such as email, online gaming, web browsing, video conferencing, instant messaging, and other, similar IP-enabled services.  The Commission has not adopted a size standard for entities that create or provide these types of services or applications.  However, the Census Bureau has identified firms that "primarily engaged in 1) publishing and/or broadcasting content on the Internet exclusively or 2) operating Web sites that use a search engine to generate and maintain extensive databases of Internet addresses and content in an easily searchable format (and known as Web search portals)."[211]  The SBA has developed a small business size standard for this category, which is:  all such firms having 500 or fewer employees.[212]  According to Census Bureau data for 2007, there were 2,705 firms in this category that operated for the entire year.[213]  Of this total, 2,682 firms had employment of 499 or fewer employees, and 23 firms had employment of 500 employees or more.[214]  Consequently, we estimate that the majority of these firms are small entities that may be affected by rules adopted pursuant to the Order.

65.    **Data Processing, Hosting, and Related Services**.  Entities in this category "primarily … provid[e] infrastructure for hosting or data processing services."[215]  The SBA has developed a small business size standard for this category; that size standard is $25 million or less in average annual receipts.[216]  According to Census Bureau data for 2007, there were 8,060 firms in this category that operated for the entire year.[217]  Of these, 7,744 had annual receipts of under $ 24,999,999.[218]  Consequently, we estimate that the majority of these firms are small entities that may be affected by rules adopted pursuant to the Order.

66.    **All Other Information Services**.  The Census Bureau defines this industry as including "establishments primarily engaged in providing other information services (except news syndicates, libraries, archives, Internet publishing and broadcasting, and Web search portals)."[219]  Our action pertains to interconnected VoIP services, which could be provided by entities that provide other services such as email, online gaming, web browsing, video conferencing, instant messaging, and other, similar IP-enabled

---

[209] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, Employment Size of Firms for the United States: 2007, NAICS code 5171103 (issued Nov. 2010).

[210] *See id.*

[211] U.S. Census Bureau, "2012 NAICS Definitions: 519130 Internet Publishing and Broadcasting and Web Search Portals," http://www.census.gov/econ/isp/sampler.php?naicscode=519130&naicslevel=6.

[212] *See* 13 C.F.R. § 121.201, NAICS code 519130.

[213] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 519130" (issued Nov. 2010).

[214] *Id*.

[215] U.S. Census Bureau, "2012 NAICS Definitions: 518210 Data Processing, Hosting, and Related Services," http://www.census.gov/econ/isp/sampler.php?naicscode=518210&naicslevel=6.

[216] *See* 13 C.F.R. § 121.201, NAICS code 518210.

[217] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 4, "Establishment and Firm Size: Receipts Size of Firms for the United States: 2007 NAICS Code 518210" (issued Nov. 2010).

[218] *Id*.

[219] U.S. Census Bureau, "2007 NAICS Definitions:  519190 All Other Information Services", http://www.census.gov/econ/isp/sampler.php?naicscode=519190&naicslevel=6.

services.  The SBA has developed a small business size standard for this category; that size standard is $7.0 million or less in average annual receipts.[220]  According to Census Bureau data for 2007, there were 367 firms in this category that operated for the entire year.[221]  Of these, 334 had annual receipts of under $5.0 million, and an additional 11 firms had receipts of between $5 million and $9,999,999.  Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

**D.  Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

67.    In the Report and Order (Order), we amend section 54.313(a) to include a new subsection 12 that requires recipients of high-cost and/or Connect America Fund support that are subject to broadband performance obligations to submit a broadband reasonable comparability certification with their annual section 54.313 report (FCC Form 481).[222]  In that certification, support recipients must certify that the pricing of the broadband offering they are relying upon to meet their broadband performance obligation is no more than the applicable benchmark as specified in a public notice issued by the Wireline Competition Bureau, or is no more than the non-promotional prices charged for a comparable fixed wireline service in urban areas in the states or U.S. Territories where the high-cost support recipient receives support.[223]  For purposes of the latter certification, we do not require that the high-cost support recipient offer a particular rate nationwide; rather it is sufficient if for each state or U.S. Territory where the high-cost support recipient receives funding, the high-cost support recipient or another provider offers the same rate for a comparable fixed wireline service in an urban area in that state or U.S. Territory.  Recognizing that high-cost support recipients are permitted to offer a variety of broadband service offerings as long as they offer at least one standalone voice service plan and one service plan that provides broadband that meets our requirements, we only require that they make the above certification for one of their broadband service offerings that satisfies all of the Commission's requirements, including that the service be offered throughout the high-cost support recipient's supported area, or for rate-of-return carriers, be made available upon reasonable request.

68.    We conclude that requiring high-cost support recipients to make this certification will ensure that the Commission can monitor their compliance with the section 254(b) principle that "[c]onsumers in all regions of the Nation . . . should have access to telecommunications and information services that are reasonably comparable to rates charged for similar services in urban areas."[224]

69.    We require that high-cost support recipients that elect to certify that their pricing of services in rural areas is no greater than their pricing in urban areas to rely upon the non-promotional prices charged for comparable *fixed wireline* services.[225]  This certification will be included in the FCC Form 481 to be filed in 2016, addressing performance during 2015, after the requirement has received Paperwork Reduction Act (PRA) approval from the Office of Management and Budget.[226]  All parties subject to a broadband public interest requirement that file this report in 2016 will be required to make the certification, and annually thereafter.  Recipients of funding through the Phase II competitive bidding

---

[220] *See* 13 C.F.R. § 121.201, NAICS code 519190.

[221] U.S. Census Bureau, 2007 Economic Census, Subject Series: Information, Table 4, "Establishment and Firm Size: Receipts Size of Firms for the United States: 2007 NAICS Code 519190" (issued Nov. 2010).

[222] *See supra* Section VII.A.

[223] *See id.*

[224] 47 U.S.C. § 254(b); *USF/ICC Transformation Order*, 26 FCC Rcd at 17708-09, paras. 113-14.

[225] *See supra* Section VII.A.

[226] Paperwork Reduction Act of 1995, Public Law 104-13; *see* 44 U.S.C. § 3507(a).  We note that we must obtain PRA approval before any ETC will be required to file the reasonably comparable rates certification for broadband.

process must submit their first certification with the first section 54.313 annual report they are required to submit after support is authorized, and each year thereafter with their annual report.[227]

70.    In the Order, we require all price cap carriers accepting model-based support to include in the annual progress report that they submit with their section 54.313 annual reports a list of the geocoded locations to which they have newly deployed facilities capable of delivering broadband meeting the requisite requirements with Connect America support in the prior year.[228]  The list must identify which locations are located in a Phase II-funded block and which locations are located in extremely high-cost census blocks.[229]  The first list must be submitted with their July 2016 annual report, reflecting deployment status through the end of 2015.[230]  This first list should also include the geocoded locations that a price cap carrier had already built out to with service meeting the Commission's requirements before receiving Phase II support.[231]  We will also collect from price cap carriers accepting model-based support in their annual section 54.313 reports the total amount of Connect America Phase II support, if any, they used for capital expenditures in the previous calendar year.[232]  In the Order, we find that it is in the public interest to require price cap carriers accepting model-based support to provide this data on an annual basis.[233]

71.    In the Order, we also take a necessary step to ensure the most efficient use of high-cost support by reducing on a pro-rata daily basis the support of any ETC that misses certification or data submission deadlines.[234]  We recognize that despite its best efforts, an ETC may miss a deadline due to an administrative oversight but still file within a few days of the deadline, and therefore implement a one-time grace period of three days.[235]  A one-time grace period of three days achieves an appropriate balance between requiring strict compliance with our rules and providing an opportunity for ETCs that may be first time filers or that make an uncharacteristic mistake to rectify quickly an error.

72.    Given our decision to modify the support reductions for late filings, the Order announces that we otherwise require strict adherence to filing deadlines.[236]  We will cease the practice of finding there is good cause for a waiver of high-cost filing deadlines in circumstances where an ETC has missed the deadline due to an administrative or clerical oversight and where that ETC has promised to revise it procedures to ensure future compliance.[237]

73.    Lastly, we adopt specific measures in the event that certain ETCs do not meet their high-cost obligations for fixed services.[238]  Specifically, in the Order, we adopt a support reduction regime for ETCs that fail to meet their deployment obligations subsequent to accepting Connect America Phase II support.[239]  For price cap ETCs we adopt a framework for support reductions that are calibrated to the

---

[227] *See supra* Section VII.A.

[228] *See supra* Section VII.B.

[229] *See id.*

[230] *See id.*

[231] *See id.*

[232] *See id.*

[233] *See id.*

[234] *See supra* Section VII.C.

[235] *See id.*

[236] *See id.*

[237] *See id.*

[238] *See supra* Section VII.D.

[239] *See supra* Section VII.D.2.

extent of an ETC's non-compliance with these deployment milestones[240] Because rate-of-return carriers are not at this time required to build out to a certain number of locations, we conclude it is appropriate to handle matters regarding their potential non-compliance on a case-by-case basis.  Additionally, we conclude that non-compliance of the reasonable comparability requirement is best dealt with on a case-by-case basis for all ETCs that must certify that the rates they offer are reasonably comparable.[241]  We find that it would not be appropriate to apply a uniform support reduction to all ETCs that fail to offer reasonably comparable prices.[242]

###### E.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

74.    The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others: (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[243]

75.    The rules that we adopt in the Report and Order provide flexibility in meeting the public interest obligations that are a condition of the receipt of high-cost support for those price cap carriers accepting the offer of model-based support, we adopt targeted adjustments to the framework established by the Commission in the *USF/ICC Transformation Order* to provide carriers flexibility.  Specifically, we adopt evenly spaced annual interim milestones for price cap carriers to offer at least 10/1 Mbps to an additional 20 percent of the requisite number of high-cost locations each year.[244]  We also modify the build-out requirements established for price cap carriers accepting model-based support to create evenly spaced annual interim milestones.  We require price cap carriers accepting model-based support to complete construction to 40 percent of the requisite number of locations in a state by the end of calendar year 2017, instead of 85 percent by the mid-2018, which is a more realistic expectation, given that carriers will not accept the offer of support until mid-year in 2015 and then will be developing detailed network construction plans.[245]  We also will permit a modest adjustment to the number of model-determined funded locations in a given state with a corresponding reduction in support.[246]  We expect the flexibility in deployment for price-cap carriers accepting model-based Phase II support will minimize the economic impact on small entities.

76.    Additionally, as the Commission did in 2011, we continue to offer a more flexible approach to deploying broadband for rate-of-return carriers.  Rate-of-return carriers are only required to meet the higher speed if the request for service is reasonable – meaning that the carrier could cost effectively extend voice and broadband-capable network to that location, given its anticipated end-user revenues and other sources of support.[247]  Rate-of-return carriers will be required to offer at least 10/1 Mbps broadband service upon reasonable request, consistent with past guidance regarding our expectations regarding the reasonable request standard.[248]  If a request for 10/1 Mbps is not reasonable in

---

[240] *See id.*

[241] *See id.*

[242] *See id.*

[243] 5 U.S.C. § 603.

[244] *See supra* Section III.C.

[245] *See id.*

[246] *See supra* Section III.E.

[247] *See id.*

[248] *See* Section III.A.

a given circumstance, but offering 4/1 Mbps is reasonable, we would expect a rate-of-return carrier to offer 4/1 Mbps.[249]

77.      We also conclude, based on our consideration of the relevant statutory framework and the record before us, that it is in the public interest to forbear from enforcing a federal high-cost requirement that price cap carriers offer voice telephony service throughout their service areas pursuant to section 214(e)(1)(A) of the Act in three types of geographic areas: (1) census blocks that are determined to be low-cost, (2) census blocks served by an unsubsidized competitor, and (3) census blocks where a subsidized competitor – i.e., another ETC – is receiving federal high-cost support to deploy modern networks capable of providing voice and broadband to fixed locations.[250]  We find that limited forbearance from section 214(e)(1)(A) will promote competitive market conditions by giving affected carriers the flexibility to compete on a more equal regulatory footing in the voice telephony market with competitors that already have the opportunity to make decisions about how best to offer voice telephone service.

78.      For those price cap carriers serving non-contiguous areas that elect to continue receiving frozen support amounts in lieu of the offer of model-based support, we recognize that such carriers face unique circumstances in the areas they serve and experience different challenges in deploying broadband service in those areas.  Consequently, a "one-size-fits-all" approach would leave some of these carriers potentially unable to fulfill their service obligations.  We are confident that tailoring specific service obligations to the individual circumstances of each non-contiguous carrier that elects to continue receiving frozen support will best ensure that Connect America funding is put to the best possible use.[251]

79.      We institute a broadband reasonably comparable rate certification on all ETCs that receive ongoing high-cost support in areas served by price cap carriers and rate-of-return carriers.[252]  Although the Commission notes that filing deadlines will be strictly enforced, we adjust the reduction of support for all ETCs, including small entities, and provide a grace period to ensure it is not unduly punitive given the nature of non-compliance.[253]

80.      We also adopt specific measures that the Wireline Competition Bureau will take in the event that certain ETCs do not meet their high-cost support deployment obligations for fixed services or does not offer rates that are reasonably comparable to rates offered in urban areas.[254]  The reductions represent a detailed calculus to ensure that no carrier is penalized inappropriately on its non-compliance.  As such, price cap ETC support reductions scale with the extent of an ETC's non-compliance, and create incentives for ETCs to come into compliance as soon as possible.[255]  For rate-of-return ETCs, given that their obligation is to provide voice and broadband service upon reasonable request and we do not have sufficient experience to create specific deployment milestones, we find it appropriate to handle matters regarding their potential non-compliance on a case-by-case basis.[256]  Additionally, determined that non-compliance with the reasonable comparability requirement is best dealt with on a case-by-case basis for all ETCs because of the variety of factors that go into determining whether prices are reasonably

---

[249] *See id.*

[250] *See id.*

[251] *See supra* Section III.D.

[252] *See supra* Section VII.A.

[253] *See supra* Section VII.C.

[254] *See supra* Section VII.D.

[255] *See id.*

[256] *See id.*

comparable.[257]  Accordingly, we determined that it would not be appropriate to apply a uniform support reduction to all ETCs that fail to offer reasonably comparable prices.[258]

## F.    Report to Congress

81.     The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Small Business Regulatory Enforcement Fairness Act of 1996.[259]  In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the Report and Order and FRA (or summaries thereof) will also be published in the Federal Register.[260]

---

[257] *See id.*

[258] *See id.*

[259] 5 U.S.C. § 801(a)(1)(A).

[260] *See id.* § 604(b).

Federal Communications Commission                    FCC 14-190

## STATEMENT OF
## CHAIRMAN TOM WHEELER

Re:     *Connect America Fund*, WC Docket No. 10-90,  *ETC Annual Reports and Certifications*, WC
        Docket No. 14-58, *Petition of USTelecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from
        Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next-Generation Networks*,
        WC Docket No. 14-192.

Universal service has been at the core of the FCC's mission since this agency was established 80 years ago. But in the 21st century, our nation needs universal broadband networks to continue to compete on the world stage. The Commission's 2011 *Transformation Order* was a key milestone in updating the Commission's work for the Internet age. The Commission took an outdated program designed to deliver voice service to rural America and replaced it with the Connect America Fund, a program designed to help support the deployment of state-of-the-art voice and broadband networks throughout the United States.

Already, Phase I of the Connect America Fund has helped support the deployment of broadband to 1.6 million previously unserved Americans. The long-term success of the Connect America Fund will be measured not just by the number of newly-served Americans, but by the quality of the networks that are being deployed.

Today's Order put us on the path to potentially bring broadband networks and services to over 5 million rural Americans. In particular, the Order will increase the minimum speed required as a condition of high-cost support to 10 Mbps/1 Mbps. The framework adopted by the Commission in 2011 established 4 Mbps download speeds as the standard for support, but expressly anticipated that a higher minimum speed standard would be necessary in the future to provide an evolving level of universal service. Just three years later, that standard already needs an upgrade. Four megabits per second isn't adequate when a single HD video delivered to a home or classroom requires 5 Mbps of capacity.

In addition, we have a statutory responsibility to ensure that the baseline for urban connectivity and rural connectivity is reasonably comparable. According to recent data, 99% of Americans living in urban areas have access to fixed broadband speeds of 10 Mbps/1 Mbps, and 52% of Americans have adopted broadband with speeds of at least 10 Mbps/1 Mbps. We can't connect millions in rural America who have been bypassed by the Internet revolution for too long and then offer them a second-rate online experience.

Given that we are requiring broadband providers to build networks capable of higher speeds, the Order makes modest adjustments to other aspects of the program. For example, we increase the duration of support for "price-cap" carriers accepting model-based support from five to six years, with the option for a seventh year of support as we transition to Phase III when all support in price-cap territories will be awarded through competitive bidding. And we are providing increased flexibility in the build-out requirement. The net result of these adjustments is strong, enforceable obligations to deploy robust broadband for any price cap carrier that accepts model-based support.

Finally, we are also modifying the rate-of-return funding mechanism as a short-term measure to replace the benchmarks the Commission eliminated earlier this year. The changes adopted today will distribute traditional universal service support for small carriers more equitably and curb waste, as we work to develop a long-term, forward-looking reform plan.

Bottom line, today's Order takes significant steps towards ensuring that our Connect America Fund program connects the millions of rural Americans to 21st century broadband networks. It's time to move forward with Phase II.

**STATEMENT OF**
**COMMISSIONER MIGNON L. CLYBURN,**
**APPROVING IN PART AND DISSENTING IN PART**

Re:   *Connect America Fund*, WC Docket No. 10-90, *ETC Annual Reports and Certifications*, WC
      Docket No. 14-58, *Petition of US Telecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from
      Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next Generation Networks*,
      WC Docket No. 14-192.

In Audrey Niffenegger's debut novel *The Time Traveler's Wife,* Clare expresses her frustration
about waiting by saying: "It's hard being left behind… It's hard being the one who stays."

For too many in rural America, the long wait for broadband is not only hampering their ability to
improve their daily lives, it is curbing the best hope these communities have to be competitive.  This is
why we have set such an ambitious goal for universal broadband access and remain steadfast in our vision
of closing these gaps.

In 2011, I was proud to cast a vote approving comprehensive reforms of our universal service and
intercarrier compensation regimes, which put this country firmly on a path to narrow these divides.  I
must admit that when I voted to approve these reforms in 2011, I had hoped we would have made further
progress.  Despite the hard work of a diligent, dedicated team, things have taken a bit longer than first
anticipated.

Instead of lamenting, however, the Commission has used this lapse of time most efficiently by
approving funding to connect unserved areas and by making adjustments based on lessons learned and the
changes the industry.

So just what has happened over the past three years?  We have authorized funding, to serve over
630,000 locations, or approximately 1.65 million people, in 45 states, plus Puerto Rico, with fixed
broadband for the very first time, provided mobile coverage over tens of thousands of road miles, and
connected over 50,000 people living on Tribal lands, with access to mobile broadband.

And we are not resting because there is more to do to connect the millions who still lack access.
Broadband has the potential to change and improve the daily lives of these Americans, from education,
healthcare, economic empowerment to civic engagement, may be life changing.  And that is why I am so
pleased that today's item takes some final steps to implement the Phase II framework from the 2011
*USF/ICC Transformation Order*.

One key area warranting another look is speed.  Remember, the *USF/ICC Transformation Order*
called on us to reevaluate speeds periodically. While 4 Mbps may have been reasonable in 2011, it is clear
that this level is too slow for consideration now and in the foreseeable future.  If our goal remains for
rural areas to have services reasonably comparable to urban areas, it is important for us to aim for speeds
of 10 Mbps and beyond.

We have also had the opportunity to approve $100 million for rural broadband experiments to
assess interest in serving unserved areas, and to help inform the competitive bidding auction.  The process
shows the benefit of conducting experiments and learning lessons before investing upwards of $1.8
billion over 10 years.  Provisional winners were announced last week.  I'm pleased that the non-winning
bidders that proposed to construct networks that provide 100 Mbps will have the opportunity to submit
financial and technical information certified by an engineering firm to have these areas excluded from the
right of first refusal.  As we know, and hear Chairman Wheeler reiterate often, competition more often
than not, drives the best prices and services, and could bring about long-term savings, to the universal
service program

I am also pleased that the item addresses the so called "cliff effect" with the current rules for rate
of return carriers receiving high cost loop support or HCLS.  The *USF/ICC Transformation Order*
recognized the perverse incentives this rules creates by enabling only the companies with the highest cost

to receive support, while carriers that invest more incrementally with lower costs left with no support. While this is an important step, the FCC must move forward with permanent reforms for the rate of return carriers that incentivize and reward efficiency, while providing a predictable path for investment.

As I said when the Commission adopted the *USF/ICC Transformation Order*, this is a marathon, not a sprint, and while the progress we are making today will put us ever so close to the finish line, we have more work to do including implementation of the Mobility Fund. I hope to be able to vote on a final Order that adopts the final parameters of the Mobility Fund soon.

While I endorse this item in many respects, there is one aspect that I cannot support.

I believe forbearance from eligible telecommunications carrier (ETC) obligations is premature until incumbent LECs no longer receive the benefits of implicit and explicit subsidies due to their legacy status and we complete reforms to the section 214(a) discontinuance process.

In addition to receiving high cost support including frozen support, and, for some, Connect America Fund-Intercarrier Compensation (ICC) support, incumbents continue to receive implicit subsidies from intercarrier compensation. These are subsidies that the FCC has found were created to recover the costs of the local network to achieve the goal of universal service.[1] The *USF/ICC Transformation Order,* adopted an end point of bill-and-keep for all traffic but did not phase down originating access nor reduce all terminating access charges. Incumbent LECs have had the benefit of these implicit subsidies to recover the costs of building and maintaining their networks long before competitive ETCs existed. Indeed, the difference between incumbent LECs and competitive LECs is part of the reason that only incumbent LECs are eligible to receive explicit support from the FCC's intercarrier compensation recovery mechanism to transition away from these revenues. Incumbents therefore continue to receive such subsidies and will continue to do so in the future, until the FCC completes the transition to bill-and-keep for all traffic. Until such time, these providers continue to receive implicit subsidies as they have for decades, which are designed to further our universal service objectives.

More specifically, the item forbears from ETC obligations for price cap incumbent LECs in three broad areas: (1) census blocks that the cost model determines are "low cost"; (2) census blocks served by an unsubsidized competitor; and (3) census blocks where another ETC receives support likely due to winning the competitive bidding process. I'm particularly concerned about forbearance in areas, where the cost model considers a census block to be "low cost." For one, granting forbearance from this category puts an incredible amount of faith that the cost model's projection that these are in fact low cost areas is accurate. It also potentially puts in jeopardy, the ability consumers in these areas, to have basic voice service from their incumbent provider.

In the spirit of compromise, I proposed modifying forbearance to census blocks where an (1) unsubsidized competitor exists or (2) where a subsidized ETC competitor wins the area in the competitive bidding process. Given the substantial overlap between areas served by unsubsidized competitors and "low cost" areas, the difference between my proposal and the forbearance in item is small. The item

---

[1] *See Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support; Developing a Unified Intercarrier Compensation Regime; Federal-State Joint Board on Universal Service; Lifeline and Link-Up*; WC Docket Nos. 10-90, 07-135, 05-337, 03-109, CC Docket Nos. 01-92, 96-45, GN Docket No. 09-51, Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554, para 45 (2011) (USF/ICC Transformation NPRM) ("Intercarrier compensation and universal service have long been intertwined. Historically, both universal service policies and intercarrier compensation policies worked in tandem to enable companies to provide affordable local phone service to residential consumers"); *see also id.* at 48 ("The access charge rules enabled local carriers to recover their historical costs, including common network costs and overhead, from long distance carriers. These intercarrier payments were one means by which local telephone companies were able to keep residential rates low by recovering some of their network costs from other carriers rather than the telephone companies' own customers.")

indicates that "over 90%" of locations have access to a cable provider.  But, this still means that a number of consumers lack such access and have only one option even for basic voice service – the incumbent provider.  I am concerned about what happens to these customers, they should not be left behind.

In other words, my compromise would have granted forbearance to all areas where consumers have an alternative option. This would have granted forbearance to the vast majority of the country since cable providers offer broadband to nearly 90% of the entire population.  Given that the item forbears from low cost areas and leaves certain customers with no alternative provider, I do not see how the item can conclude that forbearance does not harm those customers or that forbearance is in the public interest.

To be fair, the forbearance analysis relies heavily on the section 214(a) process to ensure consumers are protected and the public interest is not harmed.  This is cold comfort to me.  In last month's *Technology Transition NPRM and Declaratory Ruling*, the Commission sought comment on changes to the section 214(a) process to ensure that consumers are protected and have adequate substitutes, and that discontinuance does not harm competition.  I fear it is premature to rely on section 214(a) until such process is reformed.

I am also concerned about the ability to administer the forbearance because incumbents will have ETC obligations in some areas of a study area but not others.  Who has oversight over these obligations? How do we confirm that they are satisfying obligations their ETC obligations in areas without forbearance?  The item leaves these questions unanswered, which I find troubling.

Finally, while I am concerned about the potential pressure the decision will place on states as carriers use forbearance as a means to avoid state oversight, I appreciate the clarification that forbearance does not preempt state carrier of last resort obligations.

So, in sum, I am pleased to support the vast majority of this item but I respectfully dissent from the forbearance analysis.

I want to thank the dedicated staff of the Wireline Competition Bureau and Office of Strategic Planning & Policy Analysis for their work on this item.

**Federal Communications Commission**                                      **FCC 14-190**

## STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL

Re:     *Connect America Fund*, WC Docket No. 10-90, *ETC Annual Reports and Certifications*, WC Docket No. 14-58, *Petition of US Telecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next Generation Networks*, WC Docket No. 14-192.

Universal service is a cherished principle in communications.  After all, it was back in 1934 when Congress first directed the Federal Communications Commission to make "communications by wire and radio" available "so far as possible, to all the people of the United States."  And it was Congress who expanded on this notion by adding new principles to guide universal service policy in 1996.  As a result, the duty to preserve and advance universal service is the law of the land.

The law also now requires the Commission to ensure that universal service evolves over time.  I believe this is what our Report and Order does today.  To keep up with changes in the broadband marketplace, we revise our speed requirement for recipients of high-cost support to a minimum of 10 Megabits downstream.

I support this change and the many others we make here today.  But I am mindful that as we seek to evolve universal service policy we can also create more complexity and uncertainty for broadband providers.  Building networks takes time—and is not easy in our least populated communities.  So I am pleased that in today's Report and Order we make some adjustments to the framework for the offer of model-based support for price cap carriers.

Going forward, as we implement further universal service reforms, I hope we put a premium on crafting rules in ways that reduce complexity and uncertainty.  Because if we do this right, we will connect America by providing better broadband and wireless service in rural America.

## STATEMENT OF
## COMMISSIONER AJIT PAI,
## APPROVING IN PART AND DISSENTING IN PART

Re:     *Connect America Fund*, WC Docket No. 10-90, *ETC Annual Reports and Certifications*, WC
        Docket No. 14-58, *Petition of USTelecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from
        Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next-Generation Networks*,
        WC Docket No. 14-192.

Having grown up in rural Kansas, I know what it's like to wait for your hometown to catch up
with urban America.  In the 1980s, small towns were waiting for cable.  In the 1990s, we waited for an
Olive Garden.  In the 2000s, we waited for good cellphone service.  And today, it's all about broadband.

Three years ago, the FCC told rural Americans they could stop waiting.  The Commission's
*Universal Service Transformation Order* created the Connect America Fund Phase II, which we
anticipated would start paying for new broadband connections to unserved areas by January 1, 2013.[1]
Almost two years later, we're finally launching that project.  I wish we would have done so sooner—rural
families and small businesses have already waited too long—but I'm glad nonetheless that we're finally
getting something done.

However, I cannot support every aspect of today's decision because I fear that we are going to
leave many communities without broadband for the foreseeable future.  Incentivizing wireline broadband
providers to deploy service deep into the unserved countryside requires a balancing act, one that the
*Universal Service Transformation Order* performed admirably.

Yet today's *Order* disrupts that balance.  Specifically, it raises the speed benchmark to 10
Mbps—the right call in my book—but then largely ignores that this change roughly doubles the expected
costs of deployment.[2]  An appropriate counterweight would have been increasing the term of support
from 5 years to 10, but the *Order* only increases it marginally, to 6.  This imbalance needlessly risks
tipping the scales against deployment, which may strand millions of Americans in broadband dead zones
for years to come.

An impressive bipartisan chorus in Congress has sung this same refrain.  Sixty-four Members of
Congress, including almost a quarter of the Senate, have written the FCC, concerned that our
implementation of the Connect America Fund won't be sufficient to ensure universal broadband
deployment.  Among the many examples:

- Senator Roy Blunt wrote asking us to "heed the advice of local communities and
  stakeholders" and to adopt a "10 year funding period to allow adequate time for
  construction."[3]
- Senator Bill Nelson asked that we consider "extending the CAF II funding period . . .
  from the current 5 years to 10 years to allow adequate time for the construction of higher-
  capacity networks."[4]
- Senators Maria Cantwell and Patty Murray wrote that we "must" do so.[5]

---

[1] *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order and Further Notice of Proposed
Rulemaking, 26 FCC Rcd 17663, 17725, para. 157 (2011).

[2] Letter from Jonathan Banks, Senior Vice President, USTelecom, to Marlene Dortch, Secretary, FCC, WC Docket
No. 10-90, at 4–9 (filed Nov. 13, 2014).  Notably, the *Order* does not dispute this fact but responds with the
irrelevant (but indeed irrefutable) point that costs "vary by carrier."  *Order* at para. 22.

[3] Letter from Roy Blunt, U.S. Senator, to the Honorable Tom Wheeler, Chairman, FCC (Sept. 3, 2014).

[4] Letter from Bill Nelson, U.S. Senator, to the Honorable Tom Wheeler, Chairman, FCC (Aug. 29, 2014).

**Federal Communications Commission**                                    **FCC 14-190**

- Senators Ron Johnson and Tammy Baldwin reminded us that "if the Commission more than doubles the speed requirements without allowing the appropriate level of flexibility in other elements of CAF II, the program's overall mission could be endangered," and then asked us to "extend[] the term of support up to ten years."[6]
- The Wyoming congressional delegation wrote that "thousands of rural communities are now counting on CAF II" and asks that we take to heart the idea of "extending the term of support up to ten years."[7]

At a time when most Americans don't think politicians in Washington can agree on anything of significance, it's remarkable to see a legislative consensus on broadband deployment that reflects such political and geographic diversity. But rather than heed this wise counsel from our nation's elected representatives, the FCC goes its own way with little in the way of evidence to support its decision.

In an effort to find common ground, I offered to support a modest extension of the term of support to 8 years. There was bipartisan support for it; I thank Commissioner Rosenworcel for her backing and advocacy. But unfortunately, we fell one vote short.

In the end, I hope that I am wrong. I hope that carriers will seize upon all of the opportunities available to deploy broadband to the farthest reaches of our nation under the Connect America Fund. But because the *Order* doesn't take the steps necessary to secure that potential, I cannot support it in full. I accordingly approve in part and dissent in part.

(Continued from previous page) ——————————————
[5] Letter from Maria Cantwell, U.S. Senator, Patty Murray, U.S. Senator, Adam Smith, U.S. Representative, Rick Larsen, U.S. Representative, Suzan DelBene, U.S. Representative, Denny Heck, U.S. Representative, and Derek Kilmer, U.S. Representative, to the Honorable Tom Wheeler, Chairman, FCC (Oct. 3, 2014).

[6] Letter from Ron Johnson, U.S. Senator, and Tammy Baldwin, U.S. Senator, to the Honorable Tom Wheeler, Chairman, FCC (Nov. 13, 2014).

[7] Letter from Michael B. Enzi, U.S. Senator, John Barrasso, M.D., U.S. Senator, Cynthia Lummis, U.S. Representative, to the Honorable Tom Wheeler, Chairman, FCC (July 31, 2014).

Federal Communications Commission                              FCC 14-190

CONCURRING STATEMENT OF
COMMISSIONER MICHAEL O'RIELLY

Re:      *Connect America Fund*, WC Docket No. 10-90, *ETC Annual Reports and Certifications*, WC
         Docket No. 14-58, *Petition of USTelecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from
         Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next-Generation Networks*,
         WC Docket No. 14-192.

Today the Commission chooses to trade faster deployment to all for marginally higher-speed
broadband for some. The reason I can concur with this item is that the Chairman and staff were willing to
work with me to make improvements to promote faster deployment to some unserved consumers, and the
Commission will be providing carriers at least some ETC relief in areas that are low-cost or are served by
certain other providers.

To be clear, I support higher speeds for all Americans. I do believe that if we had stuck to the
path set forth in 2011, we would have gotten basic 4/1 broadband service to the maximum number of
unserved Americans, while also increasing speeds for others in the process. That's because deploying 4/1
to more remote areas would mean higher speeds in areas passed. Moreover, the reality is that anyone
that's deploying in unserved areas these days won't be installing copper. And we would have done all of
that within 5 years. We also would have opened more areas to a Phase III competitive bidding process
sooner, which could have meant even better speeds, lower costs to the Fund, or even both.

Instead, consumers will now have to wait longer to get service and, at the end of that timeline,
they will only be guaranteed speeds of 10/1. And that's just the lucky ones that don't fall within the
territory that carriers can choose to write off altogether. I'm also worried that providers that might have
been interested in competing for funding in three years, if we had stuck to the original plan, will decide
that the fix is in and won't bother to show up for an auction that we claim will happen in five years.

It is true that some incumbents will turn down the not-so-statewide commitment in some places
and those areas will go to auction sooner, opening those areas to competing providers. But rethinking
CAF Phase II and the resulting delays have muddied that path as well. Supposedly, that auction will be
held in 2016. But I am skeptical that the Commission can pull that off given the amount of work and
Commission resources needed to complete the incentive auction now scheduled for that time. Moreover,
once we do get around to the post-ROFR auction, the winning bidders will have a full 10 years to
complete their deployment. So unserved consumers in those areas might not get service until 2026. That
is just laughable.

Moreover, I've seen no evidence of any work on the Remote Areas Fund – the backstop to
provide service in areas that aren't claimed by the incumbents or at auction. There is no reason that we
cannot start to work on the RAF and have a framework ready for when we know the specific areas. If we
don't plan ahead, we could use up all of the funding in lower cost areas, jeopardizing service in these
hardest to reach areas.

For those who think that this is much ado about nothing, I present the attached map of price cap
areas. If you can't see the key, the dark green portions are areas that were initially eligible for Phase II
support at the start of the challenge process because there were no unsubsidized competitors in those areas
offering service of at least 3/768. Many of those areas are unserved by incumbents as well. The dark red
are the extremely high-cost areas that are most likely to end up in the RAF after the post-ROFR auction.
That's a lot of areas – and a lot of consumers – particularly west of the Mississippi.

To sum up my concerns, based on the rules adopted today, we hope that Americans that live in
those dark green areas will be served within 6 to 10 years from now, but for many it will only be at 10/1.
Think about what 10/1 is going to seem like at that time. For those dark red areas, all we can say is that
we plan to have a plan. For them, forget about debates about fast lanes or slow lanes; they have no lanes.

**Federal Communications Commission**                    **FCC 14-190**

Even with these serious shortcomings, I suggested improvements, as I routinely do, in the hopes that engaging will mean that an item at least doesn't get any worse. And that was a real possibility here as carriers may not have received ETC relief in areas that are low cost or served by certain other providers. I am also pleased that the order now includes incentives for carriers to identify upfront areas encompassing at least 2 percent out of the 5 percent of the locations that they are no longer required to serve so that, rather than stranding consumers in those areas for the duration of CAF Phase II, they could potentially be served by another provider. Similarly, the order now makes clear that there must be deployment to truly unserved areas even in the early years of the term.

Sadly, a number of my edits were still rejected. Top of the list: the item ignores my repeated calls for an overall cap on USF, on the argument that this isn't the place to do it although it is the same argument made on every USF item we have considered.

On balance, however, and in light of the accommodations that were made, I am able to concur with the order. I thank the staff for their hard work.

PRICE CAP AREAS MAP

